# EXHIBIT 1

# In the Matter Of:

## GODFREY vs CSAA

5:19-CV-329G

# RUSSELL GODFREY

*December 09, 2019*



ESQUIRE DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

1   A   Yes.
2   Q   And we'll get into the issues on that claim
3   later.  How did you come to hire Butler to put the
4   roof on?
5   A   A friend of mine worked for him.
6   Q   Do you remember the name of your friend?
7   A   Brian Nixon.
8   Q   Were you happy with the work that they did?
9   A   Yeah.
10  Q   Okay.  Has -- other than the claims that
11  you already referred to and the repairs made with
12  regard to those claims, have you had any other work
13  done on your roof?
14  A   No.
15  Q   So this roof is seven years old?
16  A   Right.
17  Q   And what was the -- when Butler installed
18  the roof, did they tell you what the life expectancy
19  of that roof would be?
20  A   No.
21  Q   You would expect a roof to experience some
22  wear and tear over the course of seven years;
23  correct?
24  A   Well, yeah.  It's outside.
25  Q   Yeah.  And a seven-year roof isn't as good



1    as a brand-new roof; correct?
2        A    Yeah.  I would say so.
3        Q    Okay.  So can you tell me about the day of
4    the storm that is the subject of this lawsuit?
5        A    Well, we had -- it was just a bad storm.
6    And that year we had a lot of ice and wind and, you
7    know, rain.  We never had problems since we've had
8    the new roof put on, and it started leaking.
9        Q    Can you take me through that day?
10       A    Well, we just noticed water coming into the
11   house.
12       Q    Okay.  When did you notice the water?
13       A    We got up that morning and I came down the
14   stairs and I slipped in it.
15       Q    Okay.
16       A    The bottom of the stairs -- because it's a
17   marble floor.
18       Q    Okay.
19       A    It was slick.  We wasn't expecting it.  And
20   then there's a long hallway with kind of a parapet
21   section and it was just pouring down through that.
22       Q    Okay.  Like from the ceiling or down the
23   wall?
24       A    Well, both.  It was coming along the sides
25   of the wall and then in the parapet where the stairs



```
 1      Q    All right.  After Allen Lippoldt became
 2   involved, did you speak to Triple A again?  Or did
 3   you just leave it to Allen Lippoldt?
 4      A    I think I just left it with him.  But
 5   again, you know, I can't --
 6      Q    After Allen Lippoldt became involved, did
 7   you allow Allen to speak for you --
 8      A    Yes.
 9      Q    -- with Triple A?
10           MR. GIVENS:  Object to the form.
11           THE WITNESS:  Yes.
12      Q    (By Ms. Kane)  Was Allen speaking on your
13   behalf to Triple A?
14           MR. GIVENS:  Object to the form.
15           THE WITNESS:  He was speaking to Triple
16   A to help get the claim paid.
17      Q    (By Ms. Kane)  Did you give him permission
18   to tell Triple A what you were thinking?
19           MR. GIVENS:  Objection.
20           THE WITNESS:  I don't remember anything
21   about that.
22      Q    (By Ms. Kane)  Okay.
23      A    I was just trying to get the roof fixed.
24   To get the insurance company to pay for the claim.
25      Q    And you authorized him through your
```



1  relationship with Ultimate to contact the insurance
2  company?
3              MR. GIVENS:  Objection to form.
4              THE WITNESS:  He worked for them.
5      Q   (By Ms. Kane)  Was it your understanding
6  Ultimate Roofing would be contacting the insurance
7  company for you on this claim?
8      A   Yeah.  Allen Lippoldt, yes.
9      Q   Okay.  So when they -- when Ultimate
10 Roofing contacted Triple A, they were doing that for
11 you in order to facilitate the claim?
12     A   Yes.
13     Q   Okay.  So if he said something good on your
14 side to support your position, you would be bound by
15 that to Triple A?
16             MR. GIVENS:  Object to the form.
17             THE WITNESS:  If he said something
18 good?
19     Q   (By Ms. Kane)  If he was supporting your
20 position about the claim when he spoke to Triple A,
21 you would be bound by that?
22             MR. GIVENS:  Object to the form.
23             THE WITNESS:  He would be bound by?
24     Q   (By Ms. Kane)  If he said -- if he
25 supported your position that this roof damage was



```
 1      Q   Okay.  So you already said that the roof is
 2   completely repaired now?
 3      A   Yes.
 4      Q   You've asserted a bad faith claim against
 5   Triple A; correct?
 6      A   Yes.
 7      Q   What does bad faith mean to you?
 8      A   Well, just that they were -- they were
 9   negligent.  They had facts, pictures, people out
10   there on the roof that told them that damage was
11   caused by the storm and they denied the claim for --
12   I don't know why.
13      Q   So on what facts do you base your
14   contention that Triple A committed bad faith?
15      A   They had their report from the adjuster
16   that said it was damaged in the storm.
17      Q   So how is Triple A unreasonable, in your
18   own words?
19      A   They didn't -- they had their own expert
20   out there that was on site that said -- in my own
21   living room, said that it should be paid.  The claim
22   was caused by the storm.
23      Q   I'm sorry.  I just want to clarify.  By
24   "their own expert," who are you referring to?
25      A   The adjuster that came to the house.
```



800.211.DEPO (3376)
EsquireSolutions.com

```
1        A    Okay.
2        Q    I was going to ask you what that receipt
3   was referring to.
4        A    I'm sure --
5        Q    Was it this claim or a previous claim?
6        A    I'm sure that's the furniture that was
7   damaged.
8        Q    Okay.  So it was purchased in 2007?
9        A    Okay.
10       Q    So those dressers would be 15 years old?
11       A    (Nods head.)
12       Q    No.  Not 15.  11 years old at the time of
13  the damage; correct?
14       A    Uh-huh.
15       Q    Okay.  Are you claiming -- so that receipt
16  was for a whole bedroom suite.  A king bed, dresser,
17  nightstand and a mirror.  Are you claiming any
18  damage to the rest of those pieces?
19       A    No.  They weren't in that area.
20       Q    Did you suffer any other financial losses
21  that were separate and apart from the benefits you
22  claim are owed under the contract?
23       A    No.
24       Q    Any financial damages specific to the
25  handling of the claim, other than repairs to the
```



```
 1   roof?
 2        A    Other financial damages?
 3        Q    Financial damages.
 4        A    No.  Just having to take out the loan and
 5   stuff.
 6        Q    No loss of income?
 7        A    No.
 8        Q    Are you claiming that you have suffered
 9   emotional distress from Triple A's handling of your
10   claim?
11        A    Yeah.  But there is no, like, doctor bills
12   or anything.
13        Q    Well, can you describe the emotional
14   distress?
15        A    You pay insurance to -- we're both just --
16   they wouldn't pay it.  And then every time it
17   rained, it just kept coming in.  It was very
18   upsetting.
19        Q    Did the distress interfere with your daily
20   function?
21        A    No.  Other than to come home when it rained
22   to put buckets out and towels down.  It did somewhat
23   when it rained.  It was raining quite often back
24   then, if I recall.
25        Q    Right.  So you just stated -- I want to
```



1  make it clear for the record.  Did you seek any
2  counseling, therapy, or speak to any clergy,
3  therapist or doctor?
4      A   No.
5      Q   Are you claiming any mental pain and
6  suffering?
7      A   No.
8          MR. GIVENS:  Object to the form.
9      Q   (By Ms. Kane)  Have you ever had to go to
10 counseling for anything?
11     A   No.
12     Q   So would you agree that water entering your
13 home in and of itself is stressful?
14     A   Yes.
15     Q   Okay.  And the whole process is not
16 something anybody would ever want to do if they had
17 a choice?
18     A   No.
19     Q   Would you agree that no one would want to
20 have to deal with water leaking in their home?
21     A   Yes.
22     Q   And I understand that you are not happy
23 with the way this claim was handled, but you're
24 always going to be put out in some way in a
25 situation where a roof is leaking.



```
 1      A    Uh-huh.
 2      Q    Do you agree?
 3      A    Yes.
 4      Q    Okay.  Are you claiming you suffered
 5   embarrassment?
 6      A    No.
 7      Q    Are you claiming a loss of reputation?
 8      A    No.
 9      Q    Are you claiming that Triple A breached
10   their contract with you?
11      A    Yes.
12      Q    And how do you think that they breached
13   their contract with you?
14      A    They didn't pay our claim when they had
15   previously done so.
16      Q    What damages are you seeking for the breach
17   of contract claim?
18      A    Just whatever the attorneys are
19   recommending.
20      Q    Well, what are you claiming?
21      A    What am I claiming?
22      Q    Right.  What damages are you claiming for a
23   breach of contract?  What do you think the damages
24   of the breach of contract are?
25      A    I'll let the attorneys decide that.  I
```

