# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   RUSS GODFREY, and
     NATALIE GODFREY,
 5
                     Plaintiffs,
 6
     vs.                        Case No. 5:19-cv-329 G
 7
     CSAA FIRE & CASUALTY
 8   INSURANCE COMPANY,

 9                   Defendant.

10

11

12        VIDEOTAPED DEPOSITION OF MARK S. COSTELLO

13              Friday, December 13, 2019

14                    9:33 a.m.

15

16         2300 West Sahara Avenue, Suite 770

17                 Las Vegas, Nevada

18

19

20

21

22

23

24

25   Reported by:  Allyson W. Harris, NV CCR #740
```

Page 2

1  APPEARANCES:

2  For Plaintiffs:

3      KEITH F. GIVENS, ESQUIRE
       MANSELL, ENGEL & COLE
4      21st Floor
       204 North Robinson Avenue
5      Oklahoma City, Oklahoma 73102
       405.232.5267
6      405.232.4140 Fax
       kgivens@meclaw.net
7
   For Defendant:
8
       BRUCE ROBERTSON, ESQUIRE
9      RYAN WHALEY
       119 North Robinson Avenue
10     Suite 900
       Oklahoma City, Oklahoma 73102
11     405.239.6040
       405.833.5186 Fax
12     brobertson@ryanwhaley.com

13 The Videographer:

14     Andrew Jones

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              INDEX OF EXAMINATION

2  WITNESS:  MARK S. COSTELLO

3

4  EXAMINATION                        PAGE

5  By Mr. Givens                       5

6

7

8

9

10             INDEX TO EXHIBITS

11 Number     Page    Description

12              (None marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1              Deposition of Mark S. Costello

2              Friday, December 13, 2019

09:33:25  3        *   *   *   *   *

09:33:26  4        THE VIDEOGRAPHER:  Good morning.  This is

09:33:28  5  disc No. 1 to the videotaped deposition of

09:33:34  6  Mark Costello in the matter of Russ Godfrey, et al.

09:33:34  7  versus CSAA Fire and Casualty Insurance Company

09:33:41  8  being heard before the United States District

09:33:42  9  Court, Western District of Oklahoma, case number

09:33:46 10  5:19-cv-329 G.  This deposition is being held at

09:33:52 11  2300 West Sahara Avenue in Las Vegas, Nevada,

09:33:56 12  89102, on December 13, 2019, 9:33 a.m.  My name is

09:34:03 13  Andrew Jones.  I am the videographer.  The court

09:34:05 14  reporter is Allyson Harris.

09:34:08 15        Counsel, will you please introduce

09:34:09 16  yourselves and affiliations and then the witness

09:34:11 17  will be sworn.

09:34:13 18        MR. GIVENS:  Keith Givens for the

09:34:14 19  plaintiffs, Russ and Natalie Godfrey.

09:34:17 20        MR. ROBERTSON:  Bruce Robertson for the

09:34:18 21  Defendant CSAA Fire and Casualty Insurance Company.

09:34:32 22        MARK S. COSTELLO,

09:34:32 23  was called as a witness, being first duly sworn,

09:34:32 24  testified as follows:

09:34:32 25  ///

Page 5

09:34:33  1              EXAMINATION

09:34:33  2  BY MR. GIVENS:

09:34:33  3     Q.  Good morning, sir.

09:34:34  4     A.  Good morning.

09:34:35  5     Q.  Would you please state your full name.

09:34:37  6     A.  Mark Costello.

09:34:38  7     Q.  Do you have a middle name?

09:34:39  8     A.  I do, Stephen.

09:34:40  9     Q.  And how is that spelled?

09:34:44 10     A.  S-t-e-p-h-e-n.

09:34:46 11     Q.  And, sir, is it correct that we are here

09:34:48 12  on December 13, 2019 in Las Vegas, Nevada for your

09:34:55 13  deposition in a case brought by Russ and Natalie

09:35:03 14  Godfrey?

09:35:03 15     A.  That is correct.

09:35:04 16     Q.  And is it correct that you were one of

09:35:06 17  the CSAA employees that handled her (sic) claim?

09:35:09 18     A.  That is correct.

09:35:10 19     Q.  And, sir, what's your address?

09:35:14 20     A.  934 Valetta Flat Avenue, Las Vegas,

09:35:19 21  Nevada, 89183.

09:35:22 22     Q.  How do you spell Valetta?

09:35:26 23     A.  V-a-l-e-t-t-a.

09:35:27 24     Q.  And you said it was 934 Valetta Avenue?

09:35:32 25     A.  Valetta Flat Avenue.

**Page 6**

```
09:35:34   1      Q.  And is that your residential address?
09:35:38   2      A.  Yes, it is.
09:35:38   3      Q.  And what's your phone number, cell phone
09:35:41   4   number?
09:35:42   5      A.  Cell phone number is area code (405)
09:35:44   6   517-6351.
09:35:49   7      Q.  Can you tell us when you were born?
09:35:51   8      A.  September 1, 1975.
09:35:55   9      Q.  Sir, when did you come here to work in
09:35:58  10   the Las Vegas location of CSAA?
09:36:02  11      A.  January 2nd of 2019.
09:36:04  12      Q.  And what brought you here?
09:36:07  13      A.  Promotion.
09:36:07  14      Q.  To what?
09:36:10  15      A.  Homeowner claims manager for the
09:36:12  16   Las Vegas regional center.
09:36:16  17      Q.  And what states do you all handle?
09:36:20  18      A.  Currently we handle California, Nevada,
09:36:23  19   Utah.  We also would handle Idaho, Washington, and
09:36:29  20   Oregon if there are any claims.  We have a very
09:36:32  21   small footprint there.
09:36:33  22      Q.  Are you not handling Oklahoma claims
09:36:37  23   anymore?
09:36:38  24      A.  Not currently, no.
09:36:39  25      Q.  Is there any reason for that?
```

**Page 7**

```
09:36:40   1      A.  We have four regional centers, one of
09:36:43   2   them based in Oklahoma City, which is a little more
09:36:47   3   natural for them time zonewise, local
09:36:51   4   knowledgewise.
09:36:52   5      Q.  When you were in the Oklahoma City
09:36:54   6   center, do people refer to their company as AAA?
09:37:00   7      A.  Yes.
09:37:00   8      Q.  So I've said CSAA so far.  If I say AAA,
09:37:04   9   can we agree that that's the same thing?
09:37:06  10      A.  Yes.
09:37:07  11         MR. ROBERTSON:  Objection.
09:37:07  12   BY MR. GIVENS:
09:37:07  13      Q.  And have you always referred to it as the
09:37:09  14   same thing?
09:37:10  15      A.  Not always, no.
09:37:11  16      Q.  If somebody has asked you where you work,
09:37:14  17   do you say "I work at AAA"?
09:37:17  18      A.  Yes.
09:37:22  19      Q.  Okay.  Are you aware that this case is
09:37:25  20   going to be tried in Oklahoma City on March 10th?
09:37:28  21      A.  I was not aware of that, no.
09:37:32  22      Q.  Have you been asked to come to trial --
09:37:34  23         MR. ROBERTSON:  Objection to the form.
09:37:34  24   If you've had any discussions with us about what --
09:37:37  25   what you will or won't do, I don't want you to
```

**Page 8**

```
09:37:40   1   answer that because that's attorney-client
09:37:42   2   privilege.
09:37:44   3         THE WITNESS:  Okay.
09:37:44   4         MR. ROBERTSON:  If you've had discussions
09:37:46   5   with somebody else about that then --
09:37:47   6         MR. GIVENS:  Let me clarify my
09:37:49   7   question.
09:37:49   8   BY MR. GIVENS:
09:37:49   9      Q.  Has CSAA asked you to be at trial?
09:37:53  10      A.  No.
09:37:53  11      Q.  Is there any reason why you couldn't
09:37:56  12   appear at trial --
09:37:57  13         MR. ROBERTSON:  Objection to form.
09:37:58  14   BY MR. GIVENS:
09:37:58  15      Q.  -- if CSAA asked you to?
09:38:00  16         MR. ROBERTSON:  Same.  Same objection as
09:38:02  17   far as any communications with your attorneys.
09:38:03  18         THE WITNESS:  I guess depending on
09:38:04  19   dates.
09:38:05  20   BY MR. GIVENS:
09:38:05  21      Q.  Okay.  Let me rephrase my question since
09:38:06  22   there was an objection.  Are you aware of any
09:38:09  23   reason why you could not appear at trial in March
09:38:12  24   if CSAA asks you to?
09:38:15  25      A.  No.
```

**Page 9**

```
09:38:27   1      Q.  Is it correct that the Godfreys had
09:38:36   2   insurance with CSAA on the date of the event that's
09:38:37   3   at issue in this case?
09:38:38   4         MR. ROBERTSON:  Objection, form.
09:38:39   5         THE WITNESS:  I have to double-check the
09:38:40   6   actual date.
09:38:41   7   BY MR. GIVENS:
09:38:41   8      Q.  Let me set the record before we go there.
09:38:44   9   Is it true that the date of this loss was
09:38:47  10   February 22nd of 2018?
09:38:49  11         MR. ROBERTSON:  Objection to form.
09:38:49  12         THE WITNESS:  That was the reported date,
09:38:50  13   yes.
09:38:51  14   BY MR. GIVENS:
09:38:51  15      Q.  Okay.  Do you have any reason to question
09:38:53  16   that?
09:38:53  17      A.  No, sir.
09:38:55  18      Q.  So is it true that the Godfreys were
09:38:58  19   insured under their policy with CSAA on that date?
09:39:01  20      A.  Yes, sir.
09:39:02  21      Q.  And all the premiums had been paid as far
09:39:04  22   as you know?
09:39:05  23      A.  I -- as far as I know, yes.
09:39:07  24      Q.  And is it true that their policy covers
09:39:12  25   damage from ice or snow?
```

**Mark Costello**                    **12/13/2019**                    **4 (10 - 13)**

Page 10

09:39:15  1      MR. ROBERTSON:  Objection to form.

09:39:19  2      THE WITNESS:  Not as a blanket statement,

09:39:21  3  no.

09:39:21  4  BY MR. GIVENS:

09:39:21  5      Q.  How is that wrong?

09:39:22  6      A.  It would depend on the actual damages.

09:39:24  7  Ice on a roof, if there was no damage caused by

09:39:28  8  that ice, there's no peril to be covered.

09:39:32  9      Q.  Okay.  My question was if damage is

09:39:34 10  caused by ice or snow, would it be covered under

09:39:36 11  their policy?

09:39:38 12      A.  Again, it's a little bit broad.  Damage

09:39:39 13  to what?

09:39:40 14      Q.  The structure.

09:39:42 15      A.  It would depend on the damage.

09:39:47 16      Q.  Same question for wind and hail.  If wind

09:39:49 17  and hail hits the house, does the policy cover

09:39:53 18  that?

09:39:56 19      MR. ROBERTSON:  Objection to form.

09:39:57 20      THE WITNESS:  Again, it would depend on

09:39:59 21  the damage caused.

09:39:59 22  BY MR. GIVENS:

09:39:59 23      Q.  What are you thinking of that's making

09:40:01 24  you condition your answer?

09:40:05 25      MR. ROBERTSON:  Objection.

Page 11

09:40:05  1  BY MR. GIVENS:

09:40:05  2      Q.  I'm not understanding.  When would hail

09:40:07  3  or wind damage not be covered?

09:40:10  4      A.  When it didn't cause damage.

09:40:12  5      Q.  But my question presumes there's damage.

09:40:15  6  That's what I'm having trouble understanding.

09:40:18  7      A.  Again, in speaking in specifics I would

09:40:20  8  actually have to see the damage to determine if it

09:40:22  9  was wind or hail.  If it was truly wind or hail

09:40:25 10  damage, there is quite potential, yes, that it

09:40:27 11  would be covered.

09:40:28 12      Q.  Same for wind and snow -- I mean, excuse

09:40:30 13  me, same for ice and snow?

09:40:34 14      A.  Potentially, yes.

09:40:34 15      Q.  If ice and snow damages the Godfreys'

09:40:38 16  roof, that policy is meant to cover that; correct?

09:40:44 17      MR. ROBERTSON:  Objection to form.

09:40:44 18      THE WITNESS:  It would depend on the

09:40:48 19  damages again.

09:40:51 20  BY MR. GIVENS:

09:40:51 21      Q.  Are you aware of any issue with whether

09:40:53 22  the Godfreys cooperated with CSAA on this claim?

09:40:58 23      A.  Not that I am aware of, no.

09:41:00 24      Q.  So a different way to ask that is it true

09:41:04 25  that the Godfreys did cooperate with CSAA as far as

Page 12

09:41:07  1  you know?

09:41:08  2      A.  As far as I know, yes.

09:41:09  3      Q.  How many other depositions have you

09:41:11  4  given?

09:41:13  5      A.  Two.

09:41:16  6      Q.  And were both of those in cases against

09:41:20  7  CSAA?

09:41:20  8      A.  No, sir.

09:41:20  9      Q.  Who were they against?

09:41:22 10      A.  One was in a case against CSAA and one

09:41:24 11  was against a previous employer, Farmers

09:41:33 12  Insurance.

09:41:33 13      Q.  What type of case was the Farmers case?

09:41:36 14      A.  The Farmers was dealing with a -- the

09:41:40 15  Moore tornado catastrophe.

09:41:45 16      Q.  Was it a bad faith case?

09:41:47 17      A.  I believe it was, yes.

09:41:48 18      Q.  Did it go to trial?

09:41:49 19      A.  I don't know.

09:41:50 20      Q.  Do you know if it's still pending?

09:41:52 21      A.  I don't believe it is.

09:41:54 22      Q.  What's your understanding of how it was

09:41:56 23  resolved, without giving details?

09:41:58 24      A.  From my understanding, honestly, I can't

09:42:01 25  answer.  I was briefly deposed.  They realized I

Page 13

09:42:05  1  was probably not the person they were looking for

09:42:07  2  in the claim.  I had a very minor role in the

09:42:09  3  claim.  Deposition ended short and I was

09:42:12  4  dismissed.

09:42:12  5      Q.  Did you ever hear what happened with the

09:42:14  6  case?

09:42:14  7      A.  No.

09:42:15  8      Q.  And when was that deposition?

09:42:18  9      A.  That was the Moore tornado.  Was that

09:42:24 10  2013?  So I think it was 2013 or 2014.

09:42:27 11      Q.  When was your other CSAA depo?

09:42:29 12      A.  It was earlier this year.

09:42:31 13      Q.  Do you remember what month?

09:42:33 14      A.  I think -- I want to say it was July.

09:42:37 15      Q.  And was that a bad faith case?

09:42:40 16      A.  Yes, it was.

09:42:41 17      Q.  What are the names of the plaintiffs?

09:42:44 18      A.  I cannot recall off the top of my head.

09:42:48 19      Q.  What was your role in the claim that was

09:42:50 20  involved in that case?

09:42:51 21      A.  My role in the claim was I had responded

09:42:57 22  to a letter from the plaintiff's attorney in the

09:43:00 23  transition period of the file, and then I was

09:43:03 24  listed as the person most knowledgeable of the

09:43:07 25  claim.

Page 14

09:43:08   1   Q.  And what type of loss was it?
09:43:12   2   A.  It was a water loss.
09:43:13   3   Q.  Do you remember where the water came
09:43:14   4   from?
09:43:15   5   A.  The water came from a supply line leading
09:43:18   6   to the toilet.
09:43:20   7   Q.  And who deposed you?
09:43:23   8   A.  I cannot remember his name.
09:43:26   9   Q.  Who defended your deposition or presented
09:43:29  10   you?
09:43:30  11   A.  It was outside counsel prepared -- or
09:43:32  12   hired through our legal department.
09:43:35  13   Q.  Was it Gerry Pignato?
09:43:37  14   A.  No, sir.
09:43:37  15   Q.  You don't remember who it was?
09:43:39  16   A.  No.  The case was in Arizona.
09:43:42  17   Q.  Was the claim in Arizona?
09:43:49  18   A.  Yes.
09:43:49  19   Q.  Are you aware of other CSAA bad faith
09:43:53  20   lawsuits that relate to claims that you were
09:43:56  21   involved in?
09:43:56  22   A.  No, sir.
09:43:58  23   Q.  When did you start with CSAA?
09:44:01  24   A.  Started in May of 2017.
09:44:13  25   Q.  And what did you start as?

Page 15

09:44:14   1   A.  I started as a homeowners claims
09:44:16   2   specialist.
09:44:19   3   Q.  Can you please tell us about any training
09:44:20   4   that you had when you started.
09:44:22   5   A.  Training from CSAA?
09:44:24   6   Q.  Yes.
09:44:24   7   A.  I had policy training.  I have continuing
09:44:32   8   education that included hands-on teaching about
09:44:35   9   mitigation processes, et cetera.  I came in with
09:44:39  10   more training than most, however, so I did not
09:44:42  11   attend the other trainings.
09:44:47  12   Q.  Were you given any type of claim
09:44:49  13   guidelines or manual as a result of that training
09:44:52  14   that you did go through?
09:44:54  15   A.  I wasn't given a manual.  For me it was a
09:44:59  16   little different as I came in in a role that most
09:45:01  17   people promote to within CSAA, so they already know
09:45:05  18   the claim system, the general claims path or -- so
09:45:09  19   we walk through and do hands-on training, and then
09:45:13  20   there's a lot of on-the-job training.  The main
09:45:17  21   training focus was the different policies.
09:45:19  22   Q.  And I just want to make sure that I
09:45:21  23   understand.  Do you remember any documents that you
09:45:23  24   were given as a result of your initial training at
09:45:25  25   CSAA that you kept?

Page 16

09:45:28   1   A.  No.
09:45:29   2   Q.  What about materials that you were given
09:45:31   3   that you didn't keep?
09:45:34   4   A.  I mean, there were handouts that we
09:45:36   5   worked on that would give you a hypothetical
09:45:39   6   situation, but most of the training was done
09:45:42   7   verbally and hands-on in the classroom.
09:45:49   8   Q.  Was any of the training on how to
09:45:50   9   diagnose or evaluate what caused damage to a roof?
09:45:54  10   A.  The formal training, no.
09:45:57  11   Q.  Have you ever had any training at CSAA
09:45:59  12   about how to figure out what caused damage to a
09:46:03  13   roof?
09:46:04  14   A.  Have I had from CSAA, no, I have not.  I
09:46:07  15   had it prior.
09:46:08  16   Q.  And where did you have it prior?
09:46:10  17   A.  Through Farmers Insurance.
09:46:12  18   Q.  How long were you there?
09:46:13  19   A.  I worked at Farmers for 13 years.
09:46:18  20   Q.  From when to when?
09:46:20  21   A.  2002 to 2015.
09:46:24  22   Q.  What did you do between '15 and '17?
09:46:27  23   A.  Between '15 and '17 I worked for Life
09:46:31  24   Covenant Church out of Oklahoma City.
09:46:38  25   Q.  Any other jobs during that period of

Page 17

09:46:41   1   time?
09:46:41   2   A.  No, sir.
09:46:42   3   Q.  And what led to you leaving Farmers?
09:46:49   4   A.  Time commitment, change of process to
09:46:51   5   more of a cat-based model in the homeowners claims
09:46:55   6   department.  I was a field specialist, and I didn't
09:46:57   7   want to move to a cat-type role which had me on the
09:47:01   8   road all the time.
09:47:02   9   Q.  Any other reasons?
09:47:04  10   A.  No, sir.
09:47:05  11   Q.  And so you resigned?
09:47:07  12   A.  Yes.
09:47:12  13   Q.  Which office did you work out of?
09:47:15  14   A.  I worked out of the Oklahoma City
09:47:19  15   HelpPoint.  Prior to that it was U9, the Oklahoma
09:47:22  16   City property office.  Prior to that it was the
09:47:22  17   Oklahoma City HelpPoint.
09:47:22  18   Q.  Is HelpPoint the big complex out on
09:47:25  19   Memorial?
09:47:26  20   A.  Yes, sir.
09:47:26  21   Q.  And what is U9?
09:47:29  22   A.  U9 was a satellite property claims office
09:47:30  23   that stood alone out in Edmond, and then it was
09:47:33  24   absolved (sic) back into the HelpPoint based on
09:47:35  25   real estate deals that I had nothing -- no

Page 18

09:47:37 1 knowledge of, really.

09:47:38 2    Q.  Did you ever have any breaks in your work

09:47:41 3 from '02 to '15?

09:47:43 4    A.  No breaks in the work.  Different titles,

09:47:46 5 different roles, but no breaks in the work, no,

09:47:48 6 sir.

09:47:48 7    Q.  When did you graduate high school?

09:47:50 8    A.  Graduated high school in 1994.

09:47:53 9    Q.  From where?

09:47:54 10    A.  Broken Arrow.

09:47:57 11    Q.  Is that where you grew up?

09:47:58 12    A.  Yes, sir.

09:48:00 13    Q.  And what did you do after you graduated?

09:48:03 14    A.  Went, moved to Norman and attended the

09:48:06 15 University of Oklahoma.

09:48:08 16    Q.  Right away?

09:48:08 17    A.  Yes, sir.

09:48:09 18    Q.  And how long did you stay there?

09:48:12 19    A.  I stayed in Norman predominantly until I

09:48:17 20 moved to Las Vegas this year.  I think I had a

09:48:19 21 one-year stint where I lived in Oklahoma City

09:48:22 22 during that.

09:48:25 23    Q.  And what did you do at Life Covenant

09:48:28 24 Church?

09:48:29 25    A.  I was an associate youth pastor and then

Page 19

09:48:33 1 associate life groups and life missions pastor.

09:48:37 2    Q.  Where did you work physically?

09:48:39 3    A.  Physically I worked at the Oklahoma City

09:48:43 4 campus, which was Northwest 122nd and Penn.  I

09:48:47 5 worked at the Midwest City campus, which was on

09:48:50 6 Reno and Air Depot in Midwest City, and then in

09:48:54 7 Mustang off of Highway 52 and Mustang Road.  Those

09:48:58 8 are the three different campuses.

09:49:02 9    Q.  So that's different than Life Church.

09:49:04 10    A.  No, it is part of Life Church.  That's --

09:49:06 11 the actual full name is Life Covenant Church, but

09:49:10 12 it is known as Life.Church or --

09:49:13 13    Q.  I'm just trying to remember where there's

09:49:15 14 a campus at 122nd and Penn.

09:49:17 15    A.  It is -- it sits right out at -- I'm

09:49:19 16 feeling like it's 122nd and Penn -- or maybe

09:49:23 17 it's -- it's 122nd.  I can't remember what the

09:49:24 18 cross streets -- it's been a while.

09:49:25 19       MR. ROBERTSON:  Isn't that the one on

09:49:26 20 that northeast corner?

09:49:28 21       THE WITNESS:  It's the biggest one.

09:49:29 22 Maybe it's not Penn.  It's further out.  It's

09:49:32 23 north.  It's 122nd --

09:49:33 24 BY MR. GIVENS:

09:49:33 25    Q.  I mean, there's 178th and Western -- or

Page 20

09:49:35 1    I'm sorry, 178th and Penn.

09:49:36 2    A.  I thought it was 122nd.  I

09:49:38 3 can't remember.  It's been several years.

09:49:40 4    Q.  The main location is 178th and Penn in

09:49:44 5 Norman.

09:49:44 6    A.  The one -- it's not that one.  It was the

09:49:45 7 large broadcast location off 122nd, if I remember.

09:49:51 8 I can't -- I could drive there if I needed to,

09:49:54 9 but --

09:49:54 10    Q.  That's my church.

09:49:54 11    A.  Oh, okay.

09:49:54 12    Q.  That's why I'm asking.

09:49:56 13    A.  I got you.  So it was the large Oklahoma

09:49:59 14 City one where Craig Groeschel did do his live

09:50:03 15 teaching until recently.

09:50:05 16    Q.  And what led you to leave there?

09:50:07 17    A.  It was not the job I thought I was

09:50:10 18 taking.

09:50:11 19    Q.  And what does that mean?

09:50:13 20    A.  The time commitment was unreasonable, in

09:50:17 21 my opinion.  Having a family, it was actually worse

09:50:20 22 than being on the road for -- as a catastrophe

09:50:26 23 adjuster.

09:50:27 24    Q.  And did you resign?

09:50:29 25    A.  Yes, I did.

Page 21

09:50:30 1    Q.  Have you ever been a cat adjuster?

09:50:32 2    A.  I have not been titled cat adjuster.  I

09:50:32 3 have worked on catastrophe claims.

09:50:33 4    Q.  You mentioned the Moore tornado, which

09:50:37 5 was a tornado claim.

09:50:38 6    A.  Yes.

09:50:39 7    Q.  Have you ever worked on any cat losses

09:50:41 8 that were ice and snow?

09:50:46 9    A.  No, sir.

09:50:48 10    Q.  Did you ever have any training at Farmers

09:50:48 11 that specifically dealt with diagnosing damage to a

09:50:50 12 roof based on ice or snow?

09:50:53 13    A.  I had training on Far- -- at Farmers on

09:50:56 14 diagnosing damage to roof and multiple perils.

09:50:59 15    Q.  So did any of that focus specifically on

09:51:03 16 ice and snow damage?

09:51:04 17    A.  It did talk about ice and snow and ice

09:51:07 18 damming, yes.

09:51:08 19    Q.  So what is -- what are the factors that

09:51:09 20 you look at on a roof for determining whether it's

09:51:16 21 damage by ice or snow?

09:51:17 22    A.  Are you referring to ice damming or are

09:51:19 23 you referring to the weight of ice and snow,

09:51:21 24 because those are two separate --

09:51:21 25    Q.  Well, let's take each one.

Page 22

09:51:23  1   A.  Sure.  Ice damming, generally speaking,
09:51:25  2   does not do much damage to the roof itself.  It
09:51:28  3   comes from packed ice under multiple layers and
09:51:32  4   ventilation causing water to melt underneath but
09:51:35  5   stay frozen on top.  The water has to find a low
09:51:38  6   place to go.  Weight of ice and snow would
09:51:40  7   generally be reviewed in the areas of almost a full
09:51:44  8   collapse because it takes either a massive amount
09:51:49  9   of ice or snow or the presence of ice or snow for a
09:51:52 10   long time to create damage.  You --
09:51:59 11   Q.  So if I'm looking at a flat roof like the
09:52:03 12   Godfreys have that's involved in this claim, take
09:52:05 13   ice damming for example.  What physically are you
09:52:10 14   looking for to decide in your mind whether it was
09:52:13 15   because of ice or snow?
09:52:15 16   A.  Specifically on the Godfreys' roof?
09:52:18 17   Q.  Yes, sir.
09:52:19 18   A.  Well, again, we're looking at different
09:52:20 19   things.  We didn't deny any of the water entering
09:52:24 20   the home from the presence of ice and snow.  We
09:52:26 21   wrote to cover and agreed to cover the damage
09:52:30 22   caused by the water coming in from the ice and
09:52:33 23   snow.
09:52:34 24        As to the weight of the ice and snow, I
09:52:35 25   looked at multiple factors:  The condition of the

Page 23

09:52:37  1   roof, the forecast and the temperatures at the
09:52:41  2   time, the condition of the roof away from where the
09:52:44  3   ice damming occurred.  There was a lot that went
09:52:48  4   into it.
09:52:53  5   Q.  I guess I'm -- I don't feel like I'm
09:52:55  6   getting an answer to what I'm asking.  I'm asking
09:52:58  7   as you're looking at their roof -- and you only saw
09:53:01  8   it in pictures; right?
09:53:03  9   A.  Correct.
09:53:03 10   Q.  So in the pictures, what physically are
09:53:04 11   you looking at to decide whether the cause of the
09:53:09 12   water coming in the house was from the ice damming
09:53:12 13   or the weight of snow?
09:53:15 14        MR. ROBERTSON:  Objection to form.
09:53:16 15        THE WITNESS:  Again, we're looking at two
09:53:18 16   different things.  We looked at could ice have been
09:53:21 17   there and water entered the home through that, yes.
09:53:23 18   So we -- that's why the interior damages were
09:53:26 19   accounted for and covered by the policy.  The other
09:53:29 20   question being asked was did the weight of ice or
09:53:32 21   snow pull the roof away from the edge.  So I looked
09:53:35 22   at the overall condition of the roof.  I looked at
09:53:38 23   any previous potential repairs in the area.  I
09:53:41 24   looked at the weather specifically on how long ice
09:53:45 25   could have been present on that roof.

Page 24

09:53:51  1   BY MR. GIVENS:
09:53:51  2   Q.  Where did you get your weather data?
09:53:54  3   A.  If I believe correctly, I just looked at
09:53:56  4   local forecasts.  Generally speaking, I would look
09:53:59  5   at Weather Underground.  There are several sites
09:54:08  6   you can find that will give you historical data for
09:54:08  7   weather.
09:54:09  8   Q.  And I guess I'm just asking --
09:54:10  9   A.  And also I was local in the area, so I
09:54:13 10   knew -- I knew the basic weather patterns and I
09:54:16 11   knew when it was cold and when it wasn't.
09:54:17 12   Q.  Well, you lived in Norman at the time; is
09:54:19 13   that right?
09:54:20 14   A.  I did, but I also worked in Oklahoma
09:54:22 15   City, North Oklahoma City, Edmond area.
09:54:23 16   Q.  At May and Memorial?
09:54:26 17   A.  Yes.
09:54:28 18   Q.  I'm trying to understand specifically
09:54:30 19   where you looked to get your weather data, and I
09:54:32 20   think you said there's various --
09:54:34 21   A.  There is --
09:54:34 22   Q.  -- sources.  I'm asking you which ones
09:54:36 23   you looked at.
09:54:37 24   A.  I cannot recall exactly.  My normal ones
09:54:39 25   would have been Weather Underground, local news.

Page 25

09:54:46  1   Q.  How do you go back and look at what the
09:54:48  2   news said a week later or two weeks later?
09:54:51  3   A.  You can look where -- I mean, looking at
09:54:53  4   weather data, if you Google weather, Oklahoma City
09:54:56  5   weather, Edmond, and put dates in, it will give you
09:55:00  6   a multitude of sites to look at and compare.
09:55:02  7   Q.  Are you saying you actually did that in
09:55:04  8   the Godfrey claim?
09:55:04  9   A.  I believe I did, yes.
09:55:07 10   Q.  Or that's what you would have normally
09:55:08 11   done?
09:55:08 12   A.  That's part of my normal process, so I
09:55:10 13   have no reason to think I would not have done that
09:55:14 14   in this claim.
09:55:13 15   Q.  But as to whether you exactly did it in
09:55:15 16   this claim can you say?
09:55:17 17   A.  I do believe I did.  As I reviewed the
09:55:20 18   file, I do believe the discussions I had with the
09:55:20 19   owning adjuster included the weather at the time of
09:55:21 20   the claim.
09:55:23 21   Q.  And just for the record, is it true that
09:55:24 22   I gave you a copy of the claim file, and that's
09:55:27 23   what's in your hands right now?
09:55:28 24   A.  Yes, sir, it is.
09:55:30 25   Q.  And I advised you that you're free to

Page 26

09:55:32  1  refer to it, rely upon it at any time you want.
09:55:36  2      A.  Yes, sir.
09:55:36  3      Q.  Okay.  There is mention in the claim
09:55:38  4  file, either by you or the handling adjuster,
09:55:41  5  Miss Brooks, that -- that you are or her or both of
09:55:45  6  you didn't think that there was enough ice or snow
09:55:49  7  to cause this damage, but I couldn't find any
09:55:53  8  weather data in the file.  Is there a reason that
09:55:55  9  the weather data you're referencing isn't noted in
09:55:59 10  the file?
09:56:00 11          MR. ROBERTSON:  Objection to form.
09:56:02 12          THE WITNESS:  Sure.  Because I could even
09:56:04 13  today still go back and find that weather data if I
09:56:06 14  need it.  I don't put every single note, form,
09:56:10 15  thing in the file.  I note that the weather was
09:56:13 16  reviewed or else these claim files would be a
09:56:16 17  monstrosity per claim.
09:56:18 18  BY MR. GIVENS:
09:56:19 19      Q.  But would you agree that if you're going
09:56:21 20  to deny causation of damage based on ice and snow
09:56:25 21  as wear and tear, relying on weather data,
09:56:33 22  shouldn't that weather data that you're relying on
09:56:40 23  be put in the claim file?
09:56:42 24          MR. ROBERTSON:  Objection to form.
09:56:43 25          THE WITNESS:  I -- I noted that I

Page 27

09:56:43  1  reviewed the weather data.
09:56:43  2  BY MR. GIVENS:
09:56:43  3      Q.  Does CSAA have any policy on that in
09:56:46  4  terms of putting that data in the claim file if you
09:56:53  5  rely on it?
09:56:53  6      A.  CSAA asks that we put pertinent
09:56:53  7  information to our decision in the file, which I
09:56:53  8  noted as "Reviewed the weather."
09:56:55  9      Q.  But as to what data you reviewed, you
09:56:57 10  don't consider that important data to the outcome
09:57:01 11  of this claim?
09:57:02 12          MR. ROBERTSON:  Objection.
09:57:02 13          THE WITNESS:  No, I do.  That's why I
09:57:04 14  noted that I reviewed it.  Again, it could be found
09:57:06 15  today if I went and looked for it.
09:57:10 16  BY MR. GIVENS:
09:57:10 17      Q.  Well, do you recall how much ice and snow
09:57:12 18  was on the roofs in Edmond that storm?
09:57:15 19      A.  Not off the top of my head, no.  I
09:57:18 20  believe the weather supported that it wouldn't have
09:57:20 21  been on there very long just because we weren't
09:57:24 22  freezing for very long at the time.
09:57:26 23      Q.  How does weather data show you that ice
09:57:29 24  and snow didn't sit on a flat roof for an extended
09:57:33 25  period of time?

Page 28

09:57:34  1      A.  Well, there's a couple factors, not just
09:57:37  2  weather data.  The weather data getting above a
09:57:40  3  freezing point would tell me that ice and snow
09:57:42  4  would melt above freezing, and then the other
09:57:45  5  factor of the presence of water tells us that the
09:57:47  6  ice and snow melted.
09:57:50  7      Q.  Well, how long does it take for ice to
09:57:51  8  melt on a flat roof?
09:57:53  9      A.  Depends on the amount of ice.
09:57:56 10      Q.  Did you do any type of analysis or
09:57:58 11  calculation on this roof or this melt?
09:58:02 12      A.  I was able to -- I mean, when I looked at
09:58:05 13  the photos, there was no ice present a few weeks
09:58:08 14  later.  Again, it was based on the photos provided
09:58:12 15  as well as the data gathered.
09:58:16 16      Q.  Is it true that in the claim file there
09:58:19 17  are references to the plaintiff Mr. Godfrey and a
09:58:24 18  roofer actually getting up on the roof and trying
09:58:27 19  to remove as much of the ice and snow as they
09:58:30 20  could?
09:58:31 21      A.  I do not recall.
09:58:36 22      Q.  Do you recall that that's what they did
09:58:37 23  to try and mitigate and stop the leaks?
09:58:40 24      A.  I do not recall.  I know they tarped the
09:58:42 25  roof, so that would probably necessitate some

Page 29

09:58:44  1  removal if there was things there.  Again, I don't
09:58:47  2  have photos that supported anything for that.
09:58:48  3      Q.  And if they did take those actions, that
09:58:51  4  was the right thing for them to do?
09:58:53  5      A.  The policy does ask you to -- to do your
09:58:55  6  best to mitigate your damages.  Yes, you are
09:58:57  7  responsible for that.
09:58:58  8      Q.  So going back to my original question, is
09:59:01  9  there anything you can look at in terms of, say,
09:59:04 10  the edges of the flat roof, how it looks next to
09:59:09 11  where it originally was, to decide if it's damage
09:59:13 12  from ice or snow?
09:59:15 13          MR. ROBERTSON:  Objection to form.
09:59:18 14          THE WITNESS:  What I can do is take a
09:59:19 15  look at the edges of the flat roof and determine
09:59:21 16  that there had been previous repairs made.  The --
09:59:25 17  the pull-away was not consistent with a straight
09:59:28 18  pull-away.  It was consistent with the other waves
09:59:33 19  seen on the roof which happen over time on flat
09:59:34 20  roofs based on wear and tear and deterioration.
09:59:38 21  BY MR. GIVENS:
09:59:38 22      Q.  Could you explain that a little more.
09:59:39 23  What do you mean?
09:59:40 24      A.  Sure.  The photos, one, they showed that
09:59:43 25  previous repairs had been made to those same edges.

Page 30

09:59:46  1   So this was not a new form of damage.  There was an
09:59:52  2   additional layer of seal.  There was different
09:59:55  3   coloration there.  The photos showed that the edges
09:59:57  4   were not pulled straight back away.  They were up
10:00:00  5   in a cupped area which would be more consistent
10:00:03  6   with that hap- -- the seal failing over time
10:00:06  7   could then with something pulling it straight
10:00:10  8   back -- you would accept that something pulling it
10:00:12  9   straight -- or expect something pulling it straight
10:00:12  10  back to pull it away, not up.
10:00:18  11      Q.  Are you saying that ice and snow cannot
10:00:12  12  pull a flat roof up at the --
10:00:23  13      A.  No.
10:00:23  14      Q.  -- at the edge?
10:00:24  15      A.  What I'm saying was the damage in the
10:00:26  16  photos was consistent with that happening over
10:00:29  17  time.
10:00:30  18      Q.  Is there any other evidence that you saw
10:00:32  19  that you relied on that helped to make your
10:00:35  20  decision?
10:00:36  21          MR. ROBERTSON:  Objection, asked and
10:00:37  22  answered.
10:00:37  23  BY MR. GIVENS:
10:00:37  24      Q.  I'm trying to make sure you've said
10:00:39  25  everything there was.

Page 31

10:00:40  1       A.  Again, the overall condition of the roof,
10:00:42  2   the wave pattern of the flat roof that was
10:00:47  3   consistent throughout, the areas of previous repair
10:00:50  4   on the roof.
10:00:53  5       Q.  Are you --
10:00:54  6       A.  All of those led to the determination of
10:00:56  7   this was a pattern of wear and tear of things
10:00:59  8   happening over time, not -- not from this snow and
10:01:04  9   ice event.
10:01:04  10      Q.  Could what you're calling seal or sealant
10:01:07  11  have been glue that was used when the roof was
10:01:10  12  installed?
10:01:11  13      A.  Potentially, yes, however, based on the
10:01:14  14  discoloration, it appeared to be much newer than
10:01:17  15  the rest of the roof area.  There was also several
10:01:20  16  other repairs done on that roof over time.
10:01:22  17      Q.  And how do you know that?
10:01:24  18      A.  You could see them in the photos.
10:01:25  19  They're identified in several photos.
10:01:27  20      Q.  And how do you know they're repairs
10:01:29  21  versus glue or sealant put on originally?
10:01:33  22      A.  Again, you know, some of it's from the
10:01:36  23  notes of the adjuster on site.  I'm not sure what
10:01:41  24  discussions he had with the roofer.  I wasn't privy
10:01:43  25  to those.  But they're consistent with repairs,

Page 32

10:01:45  1   repairs -- spot repairs on flat roofs.
10:01:48  2       Q.  I'm just asking you based on your viewing
10:01:50  3   of the pictures how do you know that?
10:01:52  4       A.  Based on the levels of deterioration
10:01:55  5   around it versus the spots themselves, based on the
10:01:58  6   notes of the adjuster on site.
10:02:03  7       Q.  And when you say levels of deterioration,
10:02:06  8   physically what are you talking about?
10:02:08  9       A.  Physically along the seams you can see
10:02:10  10  there's deterioration.  You can see waves in the
10:02:14  11  roof, which is not uncommon with a flat roof.  Over
10:02:17  12  time, as weight does put pressure on it, it begins
10:02:21  13  to not be a flat surface.  Those are consistent
10:02:25  14  across the roof.  Those don't happen from a
10:02:28  15  one-time event unless that event is extremely long.
10:02:29  16  Those we have in the presence of water over time.
10:02:31  17  Even in the photos a few weeks later there's a
10:02:36  18  different area of the roof that shows ponding with
10:02:39  19  standing water on it.
10:02:44  20      Q.  What do you mean by "waves"?
10:02:46  21      A.  If you look at the roof itself, it is not
10:02:51  22  a flat surface.  It is not a flat roof.  The --
10:02:55  23  there are areas of compressed -- of the EPDM
10:03:02  24  material throughout it, and it gives a presence of
10:03:04  25  looking like there is literal waves moving through

Page 33

10:03:12  1   it.
10:03:13  2       Q.  And are you saying that cannot be caused
10:03:14  3   by ice or snow?
10:03:15  4       A.  I'm saying that presence would -- that
10:03:16  5   level of deterioration would require sitting ice or
10:03:20  6   snow for an extended period of time to do that.
10:03:23  7       Q.  Well, could the waves exist but the ice
10:03:26  8   and snow still affect the edges of a flat roof so
10:03:29  9   water can get in?
10:03:30  10      A.  That's not what happened in this claim
10:03:33  11  from the photos and the inspection.
10:03:34  12      Q.  How do you know?
10:03:36  13      A.  Again, based on the weather data from the
10:03:39  14  time, the appearance of previous repairs to the
10:03:42  15  same areas, this was not something that was -- and
10:03:45  16  the overall cupping and stretch of that material
10:03:49  17  did not give the appearance of something that
10:03:51  18  happened on a one-time short event.
10:03:54  19      Q.  Are you aware that the Godfreys advised
10:03:58  20  CSAA that the leaks involved in this claim started
10:04:05  21  suddenly at that time?
10:04:06  22      A.  I am aware, and we covered the interior
10:04:08  23  water from those edges.
10:04:10  24      Q.  Okay.  I'm asking you that because if all
10:04:13  25  of this is going on with this roof as you've said,

Page 34

```
10:04:18  1   wouldn't there have been leaks prior to the day
10:04:21  2   that all the ice and snow was on the roof?
10:04:25  3       A.  It would have taken it melting on the
10:04:27  4   edge for water to come in.
10:04:28  5       Q.  Well, rain would come in, wouldn't it,
10:04:31  6   whenever it would rain if it was really worn and
10:04:34  7   torn -- strike that.
10:04:35  8           Rain would come in when it would rain if
10:04:37  9   it was an old roof in bad condition from wear and
10:04:43 10   tear; correct?
10:04:43 11       A.  Not always, no.
10:04:45 12       Q.  Why not?
10:04:46 13       A.  I mean, if you look at that roof, a lot
10:04:47 14   of it goes towards the ponding in the center.  You
10:04:51 15   would have to have rain itself flowing in a flat
10:04:56 16   roof direction.  There is an edge to it that can
10:04:56 17   deflect some of that.  The reason ice and snow
10:04:58 18   would go in is because ice did fill and sit on the
10:05:01 19   edges, and when that melted, it had a straight path
10:05:04 20   down.  Saying rain would have that same straight
10:05:07 21   path, not always consistent, no.  I didn't check
10:05:10 22   the rain.  Generally speaking, not the rainiest
10:05:15 23   time of year, so. . .
10:05:20 24       Q.  It just seems odd that it's a coincidence
10:05:23 25   that all this water would suddenly come in their
```

Page 35

```
10:05:25  1   house at the time there's this snow and ice event
10:05:29  2   but not before that --
10:05:30  3           MR. ROBERTSON:  Objection.  Sorry.
10:05:31  4   BY MR. GIVENS:
10:05:31  5       Q.  Did that trouble you at all?
10:05:34  6       A.  No, sir, because it made sense why it
10:05:36  7   would come in at that time, and if it'd been a dry
10:05:39  8   season previous to it, you wouldn't have noticed
10:05:42  9   anything.  It would take the presence of water for
10:05:45 10   water to come in.
10:05:50 11       Q.  And you're not sure what the weather data
10:05:52 12   would show for how rainy it was in the months
10:05:55 13   leading up to February of 20 --
10:05:57 14       A.  I'd have to go back.
10:05:57 15       Q.  -- 2018?
10:05:58 16       A.  Not that I can recall directly.  I'd have
10:06:00 17   to go look.
10:06:01 18       Q.  Okay.  So could this loss have happened
10:06:09 19   because of a combination of a roof that was that
10:06:12 20   old and the ice and snow that also pulled on the
10:06:14 21   roof?
10:06:15 22           MR. ROBERTSON:  Objection to form.
10:06:18 23           THE WITNESS:  I would say we covered the
10:06:18 24   water because of the presence of ice and snow.  We
10:06:22 25   did not cover the roof because that had been
```

Page 36

```
10:06:25  1   deteriorating and happening over time.
10:06:27  2   BY MR. GIVENS:
10:06:27  3       Q.  My question is the water that got in the
10:06:28  4   house and inflicted damage on the house, how do you
10:06:32  5   rule out that the ice and snow had zero impact on
10:06:36  6   causing the roof to let the water in --
10:06:39  7       A.  We ruled out --
10:06:39  8           MR. ROBERTSON:  Objection.
10:06:41  9           THE WITNESS:  Oh, sorry.
10:06:41 10           MR. ROBERTSON:  Objection to form.
10:06:41 11           THE WITNESS:  We ruled out because of all
10:06:43 12   the previous factors we just discussed, that the
10:06:46 13   roof damage was caused by the ice and snow;
10:06:48 14   however, we did cover the water entering the
10:06:50 15   home.
10:06:52 16   BY MR. GIVENS:
10:06:52 17       Q.  You've said that many times.  You didn't
10:06:54 18   write the Godfreys a check; right?
10:06:56 19       A.  It was -- the water entering the home was
10:06:59 20   below their -- their chosen and paid-for
10:07:04 21   deductible.
10:07:04 22       Q.  Right.  So no payments have been issued
10:07:04 23   to the Godfreys on this claim; is that correct?
10:07:04 24       A.  Because it did not exceed the deductible
10:07:06 25   that they chose on their policy.
```

Page 37

```
10:07:12  1       Q.  But their claim was for the roof damage
10:07:14  2   as well as all the leaks in their house; correct?
10:07:17  3       A.  That's what they filed the claim for,
10:07:19  4   correct.
10:07:19  5       Q.  And had you covered the roof damage, it
10:07:22  6   would have been above their deductible; correct?
10:07:25  7       A.  If the roof damage was caused by a
10:07:27  8   covered peril, yes, the damages would have exceeded
10:07:30  9   their deductible.
10:07:33 10       Q.  We received some new documents two days
10:07:38 11   ago relating to other claims.  Were you asked to
10:07:40 12   look at any of those documents?
10:07:44 13       A.  In review of the claim with my attorney,
10:07:46 14   I was asked to look at those documents.
10:07:50 15       Q.  Was that in preparation for your
10:07:51 16   deposition just this week?
10:07:53 17       A.  Yes, sir.
10:07:54 18       Q.  Okay.  Does anything in those documents
10:08:00 19   affect your opinions either way on whether this
10:08:03 20   loss should have been covered?
10:08:04 21       A.  Based on -- are you referring to the
10:08:08 22   supplement sent in on two separate claims?
10:08:11 23       Q.  No.  Let me clarify my question.  We
10:08:15 24   received a stack of documents two days ago
10:08:20 25   regarding claims of various dates on this home.
```

Page 38

10:08:24   1   It's not anything that relates to the claim
10:08:29   2   involved in this lawsuit.
10:08:30   3       A.   What I reviewed in preparation for this
10:08:34   4   was an estimate prepar- -- a supplemental estimate
10:08:40   5   prepared by, I believe, Ultimate Roofing that
10:08:43   6   referenced two separate claims.
10:08:45   7       Q.   That was submitted in relation to this
10:08:46   8   claim, though; correct?
10:08:47   9       A.   It was submitted in relation to two
10:08:49  10   separate claims, and it was addressed on both of
10:08:52  11   the claims, and I know this looking back now.  I
10:08:55  12   didn't -- there was nothing provided to me to
10:08:57  13   review until this week.
10:08:59  14       Q.   Okay.  So you're just saying you looked
10:09:02  15   at the one from 2017 that the contractor involved
10:09:08  16   in this loss brought up?
10:09:13  17       A.   Most recently, yes.
10:09:16  18       Q.   So you didn't look at any documents from
10:09:18  19   other losses?
10:09:21  20       A.   Not in making my determination on this
10:09:22  21   claim, no.
10:09:23  22       Q.   Or for any reason this week?
10:09:25  23       A.   No, sir, not that I can recall.
10:09:27  24       Q.   I'm just trying to narrow down what
10:09:31  25   you've looked at to get ready for your deposition

Page 39

10:09:34   1   so we can talk about it.
10:09:35   2       The claim documents that you've mentioned
10:09:36   3   from 2017, those related to a -- a storm that
10:09:42   4   included wind of high speeds that resulted in a
10:09:45   5   claim on part of the Godfreys' roof; correct?
10:09:51   6       A.   Correct.
10:09:53   7       Q.   When this claim was denied, the Godfreys'
10:09:59   8   contractor, who actually performed work for that
10:10:01   9   previous damage, asked CSAA to consider the
10:10:09  10   contributing factor of the 2017 windstorm --
10:10:15  11       A.   Correct.
10:10:15  12       Q.   -- correct?  Since the Godfreys had
10:10:18  13   coverage with CSAA for both of those, if those --
10:10:21  14   separately or together, those events led to these
10:10:24  15   leaks, it should be covered; right?
10:10:26  16       MR. ROBERTSON:  Objection to form.
10:10:28  17       THE WITNESS:  Incorrect.
10:10:28  18   BY MR. GIVENS:
10:10:28  19       Q.   Why?
10:10:29  20       A.   Claims don't work as a combination of
10:10:32  21   factors over years.  That more meets the definition
10:10:34  22   of wear and tear, deterioration over time.
10:10:38  23       Q.   How is that?
10:10:41  24       A.   Well --
10:10:42  25       MR. ROBERTSON:  Objection.  Go ahead.

Page 40

10:10:43   1       THE WITNESS:  If you're saying over time
10:10:44   2   these things exacerbated, that literally meets the
10:10:49   3   definition of wear and tear and deterioration over
10:10:52   4   time.
10:10:54   5   BY MR. GIVENS:
10:10:54   6       Q.   No, that's not what I'm asking at all.
10:10:55   7   I'm asking if wind in 2017 and ice and snow in
10:10:58   8   2018, less than a year apart, combine to create
10:11:02   9   openings that water goes through, the loss would be
10:11:06  10   covered under either or both of those; right?
10:11:09  11       A.   If the loss -- if the damage was done by
10:11:11  12   the specific windstorm, it would have been covered
10:11:13  13   by that specific windstorm.  If the damage was done
10:11:16  14   by the weight of ice and snow, it would have been
10:11:20  15   covered by the weight of ice and snow.  If the
10:11:22  16   damage is done over time from multiple windstorms,
10:11:29  17   from multiple pressures of ice, water weight, and
10:11:32  18   snow, again that would meet the definition of
10:11:35  19   deterioration, wear and tear over time, not from a
10:11:38  20   specific event.
10:11:39  21       Q.   Is that something that CSAA has trained
10:11:41  22   you on, if damage occurs in separate events,
10:11:44  23   somehow that translates to wear and tear?
10:11:46  24       A.   No.  Your insurance policy covers the
10:11:49  25   specific event.  So we did cover damage, as I

Page 41

10:11:52   1   reviewed the file in 2017, caused by that wind
10:11:56   2   event.  In 2018 we did cover damage caused by the
10:12:01   3   water entering the home.
10:12:02   4       Q.   Okay.
10:12:02   5       A.   Those were separate events with separate
10:12:04   6   deductibles and separate claims.
10:12:06   7       Q.   Is it true that those roofs, though, are
10:12:08   8   right next to each other?
10:12:10   9       A.   I believe, if I looked at it correctly,
10:12:12  10   they were on opposite sides of the house, but I
10:12:14  11   could -- that was just from reviewing it this
10:12:15  12   week --
10:12:16  13       Q.   Okay.
10:12:16  14       A.   -- with --
10:12:17  15       Q.   If the document -- if the documents show
10:12:18  16   that they're next to each other, would you dispute
10:12:20  17   that?
10:12:22  18       A.   I'd have no reason to.
10:12:23  19       Q.   Okay.  And wasn't that part of what the
10:12:26  20   contractor was saying, after the denial in 2018,
10:12:31  21   that you had this roof right next to this other
10:12:34  22   roof, and in 2017 part of it was totaled and
10:12:41  23   replaced, and next to that, in 2018, you have water
10:12:44  24   get in that he was saying was from wind in '17 and
10:12:52  25   the ice and snow in '18?  Those would be two

Page 42

10:12:56   1   covered events, I guess, is my question --

10:12:58   2        MR. ROBERTSON:  Object --

10:12:59   3   BY MR. GIVENS:

10:12:59   4        Q.   -- if those are the facts.

10:13:00   5        MR. ROBERTSON:  Objection to the form.

10:13:01   6        THE WITNESS:  Those would be two separate

10:13:02   7   events again, and earlier you referenced why

10:13:08   8   wouldn't have water come in before.  So if it was

10:13:10   9   happening from 2017 and 2018, that would give a

10:13:16  10   longer window to have noticed as far as -- I guess

10:13:20  11   I'm confused at --

10:13:23  12   BY MR. GIVENS:

10:13:23  13        Q.   I'm just asking about what the contractor

10:13:24  14   was telling CSAA in his opinion, the wind in '17

10:13:33  15   caused issues with the roof combined with the ice

10:13:36  16   and snow in '18 that led to these leaks.  Is that a

10:13:39  17   correct statement of what he was telling CSAA?

10:13:41  18        MR. ROBERTSON:  Objection to form.

10:13:43  19        THE WITNESS:  I mean, from what I

10:13:45  20   reviewed of his notes this week, he also thought

10:13:47  21   that hail should be included, which would be

10:13:50  22   another separate stand-alone event, so --

10:13:55  23   BY MR. GIVENS:

10:13:55  24        Q.   Let me boil it down to this.  If I have

10:13:57  25   coverage with one insurance company for multiple

Page 43

10:13:59   1   events, and the damage is caused by one or a

10:14:06   2   combination of those events, the damage is still a

10:14:12   3   covered loss; correct?

10:14:13   4        MR. ROBERTSON:  Objection to form.

10:14:14   5        THE WITNESS:  It's not what happened in

10:14:15   6   this claim.

10:14:17   7   BY MR. GIVENS:

10:14:17   8        Q.   But if what I said is true, wouldn't it

10:14:20   9   be covered if the damage we're talking about, the

10:14:23  10   reason water got in, is covered by one or a same

10:14:26  11   combination of the events with the same company?

10:14:32  12        MR. ROBERTSON:  Objection to form.

10:14:33  13        THE WITNESS:  Again, if you're talking --

10:14:35  14   you're asking me over a year's period to combine

10:14:38  15   two events.  That's not how an insurance policy

10:14:41  16   contract works.

10:14:42  17   BY MR. GIVENS:

10:14:42  18        Q.   Well, the two events were about eight

10:14:44  19   months apart, right, April of '17 to February of

10:14:47  20   '18?

10:14:48  21        A.   Okay.

10:14:49  22        Q.   So if the Godfreys had come back before

10:14:52  23   this ice and snow event because of leaks and

10:14:58  24   said, "We think it's related to that previous

10:15:01  25   storm.  Somebody missed something," and you send

Page 44

10:15:06   1   somebody out and they see damage that let water in,

10:15:09   2   wouldn't that still be covered?  It's a supplement.

10:15:12   3        A.   We would review a supplement and any

10:15:14   4   supporting evidence with a supplement compared to

10:15:17   5   what we have.  If --

10:15:17   6        Q.   So that happens at times?

10:15:18   7        A.   It does happen, yes.

10:15:19   8        Q.   So there's no six-month limit or

10:15:22   9   eight-month limit or year limit on damage being

10:15:25  10   covered if it's a covered event?

10:15:27  11        A.   We would have to have reasonable --

10:15:29  12   reason why it would take so long.  We would ask.

10:15:33  13   We would also review what we had from that claim.

10:15:35  14   We would see, you know, the photos taken if -- in

10:15:39  15   2017.  If we have those same roofs and they don't

10:15:41  16   have that damage showing and they have them showing

10:15:43  17   now, then we would actually question, okay, well,

10:15:47  18   when we were here for the event and we found

10:15:49  19   damage, we did not find damage here.  We have notes

10:15:52  20   in our files.  We have photos that support no

10:15:54  21   damage here.  Why eight months later would you

10:15:57  22   think this damage is related to that?

10:16:00  23        Q.   Can high winds weaken a flat roof?

10:16:06  24        A.   I mean, speaking in general terms,

10:16:06  25   potentially, sure.

Page 45

10:16:08   1        Q.   Sure.  And they can lift up the edges if

10:16:08   2   it's high enough winds?

10:16:08   3        A.   I believe that was the damage that was

10:16:09   4   covered in 2017, yes.

10:16:11   5        Q.   To a flat roof right next to this flat

10:16:13   6   roof that's involved in this --

10:16:15   7        A.   At a different angle, I believe, but,

10:16:18   8   yes.

10:16:19   9        Q.   Okay.  So is it possible that wind could

10:16:22  10   weaken the roof, weaken the edges, and then snow

10:16:26  11   and ice comes along and finishes it off and water

10:16:26  12   comes in?

10:16:28  13        MR. ROBERTSON:  Objection.

10:16:28  14   BY MR. GIVENS:

10:16:28  15        Q.   Is that possible?

10:16:29  16        MR. ROBERTSON:  Objection to form.

10:16:30  17        THE WITNESS:  That does not appear to be

10:16:32  18   what happened in this claim.  Are you asking if it

10:16:34  19   is possible in the universe?  I guess, yes, it

10:16:36  20   could potentially be.

10:16:38  21   BY MR. GIVENS:

10:16:38  22        Q.   I'm not being flippant.  I'm saying in

10:16:40  23   realistic terms is that possible that those things

10:16:42  24   could happen?

10:16:45  25        MR. ROBERTSON:  Objection to form.

Page 46

10:16:45  1      THE WITNESS:  It doesn't appear that's
10:16:47  2  happened in this claim, but it could be possible,
10:16:49  3  yes.
10:16:50  4  BY MR. GIVENS:
10:16:50  5      Q.  And is it your memory that that's what
10:16:51  6  this contractor, who had done the work on the
10:16:54  7  previous part of the roof, was arguing to CSAA had
10:16:58  8  happened?
10:16:59  9      A.  To my memory, I just saw that this week.
10:17:03 10  From what I could tell, it looked like he was
10:17:05 11  trying to combine to get the roof covered for
10:17:07 12  his -- for his customer.
10:17:11 13      Q.  Well, AAA -- or, excuse me, CSAA got
10:17:16 14  premiums for the '17 policy year and premiums for
10:17:19 15  the '18 policy year --
10:17:21 16      A.  Correct.
10:17:22 17      Q.  -- correct?  So you're saying that from
10:17:23 18  the pictures that were taken in '17 in April to
10:17:27 19  when the pictures were taken in February of '18,
10:17:31 20  this part of the roof suddenly became obsolete for
10:17:38 21  wear and tear in eight months' time?
10:17:43 22      A.  At the time I reviewed this file I did
10:17:45 23  not review the 2017 claim.  There was no consideration
10:17:49 24  overlapping damages that I was notified of looking
10:17:50 25  at.  I looked specifically at this claim and made

Page 47

10:17:53  1  my determinations based on everything that was
10:17:57  2  presented as the evidence and that we've discussed
10:18:02  3  earlier.
10:18:02  4      Q.  In 2017, from what you've looked at,
10:18:05  5  isn't it true that photographs were taken of all
10:18:07  6  these flat roofs?
10:18:08  7      A.  Yes.
10:18:09  8      Q.  And the only one they identified as a
10:18:11  9  problem was one that actually got replaced?
10:18:15 10      A.  Correct.
10:18:15 11      Q.  By Ultimate Roofing?
10:18:17 12      A.  Correct.
10:18:23 13      Q.  Is it correct that at CSAA if an
10:18:25 14  inspector, whether he be an independent adjuster or
10:18:27 15  a CSAA adjuster, sees a roof that's old and worn
10:18:31 16  out, they're supposed to report that?
10:18:34 17      MR. ROBERTSON:  Objection to form.
10:18:35 18      THE WITNESS:  I would need clarification.
10:18:37 19  Can you rephrase that?
10:18:40 20  BY MR. GIVENS:
10:18:40 21      Q.  Let me try and backtrack a second.  Does
10:18:44 22  Sayde Brooks go out and inspect roofs?
10:18:47 23      A.  No.
10:18:48 24      Q.  Do you go out and inspect roofs?
10:18:49 25      A.  Not for CSAA, no.

Page 48

10:18:50  1      Q.  Has CSAA ever had its own adjusters in
10:18:53  2  Oklahoma go out and inspect roofs over the past few
10:18:56  3  years?
10:18:56  4      A.  Yes.
10:18:56  5      Q.  Who does that?
10:18:57  6      A.  I believe there are two in Oklahoma City
10:18:59  7  and three in Tulsa.
10:19:00  8      Q.  And that's it for the state?
10:19:01  9      A.  That is it for the state, yes.
10:19:03 10      Q.  Primarily they use independent adjusters
10:19:06 11  like Michael White?
10:19:08 12      A.  I wouldn't say primarily, no.  Our goal
10:19:10 13  is actually to probably have less than 40 percent
10:19:13 14  go to the independent adjusting firms.
10:19:14 15      Q.  Are you confident in that number --
10:19:16 16      A.  That's our --
10:19:16 17      Q.  -- for 2018?
10:19:16 18      A.  That's our goal.  I don't know the
10:19:18 19  number.  I don't manage the Oklahoma office.
10:19:21 20      Q.  So where do you get that number from?
10:19:23 21      A.  Normally we have reporting that would
10:19:25 22  tell us you had X amount of claims.  X went to the
10:19:27 23  field, Y went to independent adjusters, and you'd
10:19:30 24  formulate a percentage.
10:19:31 25      Q.  And you're just saying that's in your

Page 49

10:19:33  1  region?
10:19:33  2      A.  That's -- no, that's our overall company
10:19:35  3  goal would be 60 percent go to our adjusters.
10:19:38  4      Q.  Well, do you know if that's the number
10:19:40  5  for Oklahoma?
10:19:41  6      A.  That's our overall goal for our company.
10:19:43  7  I don't know Oklahoma's numbers.  I don't manage
10:19:47  8  that office.
10:19:48  9      Q.  So you can't testify from personal
10:19:50 10  knowledge what the number is for Oklahoma at all,
10:19:52 11  can you?
10:19:53 12      A.  I can testify that the goal for the
10:19:54 13  company nationwide would be 60 percent.
10:19:57 14      Q.  My question is the actual number.  How
10:19:59 15  many are done by independents versus in-house?
10:20:03 16      A.  I don't know that number.
10:20:04 17      Q.  Okay.  So do you know CSAA's requirement
10:20:12 18  or practice that when independent adjusters or their
10:20:17 19  own adjusters are supposed to report when they
10:20:23 20  inspect a roof and they -- it's in poor condition?
10:20:26 21      A.  They would photograph it.  They would
10:20:28 22  note any storm-related damages, and they would also
10:20:32 23  note nonstorm-related damages such as preexisting
10:20:36 24  repairs, things like that.
10:20:38 25      Q.  Okay.  What I'm trying to narrow my

Page 50

```
10:20:39  1    question to is are you aware at CSAA that they have
10:20:42  2    a requirement that if a roof is old and worn out
10:20:47  3    you have to report that to underwriting?
10:20:50  4        A.  There -- there's not a hard and fast rule
10:20:52  5    that says, "Older than this, this."  It's a
10:20:55  6    decision made that if this was a potential
10:20:58  7    underwriting risk, that, yes, you would want to
10:21:01  8    notify underwriting of it.
10:21:02  9        Q.  Okay.  And from all the claim files
10:21:05 10    you've been shown and that you've worked on that
10:21:07 11    relate to the Godfreys, did anybody ever tell
10:21:11 12    underwriting that the Godfreys' roof was worn out?
10:21:13 13        A.  I --
10:21:14 14            MR. ROBERTSON:  Objection to form.  Go
10:21:15 15    ahead.
10:21:15 16            THE WITNESS:  I didn't review the files
10:21:16 17    enough to know.  I didn't -- that wasn't my role in
10:21:18 18    these claims --
10:21:19 19    BY MR. GIVENS:
10:21:19 20        Q.  -- or this claim.
10:21:19 21        A.  -- or this claim.
10:21:21 22        Q.  Any documents you've reviewed, did you
10:21:22 23    see anybody reporting to underwriting that the
10:21:25 24    Godfreys' roof had problems other than the
10:21:26 25    storm-related damage that was at issue?
```

Page 51

```
10:21:28  1        A.  Not that I reviewed, no.
10:21:30  2        Q.  And it's true that either through
10:21:32  3    independent adjusters or CSAA's own adjusters, the
10:21:37  4    Godfreys' roof has been looked at several times
10:21:39  5    over the last several years?
10:21:41  6        A.  Based on what I reviewed, yes.
10:21:45  7        Q.  Okay.  So if this part of their roof was
10:21:48  8    old and worn out, that should have been reported as
10:21:52  9    part of some of those claims or one of those
10:21:54 10    claims; correct?
10:21:57 11            MR. ROBERTSON:  Objection to form.
10:21:58 12            THE WITNESS:  I mean, it was noted it was
10:22:00 13    a flat roof.  It was noted that it was -- there was
10:22:04 14    deterioration present, but I don't believe, from
10:22:06 15    what I reviewed this week, that they felt there was
10:22:09 16    a risk to that roof at that time any more than any
10:22:11 17    other flat roof.  Underwriting was aware that there
10:22:14 18    was flat roofs in Oklahoma.  Those deteriorate.
10:22:18 19    There's a lot of extreme weather conditions.
10:22:20 20    They're just probably, honestly, not the best
10:22:24 21    material for that climate.
10:22:26 22    BY MR. GIVENS:
10:22:26 23        Q.  Do you know what the life expectancy of
10:22:28 24    that type of roof is supposed to be?
10:22:31 25        A.  Off the top of my head, the actual life
```

Page 52

```
10:22:34  1    expectancy versus real, I --
10:22:35  2        Q.  In Oklahoma.
10:22:36  3        A.  I don't know it off the top of my head,
10:22:37  4    no.
10:22:38  5        Q.  Well, there's testimony that that roof
10:22:40  6    was put on seven -- six to seven years before this
10:22:44  7    loss.  Are you aware of that?
10:22:47  8        A.  I have no reason -- I mean, nobody's
10:22:50  9    testified -- or I haven't really -- I saw what the
10:22:52 10    adjuster put in the -- as the depreciation.  That
10:22:56 11    would have been based on statements from the
10:22:58 12    insured and the roofer.
10:22:59 13        Q.  Do you think a roof like this can get old
10:23:02 14    and worn out to where it's not covered for leaks in
10:23:06 15    six or seven years?
10:23:07 16        A.  There's potential, yes.  There's --
10:23:09 17        Q.  Are you saying that happened with this
10:23:12 18    roof?
10:23:12 19        A.  That's what it appears to have, yes.
10:23:14 20        Q.  So if in April or May of 2017 one or more
10:23:21 21    adjusters look at that roof that's involved in this
10:23:23 22    latest claim, and it was old and worn out, that
10:23:31 23    should have been reported since the result is it's
10:23:35 24    not covered if it's leaked -- if it leaks?
10:23:39 25        A.  Well, the leak was covered.
```

Page 53

```
10:23:40  1        Q.  But the roof's not; correct?
10:23:43  2        A.  From wear and tear, no, it is not.  It is
10:23:45  3    not covered, correct.
10:23:46  4        Q.  So every year the Godfreys are paying
10:23:49  5    replacement cost premiums for that roof, and CSAA's
10:23:52  6    not going to pay for that roof --
10:23:55  7            MR. ROBERTSON:  Objection to form.
10:23:55  8    BY MR. GIVENS:
10:23:55  9        Q.  -- correct?
10:23:56 10        A.  CSAA would have paid for the roof had it
10:23:58 11    been damaged by a covered peril.
10:24:02 12        Q.  Like snow and ice?
10:24:04 13            MR. ROBERTSON:  Objection to form.
10:24:04 14            THE WITNESS:  If the damage came from
10:24:05 15    that, yes.
10:24:22 16    BY MR. GIVENS:
10:24:22 17        Q.  Have you ever reported a roof to
10:24:24 18    underwriting that was increasing the risk on a
10:24:28 19    property?
10:24:28 20        A.  Have I personally, yes.
10:24:30 21        Q.  Okay.  And what circumstances led you to
10:24:31 22    do that?
10:24:32 23        A.  Just the overall state of disrepair of
10:24:35 24    the entire roof.
10:24:36 25        Q.  Can you explain it with more specificity,
```

Page 54

```
10:24:39  1   please?
10:24:40  2      A.  Large areas of missing or improperly
10:24:44  3   installed shingles, completely missing areas, the
10:24:48  4   age of the material, the lack of presence of
10:24:53  5   granules on it, anything that could potentially
10:24:57  6   cause an increased risk to the -- to the interior
10:25:03  7   of the home.
10:25:04  8      Q.  So can we agree that if nobody reported
10:25:07  9   this flat roof as being problematic in 2017, that
10:25:15 10   it still should have been watertight?
10:25:17 11         MR. ROBERTSON:  Objection to form.
10:25:18 12         THE WITNESS:  No, sir.
10:25:19 13   BY MR. GIVENS:
10:25:19 14      Q.  Why not?
10:25:19 15      A.  I mean, when you look at the overall
10:25:21 16   condition of the Godfreys' roof, the overall
10:25:24 17   condition of most of the roof, it is a large home,
10:25:27 18   is in good repair.  Nobody's disputing the asphalt
10:25:32 19   shingles.  A part -- a portion of flat roof had
10:25:34 20   been replaced.
10:25:42 21      Q.  But the flat roofs make up a considerable
10:25:45 22   amount of their roof area; right?
10:25:46 23      A.  I'd have to go back and look.  They have
10:25:46 24   a considerable amount covered by asphalt shingles
10:25:48 25   as well.
```

Page 55

```
10:25:48  1      Q.  But -- and flat roofs; correct?
10:25:50  2      A.  There are some flat roofs, yes.  There
10:25:52  3   are multiple areas of flat roofs.
10:25:57  4      Q.  So is it your testimony that the adjuster
10:25:59  5   or adjusters who handled the 2017 claim should not
10:26:04  6   have reported a roof that appeared old and worn
10:26:06  7   out?
10:26:08  8         MR. ROBERTSON:  Objection to form.
10:26:10  9         THE WITNESS:  In just reviewing the file
10:26:12 10   this week, I -- I honestly don't know if they
10:26:15 11   should have or shouldn't have.
10:26:18 12   BY MR. GIVENS:
10:26:18 13      Q.  We kind of skipped over the normal
10:26:22 14   preliminaries in a deposition.  You've been deposed
10:26:25 15   before.  You know how it goes, but I want to remind
10:26:29 16   you that you took an oath to tell the truth, and if
10:26:32 17   you don't tell the truth, then that can be a
10:26:36 18   problem.  You're aware of that?
10:26:38 19      A.  Yes, sir.
10:26:38 20      Q.  Okay.  And if you need to take any
10:26:40 21   breaks, will you let us know?
10:26:43 22      A.  Sure.
10:26:43 23      Q.  And if you don't understand any of my
10:26:45 24   questions, will you please let me know?
10:26:47 25      A.  Yes, sir.
```

Page 56

```
10:26:48  1      Q.  And I'll be happy to rephrase them or
10:26:50  2   repeat them for you, okay?
10:26:53  3      A.  Okay.
10:26:53  4      Q.  Have you understood everything so far?
10:26:55  5      A.  I believe so, yes.
10:27:00  6      Q.  Have you ever testified at any trials?
10:27:03  7      A.  No, sir.
10:27:06  8      Q.  Do you have any other depositions
10:27:07  9   currently scheduled?
10:27:08 10      A.  No, sir.
10:27:11 11      Q.  So you were in the Oklahoma City AAA
10:27:14 12   office from May of '17 'til January of '19?
10:27:18 13      A.  Correct, sir.
10:27:23 14      Q.  I think earlier I asked you if AAA ever
10:27:26 15   gave you any training on how to diagnose snow and
10:27:31 16   ice damage on a roof.  I want to make sure I cover
10:27:34 17   all the bases.
10:27:35 18         Did AAA ever give you any specific
10:27:37 19   training on how to diagnose other types of damages
10:27:40 20   to roof?
10:27:40 21      A.  Me personally?
10:27:42 22      Q.  Yes, sir.
10:27:42 23      A.  No, sir.  I mean, we did have reviews
10:27:45 24   through time and team meetings and things like
10:27:48 25   that, damage identification, but again, I came in
```

Page 57

```
10:27:51  1   trained.  There is a training program that I
10:27:55  2   didn't -- that I didn't qualify for as I already
10:27:59  3   knew the information.
10:28:01  4      Q.  And since you didn't go through it, you
10:28:03  5   can't say what it involved?
10:28:05  6      A.  I mean, I can as a manager speak at a
10:28:07  7   high level.  It does involve damage identification.
10:28:09  8   It does involve material identification.  It does
10:28:14  9   involve writing and reviewing estimates.
10:28:16 10      Q.  And are people that go through that
10:28:19 11   training given some type of materials?
10:28:21 12      A.  It's hands-on training.  It's actually
10:28:23 13   done here in our Las Vegas office.  We bring
10:28:25 14   everyone here.  We have a mock-up house built,
10:28:25 15   including roofs, that they're given scenarios and
10:28:30 16   walk through with an instructor.
10:28:32 17      Q.  So no written materials of any kind?
10:28:34 18      A.  There's not a manual, per se.  Again,
10:28:36 19   there's probably handouts that say, "Hey, there was
10:28:40 20   a fire in this room.  Please write the estimate,"
10:28:42 21   and then they go over it together as a team.
10:28:45 22      Q.  What I'm asking about is there any
10:28:47 23   written materials, and I'm not limiting it to
10:28:50 24   manuals, and it could be online, I'm including that
10:28:53 25   in written --
```

Page 58

10:28:55 1    A. Um-hmm.

10:28:55 2    Q. -- that talk about the factors that you

10:28:57 3  look at when you're evaluating what caused roof

10:29:00 4  damage.

10:29:00 5    A. I would say produced by CSAA, not that

10:29:04 6  I'm aware of.

10:29:04 7    Q. Do they hand out things published by

10:29:06 8  other people?

10:29:09 9    A. Not -- not on damage identification.

10:29:11 10  There are classes that are taken through PLRB.

10:29:16 11  There are vendors that offer multiple courses,

10:29:20 12  Donan Engineering offers lots of courses that we

10:29:24 13  encourage people to take. I still take them to

10:29:26 14  this day for continuing education.

10:29:31 15    Q. How do you spell Donan?

10:29:33 16    A. D-o-n-a-n.

10:29:36 17    Q. Do they give out written materials?

10:29:40 18    A. Possibly. I don't know. I have never

10:29:42 19  received any written materials from them.

10:29:44 20    Q. What's the training like?

10:29:46 21    A. It's usually a webinar with an industry

10:29:48 22  expert.

10:29:49 23    Q. And there's not written materials that go

10:29:52 24  along with it?

10:29:53 25    A. You could probably request a copy of the

Page 59

10:29:55 1  presentation at the end of it if you'd like.

10:29:59 2    Q. Is it a PowerPoint?

10:29:59 3    A. Sometimes they have PowerPoint.

10:30:06 4  Sometimes it's photos they discuss usually with an

10:30:06 5  engineer, an industry expert.

10:30:06 6    Q. But nothing like that at AAA?

10:30:08 7    A. Not produced by AAA that I'm aware of,

10:30:11 8  no.

10:30:11 9    Q. Who goes through the training that you

10:30:13 10  mentioned in Las Vegas? Is that new adjusters to

10:30:15 11  the company?

10:30:16 12    A. It is. So training is -- the training

10:30:18 13  has evolved over time. It was something that you

10:30:22 14  used to go from location to location. Now it's

10:30:24 15  housed in Okla- -- or in Las Vegas, and we bring

10:30:28 16  everyone in preferably within their first year. We

10:30:31 17  give them the support. They're not expected to

10:30:34 18  adjust a lot of these things by themselves. They

10:30:36 19  have a lot of support from other adjusters and

10:30:39 20  supervisors.

10:30:41 21    Q. Do you know what that's called, that

10:30:43 22  training course?

10:30:44 23    A. It's called Inside Essentials Training.

10:30:51 24    Q. I also received on Wednesday some

10:31:01 25  Structural Property Estimating Guidelines. Are you

Page 60

10:31:03 1  familiar with those?

10:31:04 2    A. I am.

10:31:05 3    Q. And that's what I'm trying to get at. Is

10:31:07 4  there anything comparable to that that you've ever

10:31:10 5  seen at AAA online or in a written form that deals

10:31:13 6  with how to decide what caused roof damage?

10:31:18 7    MR. ROBERTSON: What's the Bates on that?

10:31:22 8    MR. GIVENS: The first page is 1680.

10:31:30 9    MR. ROBERTSON: Okay. We don't have that

10:31:32 10  here.

10:31:32 11    MR. GIVENS: I'm asking him. He said

10:31:33 12  he's familiar with them.

10:31:34 13    THE WITNESS: Yeah.

10:31:36 14  BY MR. GIVENS:

10:31:36 15    Q. If you want to look at them, they're

10:31:36 16  right here (indicating).

10:31:39 17    A. No, I'm familiar with the estimating

10:31:40 18  guidelines. Those are specific to things like

10:31:42 19  masking versus linear foot to square foot, when

10:31:44 20  that would apply, where depreciation applied and

10:31:48 21  not applied, reasonable uniform appearance versus

10:31:52 22  matching. Those are not damage identification. We

10:31:56 23  follow the industry standard definitions for

10:32:00 24  investigation.

10:32:03 25    Q. And what is that?

Page 61

10:32:05 1    A. I mean, I guess it would depend. You

10:32:06 2  look for specific things to support or determine

10:32:12 3  the cause of loss.

10:32:14 4    Q. And where do you get this industry

10:32:16 5  standard for investigation from?

10:32:18 6    A. Well, like the definition of hail damage

10:32:20 7  is -- is standard amongst roofers and insurance

10:32:26 8  companies. Again, more specifically, we don't have

10:32:31 9  a document that says, "This is hail damage. This

10:32:33 10  is not."

10:32:35 11    Q. Okay.

10:32:35 12    A. We would through time and on-the-job

10:32:37 13  training and experience learn what to look for and

10:32:40 14  what you're trying to figure out and determine.

10:32:45 15    Q. And I know that there's not causation in

10:32:47 16  these guidelines. My question was is there

10:32:49 17  anything comparable to what I've just received as

10:32:53 18  Structural Property Estimating Guidelines that do

10:32:56 19  deal with causation?

10:32:58 20    A. Not to my knowledge, no.

10:32:59 21    Q. And that's online, written form,

10:33:01 22  anything?

10:33:02 23    A. I mean, not produced by CSAA. I'm sure

10:33:06 24  you could find some online that would --

10:33:08 25    Q. No. Just talking about at CSAA.

Page 62

```
10:33:11   1      A.  Not to my knowledge, no.

10:33:11   2      Q.  And you're not given anything from other

10:33:13   3   companies as a training or a claim handling

10:33:16   4   guideline?

10:33:16   5      A.  Not to my knowledge, no.

10:33:17   6      Q.  Okay.  And the Structural Property

10:33:20   7   Estimating Guidelines, that's where I got the

10:33:23   8   requirement that I mentioned earlier that you are

10:33:26   9   obligated to report to underwriting if something is

10:33:30  10   going on with a roof or the rest of the property

10:33:32  11   that --

10:33:33  12      A.  Correct.

10:33:35  13      Q.  -- creates an increased risk; right?

10:33:38  14      A.  Correct.

10:33:38  15      Q.  And one of those things would be an old

10:33:40  16   worn-out roof; correct?

10:33:42  17         MR. ROBERTSON:  Objection to form.

10:33:43  18         THE WITNESS:  Potentially, yes.

10:33:46  19   BY MR. GIVENS:

10:33:46  20      Q.  I mean, are you saying that if you see an

10:33:48  21   old worn-out roof you're just supposed to not to

10:33:52  22   say anything?

10:33:53  23         MR. ROBERTSON:  Objection to form.

10:33:54  24         THE WITNESS:  No.  What I'm saying is you

10:33:55  25   would review each roof on its own merits to
```

Page 63

```
10:33:58   1   determine whether an underwriting report would be

10:34:00   2   necessary.

10:34:00   3   BY MR. GIVENS:

10:34:00   4      Q.  The roof that you saw in the pictures of

10:34:01   5   the Godfrey house when you worked on their claim,

10:34:04   6   if you had seen it like that in 2017, is that a

10:34:07   7   good example of what you would have reported to as

10:34:09   8   underwriting?

10:34:11   9      A.  I can't say what I would have done in

10:34:13  10   2017 had I reviewed it, again, just because I just

10:34:16  11   saw it this week.  I don't know.  I didn't -- I

10:34:19  12   didn't review it as a reviewer.  I reviewed it as

10:34:22  13   taking an overview of the claim in preparation.

10:34:25  14      Q.  What I'm asking you is when you worked on

10:34:28  15   the 2018 claim, those pictures that you relied on

10:34:30  16   to basically deny their roof damage, I'm asking you

10:34:34  17   if you saw that, would you have reported that to

10:34:38  18   underwriting if that's how it looked in 2017?

10:34:42  19         MR. ROBERTSON:  Objection, form.

10:34:49  20         THE WITNESS:  I'm trying to think of --

10:34:51  21   so underwriting would be notified in the 2018 claim

10:34:54  22   that we denied damage based on wear and tear.  That

10:34:58  23   would be part of the claim.

10:34:59  24   BY MR. GIVENS:

10:34:59  25      Q.  That's not what I'm asking.
```

Page 64

```
10:35:00   1      A.  So had I saw that roof with the waves and

10:35:03   2   ridges and the edges torn back in 2017 would I have

10:35:08   3   turned that in to underwriting?  Potentially, yes.

10:35:08   4   I would --

10:35:08   5      Q.  How is it -- how is it potentially?

10:35:10   6   Because can you tell from those photos that water

10:35:12   7   is definitely going to be getting in there?

10:35:14   8      A.  If the photos looked like they did in

10:35:16   9   2018, then, yes.

10:35:17  10      Q.  That's all I'm trying to ask.  You would

10:35:20  11   have reported that under this requirement that

10:35:21  12   underwriting should be notified?

10:35:23  13      A.  I would have at least considered it given

10:35:25  14   the overall condition of the roof.  I might have

10:35:28  15   just noted it.  I might have discussed it with the

10:35:32  16   insured.  I mean, it's -- again, there's quite a

10:35:36  17   few factors that go into it.  And it could

10:35:40  18   potentially be, you know, harmful to the insured to

10:35:44  19   report that.  So if I had a discussion with the

10:35:46  20   insured, and we talked about it, then I might

10:35:48  21   potentially not, depending if they were planning on

10:35:53  22   repairing it.

10:35:53  23      Q.  Well, if that's not automatically

10:35:56  24   reportable, what is your understanding of when this

10:35:59  25   requirement applies?
```

Page 65

```
10:36:00   1      A.  Well, it's based on review of the file.

10:36:03   2   There's not a guideline that says, "Do it here.  Do

10:36:05   3   it there."  It's an -- it's -- an overview of the

10:36:07   4   file would tell you is there a potential risk that

10:36:08   5   needs to be notified of underwriting.  If you're

10:36:13   6   asking me personally based on the 2018 photos

10:36:15   7   would've I -- if I had reviewed those and -- as not

10:36:18   8   part of the claim, and they said, "This is not

10:36:20   9   claim-related damage," would I have reported that

10:36:22  10   in 2018, yes.

10:36:27  11      Q.  Let me find the guideline that goes with

10:36:32  12   our time period.  And I guess I should ask you, are

10:36:42  13   you familiar with these guidelines?

10:36:45  14      A.  Familiar with, yes.

10:36:46  15      Q.  Structural Property Estimating

10:36:47  16   Guidelines?

10:36:47  17      A.  They're not used every day, but yes.

10:36:49  18      Q.  Are adjusters handling these claims like

10:36:53  19   the Godfreys' supposed to know these guidelines?

10:36:57  20      A.  Generally speaking those are more for the

10:36:58  21   field and for -- given to our independent adjusting

10:37:02  22   firms, because, again, they're talking about

10:37:04  23   specific items in writing that estimate.  Our

10:37:07  24   inside adjusters do not generally write an entire

10:37:10  25   estimate.
```

Page 66

10:37:11 1    Q.  But for our purposes Sayde Brooks and
10:37:14 2  Mike White, the independent who handled this claim,
10:37:16 3  they should have followed these guidelines,
10:37:19 4  correct?
10:37:19 5    A.  I can't answer what they did and didn't
10:37:21 6  do as far as reporting.
10:37:22 7    Q.  I'm asking you are they required, to your
10:37:24 8  knowledge, to follow these guidelines, especially
10:37:27 9  Michael White who's on the roof?
10:37:29 10    A.  Mike White would have been required to
10:37:30 11  follow those guidelines.  Those would have been
10:37:33 12  provided to the independent adjusting firm.
10:37:35 13    Q.  And the same would be for the people who
10:37:36 14  saw the roof in 2017?
10:37:39 15    A.  I would have to say yes.
10:37:42 16    Q.  There is a revised version of the
10:37:43 17  guidelines with a revision date of July 12, 2017
10:37:48 18  that starts at page Godfrey -- strike that.
10:37:54 19      The revision to the estimating guidelines
10:37:56 20  dated July 12, 2017, which is labeled CSAA Godfrey
10:38:01 21  1782 --
10:38:05 22      MR. ROBERTSON:  Did you bring him a copy
10:38:06 23  to look at?
10:38:16 24  BY MR. GIVENS:
10:38:16 25    Q.  There you go.  (Hands document.)

Page 67

10:38:51 1    A.  1782.
10:38:51 2    Q.  Are you at 1782?
10:38:54 3    A.  Yes, I am.
10:38:55 4    Q.  Okay.  And you can see that that's the
10:38:57 5  revision date, July 12, 2017?
10:39:01 6    A.  Yes.
10:39:02 7    Q.  Okay.  So would you agree that this would
10:39:03 8  be the version that would likely apply to the
10:39:07 9  Godfrey claim --
10:39:07 10    A.  Yes.
10:39:07 11    Q.  -- which is from February of '18?
10:39:09 12    A.  Yes, sir.
10:39:09 13    Q.  If you'll turn to page 1786 -- no, I'm
10:39:14 14  sorry.  If you'll turn to page 1798, this is the
10:39:26 15  roof portion of the guidelines.  It says,
10:39:28 16  "Photographs on all inspections should include,"
10:39:31 17  and then it has various bullet points; right?
10:39:36 18    A.  Yes, sir.
10:39:41 19    Q.  The fifth bullet point says, "If during
10:39:42 20  the inspection there's any concern with the
10:39:44 21  insurability of the risk, photograph the concern
10:39:48 22  and all exterior views of the property to support
10:39:50 23  an underwriting referral"; correct?
10:39:52 24    A.  Correct.
10:39:53 25    Q.  Is that what we're talking about?

Page 68

10:39:54 1    A.  I believe that's what you're talking
10:39:55 2  about, yes.
10:39:56 3    Q.  Okay.  Same guidelines back on page 1785,
10:40:10 4  and this is talking about causation of a loss;
10:40:17 5  correct?
10:40:18 6    A.  Correct.
10:40:22 7    Q.  It says, "A clear and concise cause
10:40:22 8  statement must be based in an objective and
10:40:25 9  professional opinion as to how the loss came to
10:40:28 10  occur"; right?
10:40:29 11    A.  Correct.
10:40:29 12    Q.  "It is critical that estimators describe
10:40:32 13  what failed and how.  If an estimator cannot
10:40:35 14  definitively determine the failure, they may state
10:40:37 15  the difficulty clearly and then provide the most
10:40:40 16  reasonable explanation for the damage or, at their
10:40:43 17  discretion, involve a contractor or other expert
10:40:45 18  for assistance with determining the cause";
10:40:49 19  correct?
10:40:49 20    A.  Correct.
10:40:49 21    Q.  So again Mike -- Michael White was
10:40:57 22  required to follow this?
10:40:59 23    A.  Yes, sir.
10:40:59 24    Q.  And he did follow it.  He put on his
10:41:01 25  estimate that this was caused by snow and ice;

Page 69

10:41:04 1  correct?
10:41:04 2    A.  He did, yes, sir.
10:41:05 3    Q.  He didn't put on there that he had
10:41:07 4  trouble figuring it out or that an expert was
10:41:10 5  needed; right?
10:41:11 6    A.  Not to my knowledge, no.
10:41:12 7    Q.  And you could have used an expert at any
10:41:13 8  time if you thought one was needed; right?
10:41:15 9    A.  Correct.
10:41:15 10    Q.  So the only person that looked at this
10:41:18 11  roof from AAA was the independent adjuster, and he
10:41:26 12  conclusively said on his document that it was
10:41:27 13  caused by wind and snow; correct?
10:41:29 14    A.  That was his opinion, yes.
10:41:31 15    Q.  Okay.  And he --
10:41:31 16      MR. ROBERTSON:  Objection to form.
10:41:32 17  BY MR. GIVENS:
10:41:32 18    Q.  Is it true that he's the only one that
10:41:34 19  went out there from AAA?
10:41:36 20    A.  To my knowledge, he was the only one that
10:41:38 21  was physically out there, yes.
10:41:40 22    Q.  And to this day, December of 2019, has
10:41:42 23  anybody else from AAA gone out there?
10:41:44 24    A.  Not to my knowledge, no.
10:41:45 25    Q.  The only other expert, if you will, or

Page 70

10:41:48  1  contractor that got on this roof and looked at it,
10:41:51  2  he also told AAA that it was from ice and snow,
10:41:56  3  possibly from wind as well; correct?
10:41:59  4      MR. ROBERTSON: Objection to form.
10:42:00  5      THE WITNESS: Correct. He was not able
10:42:00  6  to determine an exact cause. He gave multiple
10:42:04  7  causes.
10:42:05  8  BY MR. GIVENS:
10:42:05  9      Q. To be fair, he gave those causes, right,
10:42:08 10  snow and ice and possibly wind --
10:42:11 11      MR. ROBERTSON: Objection to form.
10:42:12 12  BY MR. GIVENS:
10:42:12 13      Q. -- correct?
10:42:13 14      A. Correct. So he gave -- he gave a couple
10:42:15 15  of causes, yes.
10:42:16 16      Q. Okay. Were you working in the Oklahoma
10:42:22 17  City office when you did your work on this claim?
10:42:24 18      A. Yes, sir, I was.
10:42:26 19      Q. And so the evidence that you looked at to
10:42:29 20  make your decision was just looking at your
10:42:31 21  computer screen, photographs?
10:42:35 22      A. Looking at photographs, weather reports,
10:42:38 23  things like that, yes, sir.
10:42:41 24      Q. And these weather reports you say you
10:42:43 25  looked at, we'll never know what those are;

Page 71

10:42:47  1  correct?
10:42:47  2      MR. ROBERTSON: Objection to form.
10:42:48  3      THE WITNESS: I mean, I could probably
10:42:50  4  find them on Google if I tried. I'm not sure
10:42:52  5  exactly which ones I used but --
10:42:53  6  BY MR. GIVENS:
10:42:53  7      Q. And that's my point.
10:42:56  8      A. Okay.
10:42:56  9      Q. You're not certain of what you used;
10:42:58 10  correct?
10:42:58 11      A. Correct.
10:42:58 12      MR. ROBERTSON: Objection to form.
10:43:04 13  BY MR. GIVENS:
10:43:04 14      Q. Do you have any idea how much ice and
10:43:06 15  snow was on that flat roof?
10:43:10 16      A. At this time, no.
10:43:12 17      Q. Back then did you?
10:43:14 18      A. At the time I made the informed decisions
10:43:16 19  based on the photographs provided and the data
10:43:19 20  available with the weather.
10:43:21 21      Q. Well, neither of those told you how much
10:43:24 22  ice and snow was actually on that flat roof, did
10:43:26 23  they?
10:43:27 24      A. I mean, you can find how much ice and
10:43:29 25  precipitation was in an area. You can look at a

Page 72

10:43:31  1  lot of factors. You didn't actually have to be
10:43:34  2  standing there to see it.
10:43:35  3      Q. Are you saying that ice and snow does not
10:43:38  4  build up on a flat roof in a way that might be
10:43:42  5  different than how much ice and snow collects on
10:43:46  6  somebody's slanted roof a block away?
10:43:50  7      A. It would gather based on the amount of
10:43:53  8  precipitation in the area, yeah, and the runoff
10:43:56  9  from the rest of the house. There are factors to
10:43:58 10  it, yes.
10:44:00 11      Q. Right. So if there's one inch of snow in
10:44:03 12  an area, that doesn't specifically tell you how
10:44:05 13  much of that turned into ice and snow buildup on a
10:44:09 14  flat roof at Mr. Godfrey's house; right?
10:44:13 15      A. I mean, not particularly, no.
10:44:17 16      Q. And since there were no pictures of how
10:44:19 17  much ice and snow, to this day we'll never know;
10:44:22 18  right?
10:44:23 19      A. There were pictures weeks later that
10:44:25 20  still had water on the roof showing ponding
10:44:27 21  which --
10:44:28 22      Q. Not the ice and snow?
10:44:29 23      A. Not ice and snow, correct.
10:44:30 24      Q. Do you dispute that ice and snow is
10:44:32 25  what actually leaked in and got inside their house?

Page 73

10:44:35  1      A. No, not at all.
10:44:36  2      Q. And did you say earlier that you don't
10:44:39  3  dispute either that the ice and snow contributed to
10:44:42  4  the water going in?
10:44:44  5      A. I would say --
10:44:45  6      MR. ROBERTSON: Objection to form. Go
10:44:46  7  ahead.
10:44:47  8      THE WITNESS: -- the water came directly
10:44:49  9  from the ice and snow at the edges.
10:44:52 10  BY MR. GIVENS:
10:44:52 11      Q. And the weight of the ice and snow would
10:44:54 12  have had some impact on how the roof performed;
10:44:57 13  right?
10:44:58 14      MR. ROBERTSON: Objection to form.
10:45:00 15      THE WITNESS: It didn't appear to in this
10:45:01 16  case.
10:45:03 17  BY MR. GIVENS:
10:45:03 18      Q. How do you know that?
10:45:04 19      A. I mean, based on the levels of waves and
10:45:06 20  deterioration, the fact that there was still
10:45:09 21  ponding water showed that drainage for the roof
10:45:11 22  wasn't great. There were already low spots which
10:45:14 23  happen over time on flat roofs.
10:45:17 24      Q. But how do you rule out that that snow
10:45:18 25  and ice that was building up on there had any --

Page 74

10:45:21  1    A.   Because the snow and --

10:45:21  2    **Q.   -- contribution to it?**

10:45:22  3    A.   The snow and ice that entered the home

10:45:24  4  was at the edge of the roof, not in the center

10:45:26  5  where it would have been pulling back or even on

10:45:28  6  the edge where it would have been pulling back.  It

10:45:31  7  was at the edge.  That's why it entered the home.

10:45:33  8    **Q.   If ice forms at the edge of a flat roof,**

10:45:36  9  **can it lift the roof as it --**

10:45:37 10         MR. ROBERTSON:  Objection.

10:45:37 11  BY MR. GIVENS:

10:45:37 12    **Q.   -- goes in there and expands as it**

10:45:40 13  **freezes?**

10:45:41 14         MR. ROBERTSON:  Objection to form.

10:45:42 15         THE WITNESS:  I mean, could it

10:45:43 16  potentially, yes.  It did not appear to have done

10:45:47 17  that in this case, no.

10:45:48 18  BY MR. GIVENS:

10:45:48 19    **Q.   How do you know?**

10:45:48 20    A.   Again, based on how the cupping was

10:45:50 21  formed and things like that.  It was very uneven.

10:45:55 22  It was stretched in certain areas.  There appeared

10:45:57 23  to have been previous repairs on those edges.

10:46:00 24  There was enough for me to believe that this was

10:46:02 25  not caused by the ice and snow from one event.

Page 75

10:46:11  1  BY MR. GIVENS:

10:46:11  2    **Q.   When I was trying to set up your**

10:46:19  3  **deposition back in November, I was told at one**

10:46:23  4  **point that you said you had never been involved in**

10:46:26  5  **this claim.  Do you know anything about that?**

10:46:29  6    A.   I do.  When I was first asked about this

10:46:33  7  claim, it was -- a different claim number was

10:46:35  8  provided to me, but when I looked at that file I

10:46:38  9  had no involvement in the claim, but there was

10:46:40 10  another Mark that had been involved in the claim,

10:46:43 11  so I was asking for clarification if I was the

10:46:45 12  right person, and then when I was provided the

10:46:47 13  estimate that showed I was the estimator, it had a

10:46:50 14  different claim number than what I was originally

10:46:53 15  provided and asked about.

10:46:54 16         MR. ROBERTSON:  So I assume that was a

10:46:56 17  mistake of counsel in giving him a claim number

10:47:00 18  so --

10:47:00 19         MR. GIVENS:  All I know is what I was

10:47:01 20  told.  That's why I'm asking.

10:47:03 21         MR. ROBERTSON:  I think I told you that

10:47:04 22  before.

10:47:07 23  BY MR. GIVENS:

10:47:07 24    **Q.   What was your title at the time you**

10:47:09 25  **decided this claim?**

Page 76

10:47:11  1    A.   Desk review specialist.

10:47:13  2    **Q.   And where does that fall in the chain of**

10:47:14  3  **titles?**

10:47:15  4    A.   In the chain of titles it doesn't exist

10:47:18  5  anymore.  It's part -- it's been part of the

10:47:22  6  homeowner claim specialist group now.  At the time

10:47:24  7  you had adjusters, specialists, desk review

10:47:27  8  specialists, and senior adjusters.

10:47:30  9    **Q.   Did you have some type of special focus**

10:47:32 10  **that you focused on during that period of time?**

10:47:35 11    A.   As a desk review specialist you were not

10:47:38 12  a file owner.  You reviewed estimates and works

10:47:41 13  from independent adjusters or supplements from

10:47:42 14  contractors.

10:47:43 15    **Q.   Was it propertywide or did you just focus**

10:47:46 16  **on roofs?**

10:47:46 17    A.   No, no.  It was -- it was propertywide.

10:47:50 18    **Q.   Okay.  So no matter what the cause of**

10:47:53 19  **loss or what the nature of the damage was, you**

10:47:55 20  **reviewed estimates that came in?**

10:47:57 21    A.   Correct, sir.

10:47:58 22    **Q.   Would you only review certain estimates**

10:48:00 23  **or you had to review every estimate?**

10:48:03 24    A.   I had to review any estimate that came

10:48:05 25  into our queue.

Page 77

10:48:07  1    **Q.   How was your volume measured?  I know**

10:48:10  2  **adjusters, they have how many pending claims they**

10:48:12  3  **have.**

10:48:13  4    A.   Right.

10:48:13  5    **Q.   What was it for you?**

10:48:14  6    A.   At the time it was either amount of

10:48:17  7  claims per day or dollar amount, because some

10:48:20  8  estimates we reviewed were larger, and we didn't

10:48:22  9  want to encourage people to rush through.  So we

10:48:25 10  looked at claims done and dollar amount reviewed,

10:48:28 11  not changed or just, you know, what was it you

10:48:31 12  pulled.  If you pulled a $1.2 million fire, you

10:48:34 13  probably are going to spend a day or two on that

10:48:38 14  versus smaller claims that -- you know, mitigation

10:48:41 15  bills that you can review fairly quickly.

10:48:43 16    **Q.   You said dollar amount, but what was it**

10:48:46 17  **you said before then?**

10:48:47 18    A.   Claims per day.

10:48:48 19    **Q.   And what was your claims per day**

10:48:50 20  **requirement or average?**

10:48:51 21    A.   The goal was five to seven reviews per

10:48:55 22  day.

10:48:56 23    **Q.   And that would have been at the time you**

10:48:59 24  **were doing the Godfreys?**

10:49:01 25    A.   At the time I was doing Godfreys', I

Page 78

10:49:04 1 believe it was, yes. Might even have been four,

10:49:07 2 but we adjusted a little bit, but it was no less

10:49:09 3 than four claims per day would have been the -- the

10:49:12 4 goal for that.

10:49:13 5    Q.  How much time do you estimate that you

10:49:14 6 actually took on this claim before you decided it

10:49:17 7 was not caused by ice or snow?

10:49:20 8    A.  In reviewing the notes, several hours. I

10:49:25 9 also believe the notes reflect I discussed it with

10:49:28 10 another desk reviewer who had a lot of roof

10:49:35 11 knowledge as well, the owning adjuster, to discuss

10:49:38 12 what we were seeing.

10:49:39 13    Q.  Who did you discuss it with?

10:49:41 14    A.  Sayde Brooks, the owning adjuster, and if

10:49:44 15 I recall correctly, Glenn Bearden, who was another

10:49:48 16 desk reviewer, we -- part of the team, we would

10:49:53 17 just bounce things off each other.

10:49:53 18    Q.  Bearden, B-e-a-r-d-e-n?

10:49:56 19    A.  Correct.

10:49:56 20    Q.  First name Glenn?

10:49:58 21    A.  Yes.

10:49:58 22    Q.  Where is he now?

10:49:59 23    A.  I believe he's still in Oklahoma City as

10:50:02 24 a desk reviewer.

10:50:07 25    Q.  Do you have idea any how long he's been

Page 79

10:50:10 1 with the company?

10:50:10 2    A.  Quite a while.  Off the top of my head,

10:50:12 3 I'm not sure.  Quite a while.

10:50:16 4    Q.  What about Sayde?  Do you know how long

10:50:17 5 she's been with the company?

10:50:17 6    A.  I know she actually has been in property

10:50:20 7 at least as long as I have.  We did policy training

10:50:23 8 together.  Before that she worked for CSAA I

10:50:26 9 believe in auto claims, so I would guess

10:50:28 10 probably -- if I was guessing, between three and

10:50:31 11 five years.

10:50:31 12    Q.  So she started when you did, is that what

10:50:33 13 you're saying?

10:50:34 14    A.  She started at home when I did, but she

10:50:36 15 had worked for the company previous to that.

10:50:39 16    Q.  Right.  What did you do to review for

10:50:46 17 your deposition?

10:50:47 18    A.  I reviewed the estimate and photos when I

10:50:49 19 received the correct claim number.  I reviewed just

10:50:53 20 an overall my involvement in the file, and then I

10:50:57 21 met with our attorneys earlier this week to discuss

10:51:00 22 the overall deposition, and then we -- yesterday I

10:51:04 23 actually reviewed the supplemental information

10:51:07 24 provided by Ultimate Roofing and looked at the

10:51:10 25 previous claims.

Page 80

10:51:13 1    Q.  I thought earlier you said you only

10:51:15 2 reviewed the one claim from '17 where the

10:51:19 3 overlap --

10:51:19 4    A.  Correct.

10:51:19 5    Q.  -- was going?

10:51:20 6    A.  Sorry.  Previous claim.  I'm --

10:51:24 7    Q.  You haven't reviewed any other claim

10:51:25 8 files?

10:51:26 9    A.  Outside of the one where I tried to look

10:51:27 10 and see if I had an involvement, no.

10:51:32 11    Q.  How long did you spend with the

10:51:35 12 attorneys?

10:51:37 13    A.  Probably three and a half to four

10:51:38 14 hours.

10:51:39 15    Q.  Was that here?

10:51:40 16    A.  Yesterday for about an hour and a half to

10:51:43 17 two hours here and then via phone call earlier in

10:51:46 18 the week.

10:51:47 19    Q.  So when you said "met with," it was just

10:51:49 20 by phone --

10:51:50 21    A.  Yes.

10:51:50 22    Q.  -- earlier?

10:51:50 23    A.  Yeah.

10:51:51 24    Q.  Okay.  So you're thinking three to four

10:51:53 25 hours total this week, talking to them?

Page 81

10:51:55 1    A.  I would say that's a fair estimate,

10:51:57 2 yes.

10:51:57 3    Q.  Okay.  And how long would you estimate

10:52:00 4 you spent looking at the estimates, pictures, and

10:52:01 5 the other claim documents?

10:52:02 6    A.  Probably another couple hours.

10:52:15 7    Q.  Did you look at anything else that you

10:52:17 8 haven't just identified?

10:52:19 9    A.  Not that I can recall, sir.

10:52:26 10    Q.  Are you currently scheduled to testify in

10:52:30 11 any trials?

10:52:30 12    A.  No, sir.

10:52:31 13    Q.  And you said no depos are scheduled at

10:52:32 14 this point?

10:52:33 15    A.  No, sir.

10:52:33 16    Q.  Do you know of any other cases from

10:52:36 17 Oklahoma on claims that you worked on?

10:52:38 18    MR. ROBERTSON:  Object to form.

10:52:39 19    THE WITNESS:  Not that I'm aware of.  I'm

10:52:39 20 sorry.  Not that I'm aware of.

10:52:40 21    MR. GIVENS:  Why don't we just take a

10:52:41 22 break.  We've been going a while.

10:52:43 23    THE VIDEOGRAPHER:  We are off the record,

10:52:47 24 10:52 a.m.

11:03:54 25    (Recess taken.)

Page 82

11:04:00  1      THE VIDEOGRAPHER: We're back on the
11:04:01  2  record, 11:03 a.m.
11:04:04  3  BY MR. GIVENS:
11:04:04  4      Q.  Sir, I want to ask a follow-up question.
11:04:09  5  Earlier you said you had discussed the Godfrey
11:04:15  6  claim with Sayde Brooks and Glenn Bearden.  Was
11:04:20  7  there anybody else you discussed it with when you
11:04:23  8  were working on it?
11:04:24  9      A.  I'm not a hundred percent positive.  I'm
11:04:26 10  assuming Alana Hare, Sayde's supervisor, normally
11:04:30 11  would have been involved in a conversation.  I
11:04:32 12  can't say a hundred percent that she was or if she
11:04:34 13  just was kind of within earshot.
11:04:38 14      Q.  Anybody else?
11:04:40 15      A.  Not to my knowledge.
11:04:42 16      Q.  Were there any e-mails that went around
11:04:44 17  between any of you about the claim?
11:04:49 18      A.  I'm not positive.  I believe I e-mailed
11:04:53 19  U.S. Adjusting, the manager.
11:05:04 20      Q.  Anybody else?  Any e-mails with Sayde,
11:05:06 21  Alana, Glenn?
11:05:07 22      A.  I don't recall any.  It's been a couple
11:05:09 23  years, so I mean -- normally I would just in the
11:05:11 24  same office have the conversation, so I don't know
11:05:13 25  that I would have sent any e-mails on that.

Page 83

11:05:16  1      Q.  Is it true that e-mails do not
11:05:18  2  automatically get saved as part of the claim file
11:05:23  3  at AAA?
11:05:25  4      A.  Yes, that is true.
11:05:26  5      Q.  And is it still that way.
11:05:28  6      A.  Unless -- I mean, you can have them put
11:05:30  7  into the claim file, but not every e-mail needs to
11:05:32  8  be in a claim file, so --
11:05:33  9      Q.  You have to affirmatively do that?
11:05:35 10      A.  Yes.
11:05:36 11      Q.  What reasons would you do that?
11:05:38 12      A.  If it was something that we felt would
11:05:40 13  need to be in.  A lot of times documentation or a
11:05:44 14  reply to, say, a contractor or the insured we would
11:05:47 15  want record of that in file just so we're not
11:05:51 16  standing on the word that we did reply to someone.
11:05:53 17      Q.  You mentioned that you e-mailed the
11:05:56 18  adjuster for U.S. Adjusting, and I didn't see that
11:06:05 19  in the claim file.  Do you know why that would be?
11:06:05 20      A.  I don't know.  I don't -- it wouldn't
11:06:05 21  have been copied to the claim.  It would have --
11:06:05 22  could have just been, "Hey, I've got a quick
11:06:05 23  question on this."
11:06:05 24      Q.  Do you remember what his reply was?
11:06:07 25      A.  I don't.

Page 84

11:06:08  1      Q.  And that's not in the file either that
11:06:09  2  you've reviewed?
11:06:13  3      A.  No.
11:06:13  4      Q.  Do you have any idea what Michael White's
11:06:19  5  background or experience is?
11:06:22  6      A.  Do I know his experience, no.
11:06:22  7      Q.  Or his training?
11:06:22  8      A.  No, sir.
11:06:23  9      Q.  Or how long he's been evaluating roofs?
11:06:26 10      A.  No, sir.
11:06:27 11      Q.  Do you know if they kept using him after
11:06:29 12  this claim?
11:06:30 13      A.  After this claim, I don't know for sure.
11:06:32 14  I don't believe they still use him, no.
11:06:34 15      Q.  Are you saying that something
11:06:36 16  affirmatively was done to -- to exclude him from
11:06:39 17  claims or you just don't know?
11:06:41 18      A.  I don't know.  I know I had several
11:06:44 19  claims where he probably didn't do the most
11:06:47 20  thorough investigation.  Even in this one I had to
11:06:50 21  add items to the estimate he missed.  I know when
11:06:53 22  we had those situations in him specifically, that
11:06:57 23  we reported that to our vendor group, and they work
11:07:00 24  directly with -- with U.S. Adjusting or the other
11:07:07 25  vendors.

Page 85

11:07:07  1      Q.  Did that happen before the Godfreys'
11:07:10  2  claim?
11:07:11  3      A.  Had I talked to vendor management about
11:07:14  4  him before, yes.
11:07:15  5      Q.  And did it happen after the Godfreys'
11:07:17  6  claim?
11:07:18  7      A.  I don't recall working any claims with
11:07:20  8  him after the Godfreys' claim.
11:07:22  9      Q.  What was your concern, if you had any,
11:07:23 10  other than leaving things out of estimates?
11:07:26 11      A.  He wasn't very thorough.  He had poor
11:07:31 12  documentation.
11:07:35 13      Q.  Anything else?
11:07:46 14      A.  Off the top of my head, no.
11:07:48 15      Q.  How do you think he could be so wrong
11:07:50 16  about this roof?
11:07:51 17      A.  I -- if you're asking for my opinion, I
11:07:53 18  feel like he just went out there, and the
11:07:54 19  contractor told him that's what it was, and he
11:07:57 20  didn't do much of an investigation on it.
11:07:59 21      Q.  What evidence do you have that the
11:08:01 22  contractor told him anything?
11:08:04 23      MR. ROBERTSON: Objection to form.
11:08:04 24      THE WITNESS: That's just how it -- it
11:08:07 25  came across, the way it appeared to me.

Page 86

11:08:09  1  BY MR. GIVENS:
11:08:09  2     Q.  From what?
11:08:10  3     A.  Just from his notes and his pictures and
11:08:11  4  what he would -- he didn't address a lot of things
11:08:13  5  on there that you would like to see in a file as
11:08:17  6  far as the previous damage and things like that.
11:08:21  7     Q.  So you think the contractor told
11:08:25  8  Michael White what the cause should be, and he went
11:08:27  9  with it?  Am I understanding you correctly?
11:08:30  10    A.  I think he was told that this was what
11:08:31  11  the claim was reported for, not -- I can't say that
11:08:33  12  the contractor did or didn't say that.  This is
11:08:37  13  what the claim was reported for, and that's just
11:08:40  14  what he said it was.  When we take a report, they
11:08:42  15  tell us what they think it is, and I think he just
11:08:45  16  went out there and said, "That's what this is."  I
11:08:48  17  don't know if the contractor did or didn't.  I
11:08:51  18  apologize.
11:08:51  19    Q.  Well, he got on all the roofs,
11:08:53  20  photographed all the roofs in the house and things,
11:08:56  21  didn't he?
11:08:56  22    A.  Yes.
11:08:56  23    Q.  And the interior?
11:08:58  24    A.  Yes.
11:08:58  25    Q.  So he did an investigation?

Page 87

11:08:59  1     A.  He did do an investigation, yes.
11:09:01  2     Q.  And what makes you think that he didn't
11:09:04  3  think about independently what the cause was?
11:09:08  4     A.  He didn't have notes to support that,
11:09:11  5  didn't -- he just put his general note in and went
11:09:14  6  from there.
11:09:18  7     Q.  What other information do you think
11:09:19  8  should have been in there?
11:09:21  9     A.  Well, I think the condition of the roof
11:09:22  10  should have been noted.  I think it should have
11:09:24  11  been taken into account during his investigation.
11:09:27  12  I think he probably should have followed up more on
11:09:30  13  the preexisting damages and the previous repairs
11:09:34  14  that were evident in the photos that he didn't have
11:09:37  15  notes either way, affirmative or denying on.
11:09:41  16    Q.  Do you remember what you asked him in
11:09:42  17  your e-mail?
11:09:43  18    A.  I do not.
11:09:55  19    Q.  Was there some type of vendor that these
11:09:58  20  adjusters were hired through or did you hire them
11:10:02  21  directly from U.S. Adjusting?
11:10:04  22    A.  So we would assign it to U.S. Adjusting,
11:10:06  23  and U.S. Adjusting would select a vendor.
11:10:08  24    Q.  Do you have any idea where Michael White
11:10:10  25  was located out of?

Page 88

11:10:12  1     A.  I don't.  I know he worked claims in the
11:10:15  2  Oklahoma territory.  That's usually the claims I
11:10:19  3  came across.
11:10:20  4     Q.  Had you ever met him?
11:10:22  5     A.  No, sir, not to my knowledge.
11:10:22  6     Q.  Did you ever confront him about any of
11:10:24  7  your concerns?
11:10:25  8     A.  I had conversations with him clarifying
11:10:27  9  questions.  On several claims I would call and ask
11:10:30  10  for, "Hey, what was this?  What did you think of
11:10:33  11  this?"  We had several discussions around hail
11:10:36  12  identification and how he noted it.
11:10:41  13    Q.  Did you ever let him know you didn't
11:10:43  14  think he was doing an adequate job?
11:10:47  15    A.  I did discuss with him how he noted
11:10:51  16  files.
11:10:52  17    Q.  Anything other than that?
11:10:57  18    A.  Not that I recall.
11:10:57  19    Q.  Did you ever have a conflict with him or
11:10:59  20  a discussion with him about misdiagnosing the cause
11:11:02  21  of losses?
11:11:08  22        MR. ROBERTSON:  Objection, form.
11:11:08  23        THE WITNESS:  I would say the discussions
11:11:10  24  I had with him, that I can recall, were more around
11:11:12  25  the thoroughness in his notes.

Page 89

11:11:17  1  BY MR. GIVENS:
11:11:17  2     Q.  When's the last time you've seen his name
11:11:20  3  in a CSAA claim?
11:11:22  4     A.  For me personally it probably would have
11:11:24  5  been this claim, that I can recall.
11:11:28  6     Q.  When did you get out of actually
11:11:31  7  reviewing claims as an Oklahoma related --
11:11:33  8     A.  Sure.  So I promoted to desk review
11:11:43  9  supervisor in May of 2018, so I didn't do the
11:11:46  10  firsthand reviews at that point, and then in
11:11:47  11  January of 2019 I promoted to a manager.
11:11:50  12    Q.  So in May of '18 you stopped being a
11:11:53  13  daily claim reviewer or --
11:11:55  14    A.  Yes, sir.
11:11:55  15    Q.  -- estimate reviewer?
11:11:57  16    A.  Yes, sir.
11:11:57  17    Q.  And you just manage now the people who do
11:11:59  18  that?
11:12:00  19    A.  I did at that time, yes.
11:12:01  20    Q.  And now you're a manager over adjusters?
11:12:04  21    A.  Yes, sir.
11:12:05  22    Q.  Is that a normal just manager role?  You
11:12:10  23  supervise the way they handle claims and deal with
11:12:12  24  them on claims?
11:12:15  25    A.  I more manage the day-to-day operations.

Page 90

11:12:18  1  I have a team of supervisors that report to me that
11:12:21  2  are more in the files on a daily basis, managing
11:12:24  3  workloads, things like that.
11:12:25  4     Q.  So does Alana Hare report to you or, no,
11:12:30  5  she's out of your area?
11:12:32  6     A.  She is out of my area.
11:12:33  7     Q.  Is that the kind of person that reports
11:12:35  8  to you, though?
11:12:36  9     A.  Yes, yes, I have the same level that
11:12:37 10  reports to me.
11:12:38 11     Q.  Did you ever supervise Sayde Brooks?
11:12:41 12     A.  No, sir.
11:12:42 13     Q.  Or Alana Hare?
11:12:43 14     A.  No, sir.
11:12:44 15     Q.  Do you have any idea what kind of
11:12:48 16  adjuster Sayde Brooks is?
11:12:50 17     A.  My experience with Sayde is she's a good
11:12:52 18  adjuster.
11:12:53 19     Q.  Do you think she has the experience and
11:12:54 20  the expertise to diagnose causes of roof damage or
11:12:56 21  did they leave that to people like you?
11:12:58 22     A.  At the time I think she had the support
11:13:00 23  to help make those determinations as she was
11:13:02 24  learning.  That's why I would be reviewing that
11:13:04 25  file and working with her on it, not just making

Page 91

11:13:08  1  decisions, discussing it with her.
11:13:10  2     Q.  Did some adjusters at her office do those
11:13:13  3  decisions on their own; they wouldn't send them to
11:13:15  4  you?
11:13:16  5     A.  As they were more tenured and there would
11:13:19  6  be determinations on their levels of authority
11:13:21  7  given by their supervisors, yes, there would be.
11:13:29  8     Q.  So AAA was not letting her decide cause
11:13:32  9  of roof damage on her own at that point?
11:13:34 10     A.  At that time it wasn't based on the cause
11:13:37 11  that it came to me.  It was based on the dollar
11:13:40 12  amount of the estimate.  So I would say she
11:13:42 13  didn't -- nobody told her not to, but because -- or
11:13:45 14  to determine the cause.  It was just above her
11:13:47 15  authority for dollar amount to review, so it came
11:13:49 16  to me.
11:13:50 17     Q.  Do you know what her authority was?
11:13:51 18     A.  At that time I want to say probably
11:13:53 19  $5,000.
11:13:58 20     Q.  Would that be total for a loss or would
11:14:00 21  that be --
11:14:00 22     A.  Per indi --
11:14:01 23     Q.  -- part of the roof --
11:14:01 24     A.  Per individual estimate.
11:14:01 25     MR. ROBERTSON:  Whoa, whoa, whoa.  Let

Page 92

11:14:02  1  him finish his question.
11:14:03  2     THE WITNESS:  Oh, sorry.
11:14:04  3     MR. GIVENS:  Sorry, I was stuttering.
11:14:05  4  BY MR. GIVENS:
11:14:05  5     Q.  Would the 5,000 authority be for the
11:14:07  6  total loss or would it be 5,000 for the roof or
11:14:11  7  5,000 for inside?
11:14:12  8     A.  Right.  So for review of the estimate
11:14:14  9  itself, it would be per that estimate.  For
11:14:19 10  authority to make a decision in payment, it could
11:14:22 11  be a multitude of factors.
11:14:24 12     Q.  But this estimate from Michael White was
11:14:26 13  more than $5,000 replacement cost, so that's why it
11:14:31 14  went above her?
11:14:32 15     A.  Correct.
11:14:32 16     Q.  Do you know if any reserves were ever set
11:14:34 17  on this claim?
11:14:37 18     MR. ROBERTSON:  Objection to form.
11:14:38 19     THE WITNESS:  I'm assuming they were.  We
11:14:40 20  usually set them when we set -- when we open -- the
11:14:42 21  process is to set them when you open the
11:14:44 22  exposures.
11:14:45 23  BY MR. GIVENS:
11:14:45 24     Q.  Do you know what it was on this claim?
11:14:47 25     MR. ROBERTSON:  Objection to form.

Page 93

11:14:48  1     THE WITNESS:  I don't know offhand, no.
11:14:50  2  BY MR. GIVENS:
11:14:50  3     Q.  Would that normally be in the claim file?
11:14:52  4     A.  I don't know if it would or wouldn't.
11:14:53  5  It's -- once they go away I'm not sure that there's
11:14:56  6  a way to track them.
11:14:58  7     Q.  Do you remember any reserves on this
11:15:00  8  claim?
11:15:01  9     MR. ROBERTSON:  Objection to form.
11:15:02 10     THE WITNESS:  I don't remember looking
11:15:03 11  for any.  I assume they would be there.
11:15:08 12  BY MR. GIVENS:
11:15:08 13     Q.  Earlier you told me what -- why you
11:15:10 14  didn't think this was ice and storm damage on this
11:15:14 15  roof of the Godfreys'.  Can you tell me what you
11:15:18 16  would have seen if it was ice and storm damage that
11:15:23 17  caused the loss, the factors you would have seen
11:15:27 18  versus what you didn't see?
11:15:28 19     A.  Sure.
11:15:29 20     MR. ROBERTSON:  Objection to form.  Go
11:15:29 21  ahead.
11:15:30 22     THE WITNESS:  What I saw was evidence of
11:15:32 23  long-term damage based on the overall roof.  What I
11:15:37 24  would have looked for to see if this was from the
11:15:40 25  one-time ice event would have been the lack of the

Page 94

11:15:43  1  presence of all the other deterioration, ponding,
11:15:46  2  waves, and stretch as well as looking at the area
11:15:50  3  to see that there was probably a previous repair
11:15:52  4  done based on the different levels of
11:15:56  5  deterioration.
11:16:04  6  BY MR. GIVENS:
11:16:04  7      Q.  Is that it?
11:16:05  8      A.  I mean, I again would have reviewed the
11:16:07  9  weather, did it support having ice sitting there
11:16:08 10  for a few days that could have caused that damage.
11:16:10 11      Q.  Is it true that you did find weather
11:16:13 12  reports confirming ice and snow in the Godfreys'
11:16:17 13  area?  You just didn't feel like it was enough?
11:16:20 14      A.  If I recall correctly, the weather report
11:16:24 15  supported ice and snow but not for an extended
11:16:27 16  period of time.
11:16:27 17      Q.  Do you know if that roof was in the shade
11:16:29 18  or in the sun?
11:16:31 19      A.  Based on the photos I've seen, it did not
11:16:33 20  appear to be shaded to where it would have been an
11:16:35 21  issue.
11:16:42 22      Q.  And what do you look for to tell if
11:16:46 23  something is wind damaged?
11:16:48 24      A.  For wind damage, torn seals, torn
11:16:52 25  material, lifting, debris, creases.

Page 95

11:17:07  1      Q.  Now, the factors you've gone over for ice
11:17:10  2  and snow and wind damage, are those from a book or
11:17:12  3  a manual you were given at some point or is it just
11:17:15  4  all on the job?
11:17:16  5      A.  I would say mainly experience and
11:17:18  6  training.
11:17:18  7      Q.  I noticed reference to Haag guidelines.
11:17:21  8  Do you have any Haag manuals or Haag books that you
11:17:25  9  go by?
11:17:25 10      A.  I mean, a long time ago I used to carry a
11:17:29 11  Haag book in my car for discussions, but that was
11:17:33 12  years and years and years ago before I had gotten
11:17:36 13  on a lot of roofs.
11:17:37 14      Q.  Do you believe the Haag materials are
11:17:43 15  authoritative?
11:17:43 16      A.  I believe the Haag materials that I
11:17:44 17  referenced usually were generally around wind and
11:17:45 18  hail.  I felt like they were pretty -- pretty
11:17:48 19  solid.
11:17:49 20      Q.  I guess what I'm asking is are they
11:17:52 21  authoritative in your industry?  Do --
11:17:55 22      A.  I would say --
11:17:56 23      Q.  -- people rely on them to --
11:17:56 24      A.  I would say, yes, people do rely on Haag
11:17:58 25  quite a bit in our industry.

Page 96

11:18:01  1      Q.  Anybody else you can think of that's
11:18:03  2  similar that people think is authoritative and --
11:18:08  3      A.  As far as like roof damage
11:18:09  4  identification, they're generally the go-to for
11:18:12  5  most.
11:18:21  6      Q.  I'm not going to ask for amounts, but
11:18:23  7  how's your performance recognized by CSAA, whether
11:18:29  8  it be profit sharing, bonuses, that type of thing?
11:18:32  9  Again, I'm not asking amounts, but how is that
11:18:34 10  done?
11:18:36 11          MR. ROBERTSON:  Objection to form.
11:18:36 12          THE WITNESS:  As far as just in general?
11:18:39 13  BY MR. GIVENS:
11:18:39 14      Q.  And let's go back to the February of '18
11:18:41 15  time period --
11:18:41 16      A.  So --
11:18:41 17      Q.  -- when you were in Oklahoma.
11:18:43 18      A.  Sure.  Every employee is eligible for a
11:18:47 19  merit bonus based -- or a merit raise based on
11:18:52 20  performance against yours.  Everyone in the company
11:18:54 21  is eligible for a bonus based on company
11:19:02 22  performance and your contributions to those
11:19:03 23  things.
11:19:04 24      Q.  What factors go into the merit raise?
11:19:06 25      A.  The merit raise would be based on your

Page 97

11:19:10  1  performance against your individual goals.
11:19:12  2      Q.  Can you give us some sample goals?
11:19:14  3      A.  You mentioned earlier goals for a desk
11:19:18  4  reviewer or claims per day, dollar amount reviewed.
11:19:23  5  Everybody in the company's held to an NPS, or a net
11:19:27  6  promoter score goal, as we all have a part in the
11:19:31  7  claims process.  For an individual general adjuster
11:19:33  8  it would be phone metrics such as calls that go to
11:19:36  9  voicemail, calls returned the same day, outbound to
11:19:40 10  inbound call ratios.
11:19:45 11      Q.  What about NPS goals?  What is that?
11:19:48 12      A.  NPS would be our net promoter score.
11:19:50 13  Whether we have promoters or detractors on a
11:19:51 14  survey, it goes out on claims.
11:19:56 15      Q.  Oh, I meant to ask you, did you notify or
11:19:59 16  write any letters or e-mails negative of
11:20:03 17  Michael White's work on this claim at all?
11:20:07 18      A.  Not to my recollection.  I think I asked
11:20:09 19  for clarification.  It would have been the e-mail,
11:20:12 20  which wasn't uncommon.
11:20:15 21      Q.  But beyond that where you reached out to
11:20:17 22  him, what I'm asking is did you do anything within
11:20:19 23  CSAA to say, "Hey, this guy made a mistake"?
11:20:23 24      A.  I have notified our vendor management
11:20:25 25  team.

Page 98

```
11:20:25  1      Q.  About this particular claim?
11:20:27  2      A.  I believe I did, yes.
11:20:28  3      Q.  In what way?
11:20:29  4      A.  Just let them know that there wasn't a
11:20:31  5  thorough investigation completed.
11:20:32  6      Q.  In what way did you notify them?
11:20:34  7      A.  Verbally.
11:20:35  8      Q.  Who did you talk to?
11:20:36  9      A.  Lucas Richards was the vendor manager at
11:20:40 10  the time.
11:20:40 11      Q.  Is he still around?
11:20:41 12      A.  No. He's left the company fairly
11:20:44 13  recently.
11:20:44 14      Q.  Do you know where he went?
11:20:45 15      A.  I believe just to be with his family.
11:20:51 16      Q.  He retired or --
11:20:53 17      A.  He resigned.
11:20:54 18      Q.  Do you know where he works?
11:20:55 19      A.  I do not.
11:20:58 20      Q.  And what was his response?
11:21:02 21      A.  It wasn't really a response.  Just
11:21:03 22  basically if we started to see trends or patterns,
11:21:08 23  we would let them know so he could address it with
11:21:09 24  the vendor.  That was kind of his role, the liaison
11:21:10 25  between.
```

Page 99

```
11:21:11  1      Q.  And the vendor is U.S. Adjustment (sic)?
11:21:14  2      A.  Correct.
11:21:17  3      Q.  Has anything changed as a result of how
11:21:19  4  this claim was handled?  Any changes been made in
11:21:22  5  how they do anything in terms of diagnosing roof
11:21:25  6  damage?
11:21:26  7          MR. ROBERTSON:  Objection to the form.
11:21:27  8          THE WITNESS:  How U.S. Adjusting does?
11:21:29  9  BY MR. GIVENS:
11:21:30 10      Q.  No, how CSAA.
11:21:31 11      A.  I mean, we still try to do a thorough
11:21:33 12  investigation on every claim.
11:21:36 13      Q.  My question is just because of the
11:21:43 14  Godfrey claim, has anybody done anything to
11:21:46 15  implement any type of change in the way these
11:21:50 16  claims are handled?
11:21:51 17      A.  Not to my knowledge.
11:21:52 18      Q.  And U.S. Adjustment still handles claims
11:21:58 19  for CSAA?
11:22:00 20      A.  Yes, sir.
11:22:01 21      Q.  Did anything ever come back to you after
11:22:03 22  you talked to Mr. Richards?
11:22:06 23      A.  On this particular --
11:22:07 24      Q.  About Mr. White.
11:22:09 25      A.  No, not that I can recall.
```

Page 100

```
11:22:10  1      Q.  And I think you said you told him you had
11:22:12  2  an issue with thoroughness.  Did you talk about any
11:22:15  3  details?
11:22:15  4      A.  Yes.  Just on several claims, they were
11:22:19  5  not done very thoroughly, so I would give the
11:22:23  6  specifics of those claims.
11:22:24  7      Q.  And did you say earlier it was about
11:22:26  8  omitting things?
11:22:27  9      A.  Sometimes it was leaving things off the
11:22:29 10  estimate that needed to be added.  Other times it
11:22:31 11  was phrasing used.  Other times it was just
11:22:34 12  missing -- just not doing a good investigation.
11:22:38 13      Q.  In what way?
11:22:40 14      A.  One particular claim he basically missed
11:22:46 15  an entire kitchen on a water loss.  Other
11:22:50 16  particular claims his notes were contradictory to
11:22:54 17  each other.  That did not help us resolve the
11:22:59 18  claims.
11:23:00 19      Q.  But when you talked to Mr. Richards,
11:23:02 20  there was nothing specifically mentioned about
11:23:05 21  whether it was ice and snow or whether it was
11:23:08 22  something else?
11:23:08 23      A.  The specific conversation about this
11:23:11 24  would have been I -- why was none of this
11:23:14 25  addressed.  There was nothing supporting his
```

Page 101

```
11:23:17  1  decision, and it was left to us at that point.  He
11:23:18  2  put a statement that said it was this, but nothing
11:23:21  3  to support that decision.
11:23:24  4      Q.  So you would agree that when an
11:23:28  5  independent adjuster goes out, they should be
11:23:31  6  qualified to determine the cause of a roof loss?
11:23:35  7      A.  I would agree they should be able to
11:23:37  8  identify causes.  The determination of coverage we
11:23:39  9  don't put that or don't have an expectation of
11:23:42 10  them.
11:23:43 11      Q.  But the understanding is that the person
11:23:45 12  going out there to do that evaluation is qualified
11:23:48 13  to tell what is wind damage versus a worn-out roof?
11:23:53 14      A.  We would have an expectation of that,
11:23:54 15  yes.
11:24:01 16      Q.  And insureds like the Godfreys should be
11:24:04 17  able to rely upon a good qualified adjuster being
11:24:08 18  sent to their home?
11:24:10 19      A.  I would agree with that, yes.
11:24:11 20      Q.  Can you understand how the Godfreys take
11:24:16 21  issue with the decision made on their claim when
11:24:18 22  Mr. White told them it was covered and it was snow
11:24:21 23  and ice damage?
11:24:22 24          MR. ROBERTSON:  Objection to form.
11:24:23 25          THE WITNESS:  I would say Mr. White went
```

Page 102

11:24:26  1   outside of his boundaries in making that
11:24:28  2   determination and statement. So I also would
11:24:30  3   understand why they were upset. They were given
11:24:32  4   incorrect information.
11:24:45  5   BY MR. GIVENS:
11:24:45  6       Q.  Let's go through the claim file, your
11:24:47  7   work on it if we can.
11:24:49  8       A.  Sure.
11:25:05  9       Q.  Just starting on page 1 this is a dec
11:25:07 10   sheet for the Godfreys' policy. Shows they had
11:25:12 11   $560,000 coverage on their dwelling; correct?
11:25:14 12       A.  Correct.
11:25:15 13       Q.  And they had replacement costs on their
11:25:16 14   structure, the building, and their personal
11:25:18 15   property?
11:25:19 16       A.  Correct.
11:25:21 17       Q.  And their premium on page 2 is over
11:25:24 18   $5,000 for that coverage at the time of this loss?
11:25:27 19       A.  Correct.
11:25:29 20       Q.  And I just want to make sure I understand
11:25:32 21   your answer to the question of the coverages shown
11:25:37 22   on this dec sheet. They do cover damage caused by
11:25:43 23   wind, snow, and ice if those things damage the
11:25:46 24   structure?
11:25:48 25           MR. ROBERTSON:  Objection, form.

Page 103

11:25:49  1           THE WITNESS:  Correct.
11:25:51  2   BY MR. GIVENS:
11:25:51  3       Q.  Then the next documents are -- are
11:25:54  4   Sayde's. She was the handling adjuster, and you
11:25:57  5   only came into the picture when Michael White's
11:26:00  6   estimate came in; is that correct?
11:26:01  7       A.  That is correct, sir.
11:26:03  8       Q.  And there's a -- what's called an ISO
11:26:07  9   search starting on page 13 which identifies some
11:26:10 10   previous claims. Some of them are related to the
11:26:24 11   Godfreys. Some of them may just involve the same
11:26:27 12   property that they live in. But the 2017 claim is
11:26:30 13   identified in here at page 25. Would you have
11:26:41 14   known this information at the time you worked on
11:26:43 15   the claim?
11:26:44 16       A.  I wouldn't have looked at this
11:26:45 17   information, no.
11:26:48 18       Q.  I think you referenced it, and we'll get
11:26:49 19   to the claim diaries later, but we can do that
11:26:52 20   later if you don't recall. So you don't recall
11:26:54 21   looking at the past claim history?
11:26:57 22       A.  Off the top of my head, I don't.
11:26:59 23       Q.  Okay.
11:26:59 24       A.  I would have -- need to have a reason to
11:27:02 25   go look for -- look at it as a desk reviewer.

Page 104

11:27:06  1       Q.  On page 26 there's reference to a 2015
11:27:08  2   claim that was for damage in their kitchen, which
11:27:11  3   is a different roof on that part of the house;
11:27:14  4   correct?
11:27:17  5       A.  In the active file, yes, there is a list
11:27:20  6   of that.
11:27:20  7       Q.  So that's not the area we're talking
11:27:21  8   about in this claim, do you agree?
11:27:23  9       A.  I'd agree.
11:27:29 10       Q.  Would you agree that Oklahoma has pretty
11:27:31 11   severe weather at times?
11:27:33 12       A.  I would agree with that.
11:27:34 13       Q.  And some areas seem more prone to storm
11:27:37 14   damage than others?
11:27:39 15       A.  I don't know that I could agree with
11:27:40 16   that. I think -- I mean, depending on what type of
11:27:46 17   storm damage there are.
11:27:47 18       Q.  How many times has a tornado gone pretty
11:27:52 19   much down the same path through Moore, Oklahoma?
11:27:55 20       A.  I think that extreme would be considered,
11:27:57 21   yep.
11:27:57 22       Q.  Okay. So some areas of town may get
11:28:00 23   worse weather than others?
11:28:02 24       A.  Potentially.
11:28:03 25           MR. ROBERTSON:  Objection to form.

Page 105

11:28:03  1   BY MR. GIVENS:
11:28:03  2       Q.  So relying on average weather for
11:28:06  3   Oklahoma City might not give you the actual weather
11:28:09  4   that is at somebody's house in Edmond; right?
11:28:12  5           MR. ROBERTSON:  Objection to form.
11:28:13  6           THE WITNESS:  I mean, I wasn't really
11:28:14  7   just necessarily relying on that. I mean, I would
11:28:17  8   look in the area that I'm reviewing.
11:28:20  9   BY MR. GIVENS:
11:28:20 10       Q.  Well, when you looked at weather data,
11:28:22 11   can you explain for us how it is that you
11:28:25 12   pinpointed their part of town?
11:28:27 13       A.  Generally when I search for weather data,
11:28:28 14   I use the ZIP code and will pull the closest
11:28:32 15   information.
11:28:34 16       Q.  I think you mentioned looking at media
11:28:35 17   things and things like that. They're not going to
11:28:38 18   break it down by neighborhood, are they?
11:28:41 19       A.  I mean, using the ZIP is generally going
11:28:45 20   to be as close as I went in reviewing these.
11:28:51 21       Q.  Okay. So you didn't look at YouTube
11:28:52 22   videos or whatever else you mentioned, media --
11:28:55 23   news stories that kind thing?
11:28:57 24       A.  I mean, I don't recall any news stories
11:28:58 25   like when we had the ice storms and -- ten years

Page 106

11:29:00  1  ago there.

11:29:02  2      Q.  Okay.  Starting on page 37 is Mr. White's

11:29:16  3  estimate, and there's several versions of all the

11:29:18  4  different estimates in the claim file.  Should they

11:29:20  5  all be the same if it's the same date?

11:29:23  6      A.  They should be, yes.

11:29:25  7      Q.  I've always gone by the date in the lower

11:29:27  8  right of the pages in an estimate.  Is that right,

11:29:32  9  that's the date that one was produced?

11:29:35 10      A.  Yeah, correct.

11:29:35 11      Q.  Okay.  And actually this page 37 is not

11:29:38 12  really his estimate.  It's kind of a preliminary

11:29:41 13  document called an audit trail; is that right?

11:29:45 14      A.  Correct.

11:29:45 15      Q.  What is an audit trail?

11:29:48 16      A.  Audit trail is system generated.  It

11:29:51 17  talks specifically about when changes were made.

11:29:53 18  It's literally a breakdown of an auditing of the

11:29:57 19  estimate, if there's any anomalies that should be

11:30:00 20  noted, if you went in and mainly changed something

11:30:03 21  that the system had generated, things like that.

11:30:05 22      Q.  Is it true, and we can go through each of

11:30:07 23  them, but every estimate or every U.S. Adjusting

11:30:11 24  document that CSAA received that was generated as a

11:30:14 25  result of Michael White's work, under type of loss

Page 107

11:30:19  1  every one of them says, "Weight of ice and snow"?

11:30:21  2      A.  Without looking at them, I would assume,

11:30:24  3  because that's what they reported the loss as,

11:30:26  4  yes.

11:30:26  5      Q.  Okay.  And that's what he concluded it

11:30:28  6  was; right?

11:30:30  7      MR. ROBERTSON:  Objection to form.

11:30:31  8      THE WITNESS:  I mean, that was -- that

11:30:33  9  was what his notes refer to it as, yes.

11:30:35 10  BY MR. GIVENS:

11:30:35 11      Q.  Okay.  I'm just trying to make sure that

11:30:37 12  there's no information that you have that I don't

11:30:39 13  have.

11:30:39 14      A.  No, no.  We give the independent adjuster

11:30:41 15  the cause of loss that the insured gives us and

11:30:43 16  then expect the independent adjuster to do a

11:30:47 17  thorough investigation to determine the actual

11:30:50 18  cause of loss.

11:30:51 19      Q.  Okay.  His estimate starts page 43.  Do

11:30:55 20  you see that?

11:30:57 21      A.  Yes, sir.

11:30:57 22      Q.  And this is what you would have been

11:30:59 23  looking at?

11:30:59 24      A.  Yes, sir.

11:31:00 25      Q.  And page 44 he identifies damage to what

Page 108

11:31:05  1  he calls the flat roof above the sitting room that

11:31:09  2  required removing and replacing the -- he calls it

11:31:15  3  rubber roofing or the estimate calls it rubber

11:31:18  4  roofing; right?

11:31:20  5      A.  Correct.

11:31:20  6      Q.  What do you call it?

11:31:21  7      A.  Just flat roof.  I mean, there's multiple

11:31:24  8  flat roof types of surfaces.  He calls it rubber.

11:31:28  9  There's built-up.  There's -- I was going off what

11:31:32 10  he had on there.

11:31:32 11      Q.  Well, what do you think?  What would you

11:31:33 12  call what they have on this area?

11:31:33 13      A.  Based on the photos either rubber or

11:31:38 14  EPDM.

11:31:39 15      Q.  What's EPDM?

11:31:39 16      A.  I can't remember the exact breakdown of

11:31:40 17  it.  It's a built-up roof.

11:31:41 18      Q.  But as to what EP -- EPDM means what do

11:31:46 19  you know --

11:31:46 20      A.  I honestly can't remember.  It's like an

11:31:50 21  elastic plyometri-- there's --

11:31:53 22      Q.  So what is there besides EPDM on flat

11:31:56 23  roofs?

11:31:58 24      A.  I mean, you can have modified bitumen.

11:31:59 25  You can have built-up systems.  Again, his material

Page 109

11:32:04  1  identification wasn't necessarily what I was

11:32:07  2  focused on.

11:32:08  3      Q.  Did you say you think this is an EPDM

11:32:10  4  roof?

11:32:10  5      A.  If I did, I mean without -- I -- I would

11:32:12  6  have to say based on his, it's a rubber roof.  I

11:32:15  7  just use that term kind of interchangeably when I'm

11:32:18  8  talking about it.

11:32:19  9      Q.  Is there anything about that type of

11:32:20 10  material that is either more or less prone to wind

11:32:25 11  damage or ice and snow damage?

11:32:27 12      A.  Not that I'm aware of.

11:32:33 13      Q.  Or pulling up on the edges, anything like

11:32:34 14  that?

11:32:35 15      A.  No, not to my knowledge.

11:32:35 16      Q.  Or wearing out any sooner than average?

11:32:37 17      A.  Not to my knowledge.

11:32:39 18      Q.  You did say wind damage factors earlier,

11:32:44 19  and I meant to ask you did you see any torn seals

11:32:47 20  or materials on the Godfrey roof when you worked on

11:32:51 21  their claim?

11:32:54 22      A.  There was no close-ups that showed me any

11:32:56 23  torn serial -- seals.

11:32:59 24      Q.  Or materials?

11:33:00 25      A.  Or materials.  I mean, there was cracks

Page 110

11:33:01  1  and there was deterioration along almost all of the
11:33:04  2  seams in certain areas, but he didn't have any
11:33:08  3  photos, again, that showed pulled-up, torn seals.
11:33:12  4      Q.  Is it correct that the edges were lifted?
11:33:16  5      A.  Not all of the edges, but there were
11:33:17  6  edges that had basically cupped.
11:33:21  7      Q.  And that is one sign of wind damage?
11:33:24  8          MR. ROBERTSON:  Objection to form.
11:33:26  9          THE WITNESS:  I would expect the seals to
11:33:29 10  be torn and straight paths to be lifted for wind
11:33:31 11  damage more than a bubble in the middle.
11:33:36 12      Q.  My question is just lifting of the edges
11:33:42 13  can be wind damage; right?
11:33:43 14      A.  It can be, yes.
11:33:44 15      Q.  Okay.  And ice and snow can also cause a
11:33:49 16  sagging of a flat roof; correct?
11:33:52 17          MR. ROBERTSON:  Objection to form.
11:33:52 18          THE WITNESS:  It can, yes.
11:33:55 19  BY MR. GIVENS:
11:33:55 20      Q.  And it can cause lifting on the edges?
11:33:59 21      A.  I think it potentially could, yes.
11:34:03 22      Q.  Now, back to the estimate.  We were on
11:34:08 23  page 44.  So he identifies that damage to the flat
11:34:13 24  roof above the sitting room, and then he identifies
11:34:16 25  damage to various areas inside the house; correct?

Page 111

11:34:20  1      A.  Correct.
11:34:20  2      Q.  And that's not unusual.  You can have an
11:34:23  3  area of a roof where water gets in, and it can
11:34:26  4  travel to different places in the house?
11:34:28  5      A.  It can or you can have multiple areas
11:34:31  6  where it comes in, affecting different areas of the
11:34:33  7  home.
11:34:33  8      Q.  Did you make any conclusion as to where
11:34:35  9  all the water that got in the house was
11:34:37 10  specifically coming from?
11:34:38 11      A.  I based it off of his notes and photos
11:34:40 12  that it was coming in from the edge of the roof.
11:34:44 13  That was what he estimated the damage for those
11:34:46 14  walls and ceilings.
11:34:47 15      Q.  So you didn't dispute that the areas in
11:34:50 16  the house that were damaged came from water that
11:34:52 17  was getting in around the flat roof above the
11:34:55 18  sitting room?
11:34:57 19      A.  Nope, I did not.
11:34:57 20      Q.  And that's why you ultimately said that
11:35:00 21  that interior damage should be covered?
11:35:03 22      A.  Correct.
11:35:03 23      Q.  It just fell within the deductible as
11:35:05 24  you've said?
11:35:06 25      A.  Correct.

Page 112

11:35:09  1      Q.  Do you think it's possible he may have
11:35:13  2  missed some damage in the house --
11:35:15  3          MR. ROBERTSON:  Objection.
11:35:15  4  BY MR. GIVENS:
11:35:15  5      Q.  -- from what you've said about his
11:35:16  6  thoroughness?
11:35:18  7      A.  What he missed that I recall rewriting
11:35:20  8  was items within the rooms that he noted damage.
11:35:24  9  He just didn't note all the necessary work to be
11:35:27 10  done to fix those damages.
11:35:29 11      Q.  And are you working with Xactimate when
11:35:33 12  you're working on the claim?
11:35:35 13      A.  Yes.
11:35:35 14      Q.  Are you certified in that?
11:35:37 15      A.  I don't have certifications, no.
11:35:38 16      Q.  Okay.  How much training have you had on
11:35:42 17  it?
11:35:42 18      A.  Xactimate I had multiple weeks of
11:35:47 19  training.
11:35:47 20      Q.  How long ago?
11:35:48 21      A.  I had it when I trained with Farmers
11:35:50 22  property I want to say probably back in 2011 or
11:35:54 23  '12.
11:35:54 24      Q.  Would you agree that an adjuster who's
11:36:04 25  out on the roof and in the house can see a lot that

Page 113

11:36:08  1  you're not going to be able to see just looking at
11:36:10  2  pictures they take?
11:36:12  3          MR. ROBERTSON:  Objection to form.
11:36:13  4          THE WITNESS:  I would say anything they
11:36:14  5  need us to see should be photographed.
11:36:17  6  BY MR. GIVENS:
11:36:17  7      Q.  So in response to my question do you
11:36:20  8  agree that when they're out there on the house and
11:36:22  9  in the house they're seeing a lot more things than
11:36:26 10  you are actually able to see in the pictures you
11:36:28 11  look at?
11:36:29 12          MR. ROBERTSON:  Objection, form.
11:36:31 13          THE WITNESS:  I would say I'm only able
11:36:32 14  to see what he provides pictures of.
11:36:35 15  BY MR. GIVENS:
11:36:35 16      Q.  And those are still pictures taken from
11:36:37 17  certain angles?  When somebody is out at the
11:36:39 18  property, they're seeing things from all angles and
11:36:42 19  different perspectives than you can see in photos;
11:36:48 20  correct?
11:36:49 21          MR. ROBERTSON:  Objection to form.
11:36:49 22          THE WITNESS:  The expectation is they
11:36:50 23  provide photos to give us every angle and thing
11:36:53 24  that they're looking at.
11:36:55 25  BY MR. GIVENS:

Page 114

```
11:36:55  1     Q.  Okay.  I'm not asking you about
11:36:56  2  expectations.  I'm just asking you is it true that
11:37:00  3  a person, an adjuster at the property, sees things
11:37:03  4  from all the angles they can view and sees all
11:37:06  5  aspects of things that they can see compared to you
11:37:09  6  just looking at the photos they take?
11:37:12  7        MR. ROBERTSON:  Objection to form.
11:37:14  8        THE WITNESS:  I mean, I guess -- is it
11:37:15  9  possible, yeah.  I mean --
11:37:18 10  BY MR. GIVENS:
11:37:18 11     Q.  Do you dispute that, that they see more
11:37:21 12  than you do?
11:37:22 13     A.  Not always.  I mean, depending -- again,
11:37:24 14  yes, I don't dispute that walking through the house
11:37:26 15  you're going to see all the undamaged areas.
11:37:28 16  You're going to go in places that aren't affected
11:37:31 17  by the claim.  So, yes, you would see more than I
11:37:33 18  would see from the photos.
11:37:34 19     Q.  Right.  And you're going to look up and
11:37:36 20  down and from different angles.  You're not going
11:37:38 21  to shoot every angle in a photograph that you
11:37:42 22  see --
11:37:43 23        MR. ROBERTSON:  Objection to form.
11:37:44 24  BY MR. GIVENS:
11:37:44 25     Q.  -- is that fair?
```

Page 115

```
11:37:44  1     A.  To support damages you should be
11:37:45  2  providing every single angle or to support no
11:37:49  3  damages you should be able to give the angles to
11:37:53  4  where the determination could be made.
11:37:58  5     Q.  So he found damage inside the house in
11:38:05  6  the mechanical room, sitting room, entry hall.
11:38:13  7  Those are all the areas he found; correct?
11:38:15  8     A.  Correct.
11:38:15  9     Q.  And his ultimate estimate was $5,010.13?
11:38:23 10     A.  Correct.
11:38:23 11     Q.  He applied depreciation of $849 and the
11:38:28 12  $2500 deductible with a net payment that he
11:38:30 13  recommended CSAA make to the Godfreys of $1,660.69;
11:38:39 14  is that right?
11:38:39 15     A.  That's what his estimate shows, yes.
11:38:40 16     Q.  And then if they got the roof repaired
11:38:43 17  and painted the house, they could get their $849
11:38:49 18  depreciation back?
11:38:50 19     A.  Based on his estimate, yes.
11:38:56 20     Q.  At page 53, these are where the pictures
11:39:00 21  begin that Mr. White submitted.  Do you know how
11:39:03 22  many pictures he sent in?
11:39:04 23     A.  I do not know off the top of my head.
11:39:08 24     Q.  Looks there's over a hundred
11:39:26 25  pictures if we just go by the numbers on each
```

Page 116

```
11:39:30  1  picture.
11:39:30  2     A.  Right.
11:39:30  3     Q.  It looks like 125 pictures.  I'm looking
11:39:33  4  at page 115.
11:39:45  5     A.  I'm sorry.  My numbers seem to have
11:39:50  6  gotten all --
11:39:55  7     Q.  You're looking for page 115?
11:40:03  8     A.  It jumped into -- yeah, because we
11:40:05  9  printed the pictures several times.  So it's going
11:40:10 10  to be right before there, yeah.  That looks like,
11:40:14 11  yeah, 125 pictures.
11:40:16 12     Q.  Okay.  And without going through all of
11:40:18 13  these, all of the areas where he photographs damage
11:40:20 14  inside the house, you don't dispute any of that; is
11:40:23 15  that right?
11:40:25 16     A.  I don't recall disputing any damages in
11:40:26 17  the home, no.
11:40:27 18     Q.  Okay.  The pictures where he says snow
11:40:42 19  and ice damage occurred start at page 67 or page 15
11:40:59 20  of his report.
11:41:00 21     A.  Okay.
11:41:03 22     Q.  That's the first one I noticed.  It's
11:41:05 23  picture 29, and he says, "Damage due to weight of
11:41:09 24  ice"; correct?
11:41:09 25     A.  There are previous photos of the roof
```

Page 117

```
11:41:11  1  before that, but, yes, that's where he starts to
11:41:13  2  say that was due to the weight of ice and snow,
11:41:16  3  correct.
11:41:16  4     Q.  And the ones before that are of different
11:41:18  5  parts of the roof; right?
11:41:19  6     A.  Yes.
11:41:19  7        MR. ROBERTSON:  You guys keep saying ice
11:41:22  8  and snow, and I'm sitting here looking at it and it
11:41:24  9  says ice.  Both of you have said that, and maybe
11:41:26 10  I'm wrong.
11:41:28 11        MR. GIVENS:  Well, his -- let's go back
11:41:30 12  to his first page of his estimate.
11:41:34 13        THE WITNESS:  I think he's referring to
11:41:35 14  the labeling of --
11:41:36 15        MR. ROBERTSON:  I'm just talking about --
11:41:36 16        THE WITNESS:  -- the photo itself.
11:41:36 17        MR. ROBERTSON:  I was just trying to make
11:41:37 18  a clarification for this picture.
11:41:39 19        MR. GIVENS:  Yeah.  Page 43 is the first
11:41:41 20  page of his estimate, and it says, "Weight of ice
11:41:44 21  and snow."
11:41:45 22        MR. ROBERTSON:  Okay.
11:41:46 23  BY MR. GIVENS:
11:41:46 24     Q.  Is that correct, sir?
11:41:46 25     A.  That's what he listed, yes, sir.  That
```

Page 118

11:41:49 1  was what was provided based on the intake of the
11:41:52 2  claim.
11:41:54 3     Q.  Just to make sure this isn't an issue, do
11:41:57 4  you recall there was ice and snow at that time?
11:41:59 5     A.  Yes, sir.
11:42:03 6     Q.  So let's just take the first picture,
11:42:06 7  picture 29.
11:42:10 8     A.  Yes, sir.
11:42:10 9     Q.  Can you explain to us why that picture
11:42:12 10  does not show damage due to weight of ice or
11:42:13 11  snow --
11:42:13 12    A.  Sure.
11:42:14 13    Q.  -- or both?
11:42:14 14    A.  It shows a lot of waves.  The level of
11:42:17 15  deterioration in the areas that are lower shows
11:42:20 16  that it's happened over time.  That was not
11:42:23 17  changing the color, the levels, based on this
11:42:29 18  event.  That's --
11:42:31 19    Q.  Do you know if --
11:42:32 20    A.  That is indicative of that happening
11:42:33 21  multiple, multiple times and filling and refilling
11:42:37 22  with water to deteriorate to that level.
11:42:40 23    Q.  Do you know if it was wet or dry when it
11:42:42 24  was photographed?
11:42:45 25    A.  General safety guidelines call for it to

Page 119

11:42:48 1  be moderately dry before you do an inspection, so I
11:42:52 2  would make the assumption outside of the ponding --
11:42:52 3  standing ponding areas that appear in later photos,
11:42:53 4  that most of the roof was dry or they wouldn't have
11:42:57 5  accessed it.
11:42:58 6     Q.  It says that the pictures were taken
11:43:00 7  February 27th of 2018; is that right?
11:43:03 8     A.  Yes.
11:43:03 9     Q.  So five days after the event?
11:43:05 10    A.  Um-hmm.
11:43:05 11    Q.  Or the loss was reported?
11:43:07 12    A.  Correct.
11:43:11 13    Q.  And can you tell if he's up on the roof
11:43:13 14  or is he shooting it from a ladder at the edge of
11:43:16 15  the roof?
11:43:17 16    A.  That appears to be taken from on the
11:43:20 17  roof.
11:43:20 18    Q.  So would your answers be the same for the
11:43:23 19  next several pictures that still show that same
11:43:25 20  area?
11:43:26 21    A.  I would say yes.
11:43:33 22    Q.  What about picture 33?  Anything in that
11:43:35 23  picture show damage due to ice or snow?
11:43:38 24    A.  No.  It does show a lot of deterioration
11:43:44 25  along the seam consistent with wear and tear as

Page 120

11:43:44 1  well in the lower left-hand corner.
11:43:45 2     Q.  Do you know if that's where the water's
11:43:48 3  getting in or is the water getting in around the
11:43:51 4  edges where it pulled up?
11:43:53 5     A.  If I recall correctly, most of it came in
11:43:56 6  through the edges, but there were spots I think
11:43:58 7  that he estimated from the ceiling that water was
11:44:00 8  coming in through.  You have a closer view of that
11:44:02 9  deterioration on photo 34.
11:44:04 10    Q.  So if -- strike that.
11:44:07 11       Are you saying that if you have a spot on
11:44:09 12  your roof inside your house, that automatically
11:44:11 13  means it's from deterioration right above it?
11:44:14 14    A.  Not always.
11:44:15 15       MR. ROBERTSON:  Object to form.
11:44:16 16  BY MR. GIVENS:
11:44:16 17    Q.  Because water can travel; right?
11:44:18 18    A.  It can travel, yes.
11:44:20 19    Q.  Okay.  Picture 35 on page 70, why doesn't
11:44:25 20  that show roof material pulled up from ice or snow?
11:44:30 21    A.  It shows roof material pulled up.  Based
11:44:34 22  on the level of deterioration around it, it
11:44:36 23  supports that it's happened over time, not from the
11:44:39 24  weight of ice and snow from the event that this was
11:44:41 25  reported from.

Page 121

11:44:42 1     Q.  What are you specifically referring to?
11:44:44 2     A.  The discoloration of the ponding -- or
11:44:46 3  the lower area behind it being different colors
11:44:51 4  throughout are indicative of that happening over
11:44:55 5  multiple times.
11:44:57 6     Q.  We talked about authoritative
11:45:00 7  publications.  Do you have any that you can refer
11:45:02 8  me to that says that?
11:45:04 9     A.  That --
11:45:07 10    Q.  The different colors --
11:45:08 11    A.  That the water deterioration doesn't --
11:45:09 12  that takes place over time?
11:45:11 13    Q.  What you're saying shows in this
11:45:13 14  photograph that shows deterioration and long-term
11:45:16 15  ponding due to colors, if I understood your answer
11:45:19 16  right.
11:45:20 17    A.  Well, I pointed out the colors because it
11:45:21 18  shows different levels of deterioration which
11:45:23 19  wouldn't have happened with a one-time event.
11:45:25 20    Q.  And my question is simply do you know of
11:45:27 21  an authoritative publication we could go look at
11:45:30 22  that says that?
11:45:31 23    A.  I -- I don't know of one that we could go
11:45:33 24  look at outside of on-the-job training and
11:45:36 25  learning.

Page 122

11:45:38  1    Q.  Is your answer the same for the next
11:45:41  2  photos which show different parts of the edge of
11:45:43  3  the roof?
11:45:44  4    A.  Actually, on -- if you'll notice on
11:45:46  5  photo 38 and 37 you can see where it appears that
11:45:49  6  previous resealing has been done on those areas.
11:45:53  7    Q.  And how do you know it's resealing and
11:45:57  8  not just sealant that was used when it was put
11:46:00  9  down?
11:46:00 10    A.  It appears that during the construction
11:46:02 11  you would have painted over that.  You would have
11:46:05 12  not installed it over that edge and had your --
11:46:08 13  your seal drip over that way.  Just the -- to me,
11:46:12 14  when I look at that, I see different strokes,
11:46:15 15  different areas.  It's not consistent all the way
11:46:17 16  across, which would have been consistent with the
11:46:20 17  application.
11:46:22 18    Q.  Can you be more specific as to you're
11:46:24 19  saying different strokes?
11:46:25 20    A.  Sure.  You can see larger areas.  You see
11:46:28 21  areas that it's in spots, and you see areas where
11:46:30 22  it's not really present, which would give the
11:46:32 23  indication that that wasn't all done at one time.
11:46:34 24    Q.  Are you talking about the sealant, the
11:46:36 25  gray stuff on the red paint?

Page 123

11:46:39  1    A.  The black on the edge there, yeah.
11:46:41  2    Q.  You're saying those colors of gray or
11:46:44  3  black, whatever you want to call it, aren't
11:46:46  4  similar?
11:46:47  5    A.  No, I'm saying they're not consistent.
11:46:49  6    Q.  In what way?
11:46:49  7    A.  Like if you look at the lower right-hand
11:46:53  8  corner on photo 38 you can see gaps where they
11:46:55  9  don't exist.  You also will notice they tend to
11:46:58 10  appear to already be in the areas where it's
11:47:01 11  pulling back, so that would give the impression
11:47:03 12  that someone had attempted a previous repair in
11:47:07 13  that area.
11:47:14 14    Q.  And the fact that it's on the paint, you
11:47:17 15  think that means it was done after versus --
11:47:22 16    A.  It's indicative of that, yes.
11:47:25 17    Q.  And what would lead you to that if the
11:47:27 18  crew puts the roof on originally and leaves it like
11:47:31 19  that versus patches that leaves it like that?
11:47:31 20  Isn't it just messy work either way?
11:47:35 21    A.  I mean, I -- if I'm a homeowner, I
11:47:36 22  wouldn't accept that as part of a roof put-down.
11:47:44 23    Q.  Turn the page, please.  What's shown on
11:47:47 24  page 21 of his report, which is Bates No. 73, what
11:47:53 25  makes that not snow and ice damage?

Page 124

11:47:55  1    A.  Again, it gives the appearance of there's
11:47:58  2  been -- the changing color of seal between the edge
11:48:01  3  and about six inches back gives the appearance that
11:48:05  4  it has had previous repairs in those.  You can see
11:48:09  5  the waves and ripples throughout, which are again
11:48:12  6  indicative of something happening over time, not
11:48:14  7  from a one-time short event.
11:48:17  8    MR. ROBERTSON:  Keith, can you tell me
11:48:18  9  what page you're on?  I'm sorry, my --
11:48:21 10    MR. GIVENS:  73 --
11:48:23 11    MR. ROBERTSON:  Thank you.
11:48:23 12    MR. GIVENS:  -- Bates number.
11:48:30 13  BY MR. GIVENS:
11:48:30 14    Q.  So if a previous repair was done and the
11:48:34 15  weight of the ice and snow pull it away, isn't that
11:48:37 16  covered?
11:48:39 17    MR. ROBERTSON:  Objection to form.
11:48:41 18    THE WITNESS:  I would say you would have
11:48:42 19  to, again, demonstrate that the weight of ice and
11:48:46 20  snow did that, not that it's -- I mean, you can see
11:48:48 21  the waves that match the edge pull-away.  You go
11:48:52 22  back, especially in the photo 41, in the large gap
11:48:55 23  you see and you can see it again in photo 42, those
11:48:58 24  waves are deep, and the waves are deep, and it
11:49:03 25  travels quite a distance to have happened for a

Page 125

11:49:07  1  one-time, small event.  So that is more indicative
11:49:12  2  of wear and tear over time, presence of water over
11:49:14  3  time, poor drainage over time than it is of the
11:49:21  4  weight of ice and snow causing that.
11:49:21  5  BY MR. GIVENS:
11:49:21  6    Q.  Isn't all of what you just said
11:49:23  7  inconsistent with all the leaks starting at that
11:49:25  8  time, though --
11:49:25  9    A.  No, sir.
11:49:26 10    Q.  -- when that ice and snow was there?
11:49:27 11    A.  No, sir.
11:49:28 12    Q.  Why not?
11:49:29 13    A.  Because the leaks would have started
11:49:30 14  because the ice and snow was melting there.  That
11:49:32 15  had nothing to do with pulling it away.  That's --
11:49:36 16  we admit that's how the water got there and
11:49:39 17  entered.  Nobody disputed that.
11:49:41 18    Q.  But looking at these pictures, rain would
11:49:43 19  clearly go into those areas if it's raining;
11:49:45 20  correct?
11:49:45 21    A.  If that seal had given out and the rain
11:49:48 22  came in the right direction, it could potentially
11:49:51 23  do that, yes.
11:49:52 24    Q.  Well, any decent rain is going to pour
11:49:58 25  over that edge; correct?

Page 126

```
11:50:00   1      A.  I mean, again, depending on how long it
11:50:00   2   had a decent rain before the edge gave way.
11:50:04   3      Q.  Well, in -- from April 2017 to February
11:50:05   4   of 2018 wouldn't you think there had been a lot of
11:50:09   5   rains during that time that would have gone in that
11:50:12   6   area?
11:50:13   7      A.  I would say from April of 2017, from the
11:50:15   8   photos I reviewed, that hadn't separated, so at
11:50:18   9   some point when it separated, if there was rain
11:50:20  10   after that, then, yes, it could potentially have
11:50:23  11   gone in that area.  However, the ice freezing on
11:50:26  12   the edges is what caused it.  It actually created
11:50:29  13   the presence of the water that entered the home.
11:50:31  14   Saying that that came from that isn't -- is
11:50:34  15   supported when I look at the overall photos.
11:50:36  16      Q.  So if there are photographs that show in
11:50:38  17   April of 2- -- or May of 2017 that these seams
11:50:41  18   didn't exist, your position is that suddenly the
11:50:45  19   roof became in poor condition in that eight-month
11:50:50  20   period before this snow and ice storm?
11:50:53  21      MR. ROBERTSON:  Objection to form.
11:50:54  22   BY MR. GIVENS:
11:50:54  23      Q.  Is that correct?
11:50:55  24      A.  My position is I did not see the edges
11:50:57  25   pulled away in the photos that I looked at.  Over
```

Page 127

```
11:51:01   1   time the continuous deterioration of the roof
11:51:03   2   caused the edges to pull away.  The water came in
11:51:07   3   because after the edges pulled away, there was the
11:51:09   4   presence of water from the ice and snow, and it was
11:51:11   5   the first potential time.  I don't have a photo
11:51:13   6   from every day showing me this, but I can tell from
11:51:16   7   looking at it that it was over time.
11:51:18   8      Q.  Well, the only known event to happen
11:51:21   9   after April of 2017 affecting this roof was the ice
11:51:25  10   and snow storm; correct?
11:51:27  11      MR. ROBERTSON:  Objection to form.
11:51:27  12   BY MR. GIVENS:
11:51:27  13      Q.  The only one that you know of.
11:51:29  14      A.  The only claim they filed, correct.
11:51:31  15      Q.  No, the only event that we know of that
11:51:34  16   is discussed anywhere in this claim between those
11:51:36  17   two times is the snow and ice event; right?
11:51:38  18      A.  That was the claim they filed, correct,
11:51:44  19   yes.
11:51:45  20      Q.  And all of the issues that you're talking
11:51:48  21   about, deterioration, waves, things like that,
11:51:51  22   those would not develop in eight months, would
11:51:53  23   they?
11:51:54  24      MR. ROBERTSON:  Objection to form.
11:51:55  25      THE WITNESS:  I can't determine the exact
```

Page 128

```
11:51:56   1   amount of time it would take.
11:51:58   2   BY MR. GIVENS:
11:51:58   3      Q.  Well, do you agree it would take a lot
11:52:00   4   longer than eight months?
11:52:01   5      A.  I --
11:52:02   6      MR. ROBERTSON:  Objection to form.
11:52:03   7      THE WITNESS:  I don't have the photos to
11:52:04   8   tell you exactly the condition.  I was able to
11:52:06   9   ascertain from a brief review that the edges hadn't
11:52:10  10   separated in the wind claim.  I didn't have the
11:52:11  11   same amount of photos to look at to say -- again,
11:52:16  12   to determine the exact date that this would have
11:52:19  13   separated over time based on this.
11:52:24  14   BY MR. GIVENS:
11:52:24  15      Q.  Okay.  I'm not understanding your answer.
11:52:26  16   If we start at page 67 and we go to where we are on
11:52:30  17   page 73 --
11:52:31  18      A.  Correct.
11:52:32  19      Q.  -- you've talked a lot about a lot of
11:52:35  20   long-term deterioration and --
11:52:37  21      A.  Yes.
11:52:37  22      Q.  -- wear and tear.  Are you saying under
11:52:39  23   oath that that could happen in eight months --
11:52:42  24      MR. ROBERTSON:  Objection to form.
11:52:42  25   BY MR. GIVENS:
```

Page 129

```
11:52:42   1      Q.  -- what you're pointing to in these
11:52:44   2   pictures?
11:52:44   3      A.  What I'm pointing to is the deterioration
11:52:46   4   present in these photos takes place over time.
11:52:48   5      Q.  My question is can it take place in just
11:52:51   6   eight months?
11:52:52   7      MR. ROBERTSON:  Objection to form.
11:52:53   8      THE WITNESS:  I guess depending on the
11:52:54   9   rain season, depending on the drainage of the roof
11:52:58  10   it could, but it --
11:52:59  11   BY MR. GIVENS:
11:52:59  12      Q.  Is it likely?
11:53:01  13      A.  -- also -- it wasn't a pristine roof
11:53:03  14   eight months prior.  It was a roof that was
11:53:05  15   multiple years old, had started in this process.
11:53:09  16   If this was a new roof eight months ago, it
11:53:12  17   would -- I could answer your question.  This was
11:53:14  18   not a new roof eight months before this loss.
11:53:16  19      Q.  Is it likely it happened in that eight
11:53:18  20   months?
11:53:20  21      A.  Is it likely the deterioration completely
11:53:22  22   started?
11:53:23  23      Q.  Is it likely it went from --
11:53:26  24      A.  Not pulled away from the edge to pulled
11:53:28  25   away?  There's --
```

Page 130

11:53:29  1      Q.  Let me ask my question.

11:53:31  2      A.  Sorry.

11:53:31  3      Q.  Is it likely that what you've pointed to

11:53:34  4  as long-term deterioration and being in poor shape

11:53:39  5  from wear and tear likely to have occurred in eight

11:53:41  6  months?

11:53:44  7      MR. ROBERTSON:  Objection to form.

11:53:45  8      THE WITNESS:  Again, I would have to

11:53:46  9  say -- because if the roof was brand-new eight

11:53:49 10  months prior, I could answer that question.  This

11:53:52 11  roof is obviously, at minimum, six to seven years

11:53:56 12  old based on the estimates, so I can't speak to

11:53:59 13  exactly what took place when, but based on what we

11:54:03 14  have here, it looks like this was a long-term event

11:54:06 15  given all of the supporting evidence.

11:54:14 16  BY MR. GIVENS:

11:54:14 17      Q.  Let's turn to page 76.  What makes

11:54:18 18  page -- or picture 47 not damage from ice and snow?

11:54:28 19      A.  Again, with the close-up I'm going to say

11:54:31 20  kind of the same things.  You see previous seal

11:54:33 21  there at the corner.  I don't know if that's new or

11:54:35 22  old.  It's a different color.  It's not as

11:54:38 23  deteriorated as other parts of the roof.

11:54:41 24      Q.  Well, there's no seal on the part that's

11:54:43 25  lifting up, is there?

Page 131

11:54:45  1      A.  There is seal at the edge there by the

11:54:46  2  seam.

11:54:47  3      Q.  But not on the part that lifted up?

11:54:52  4      A.  I mean, I can't -- from that angle I

11:54:54  5  can't really -- can't really tell.

11:54:56  6      Q.  Well, there's no stuff bleeding over onto

11:54:57  7  the red paint and all that like you mentioned

11:55:00  8  earlier --

11:55:00  9      A.  But there is seal --

11:55:02 10      Q.  -- right?

11:55:02 11      A.  -- at the end of the seam and seal along

11:55:04 12  the other portions of that to the right-hand side

11:55:06 13  of the photo.

11:55:07 14      Q.  I'm just asking you about the part that's

11:55:09 15  raised up a significant distance.

11:55:12 16      A.  I would say the significant distance

11:55:14 17  is -- again, there is seal at the end of that, and

11:55:16 18  also there doesn't really have anything that

11:55:19 19  indicates that that came from the weight of ice and

11:55:21 20  snow.  I mean, you're looking --

11:55:21 21      Q.  Well, what would prove it to you?  This

11:55:25 22  picture right here, what would prove to you that

11:55:28 23  this was ice and snow?  What's missing I guess is

11:55:32 24  my question?

11:55:33 25      A.  My determination wasn't made based on one

Page 132

11:55:36  1  photo.  It was made based on looking at the roof as

11:55:39  2  a whole.

11:55:40  3      Q.  Can you answer my question?

11:55:41  4      A.  Based -- I could not give you an answer

11:55:43  5  based off one photo, so I cannot answer that

11:55:46  6  question.

11:55:46  7      Q.  Well, this one space could be responsible

11:55:49  8  for a significant amount of water in the house.

11:55:52  9      A.  And we allowed --

11:55:52 10      MR. ROBERTSON:  Objection to form.

11:55:53 11      THE WITNESS:  And we allowed to cover the

11:55:55 12  water in the home.

11:55:56 13  BY MR. GIVENS:

11:55:56 14      Q.  But you're saying this isn't from ice and

11:55:58 15  snow.  So my question is what's missing that would

11:56:01 16  convince you it is ice and snow in this photo?

11:56:03 17      A.  I cannot make that determination based on

11:56:05 18  one small, close-up photo.  I based my

11:56:08 19  determination on the overall view of the roof.

11:56:24 20      Q.  Would you turn to page 83, please -- or

11:56:27 21  82.  It's page 30 of the report, and Mr. White says

11:56:34 22  on picture 60, "Area of ice damming."  Is he

11:56:40 23  correct?

11:56:42 24      A.  I would say he -- I mean, he's incorrect.

11:56:44 25  There is no ice dam there.

Page 133

11:56:46  1      Q.  Well, he's not saying current ice

11:56:49  2  damming.  Isn't it fair that he's saying there was

11:56:52  3  ice damming there?

11:56:54  4      A.  I mean, he is saying that it was an edge

11:56:56  5  that could have had ice damming there, yes.

11:56:59  6  There's no ice damming in the photo.

11:57:03  7      Q.  Okay.  Isn't this picture meant to

11:57:04  8  represent an area where he thinks ice damming

11:57:08  9  occurred?  Isn't that how you would normally

11:57:11 10  interpret it?

11:57:12 11      A.  I mean, yeah, it could be interpreted

11:57:14 12  that way.

11:57:15 13      Q.  Well, how else would it be interpreted?

11:57:15 14      A.  I mean, it says, "Area of ice damming."

11:57:17 15  They're no ice dam there, so he's telling me that's

11:57:19 16  where he felt the ice dam was.  I -- okay.

11:57:21 17      Q.  That's all I was asking.

11:57:23 18      A.  Yeah.

11:57:24 19      Q.  So is there anything about that that

11:57:26 20  proves he's wrong?

11:57:33 21      A.  I mean, is he -- he's not saying there's

11:57:37 22  damage from the ice damming there.  He's saying

11:57:41 23  that's where the ice damming was.  He just said,

11:57:44 24  "Area of ice damming."  There's no damages noted

11:57:45 25  from the ice damming.

Page 134

11:57:47  1     Q.  It says that's at an area where the flat
11:57:48  2  roof is above the entry hall; right?
11:57:50  3     A.  So the ice dam would have been
11:57:51  4  responsible for the water coming in, which is
11:57:53  5  the -- what we covered on the claim.
11:57:54  6     Q.  My question is is he saying these
11:57:56  7  pictures that show the ice damming where it
11:57:59  8  happened, in his opinion, is in the area above the
11:58:03  9  entry hall where the flat roof is?  That's what it
11:58:07 10  says on --
11:58:07 11     A.  That's what it says.
11:58:07 12     Q.  -- the photos.
11:58:08 13     A.  Yes, yes.
11:58:10 14     Q.  And part of his estimate is for damage in
11:58:12 15  those areas; right?
11:58:13 16     A.  Yes, sir.
11:58:13 17     Q.  And you didn't rule that out.  You paid
11:58:16 18  for that damage.
11:58:17 19     A.  Yes, sir.
11:58:17 20     Q.  You've said that.
11:58:18 21     A.  Yes, sir.
11:58:33 22     Q.  It seems like an obvious question, but
11:58:36 23  should an insurance adjuster and company for which
11:58:40 24  they work always be 100 percent honest with their
11:58:43 25  insureds?

Page 135

11:58:44  1     MR. ROBERTSON:  Objection, form.
11:58:47  2     THE WITNESS:  I mean, I would say yes
11:58:50  3  with the clarification that he is not an adjuster
11:58:53  4  of AAA's.  He didn't have the authority to really
11:58:57  5  have discussions other than inspect.
11:59:00  6  BY MR. GIVENS:
11:59:00  7     Q.  I'm not referring to Michael White.
11:59:02  8     A.  Okay.
11:59:02  9     Q.  My question is is it true that an
11:59:04 10  adjuster and CSAA should always be truthful with
11:59:09 11  their insured?
11:59:12 12     MR. ROBERTSON:  Objection to form.
11:59:12 13     THE WITNESS:  Yes.
11:59:19 14  BY MR. GIVENS:
11:59:19 15     Q.  Could you turn to -- well, as I'm finding
11:59:22 16  this -- strike that.
11:59:24 17     Would it be bad faith in your opinion not
11:59:26 18  to be honest with an insured?
11:59:29 19     MR. ROBERTSON:  Objection to form.
11:59:30 20     THE WITNESS:  I would say as a general
11:59:31 21  statement, being dishonest with your insured would
11:59:37 22  be considered bad faith.
11:59:37 23  BY MR. GIVENS:
11:59:39 24     Q.  And what is your definition of bad faith
11:59:40 25  that you go by?

Page 136

11:59:41  1     MR. ROBERTSON:  Objection to form.
11:59:42  2     THE WITNESS:  My definition would be
11:59:43  3  being unreasonable, not doing a thorough
11:59:47  4  investigation, not being fair and unbiased.
11:59:50  5  BY MR. GIVENS:
11:59:50  6     Q.  And we could add to that being dishonest?
11:59:54  7     A.  I think dishonest would fall under not
11:59:57  8  being fair, but sure.
12:00:02  9     Q.  Would you turn to page 489.
12:00:05 10     MR. ROBERTSON:  Bates 489?
12:00:08 11     MR. GIVENS:  Bates 489, please.
12:00:24 12     MR. ROBERTSON:  Give me just a second.
12:00:26 13  BY MR. GIVENS:
12:00:26 14     Q.  Do you see it's a letter dated March 13,
12:00:29 15  2018 written by Sayde Brooks?
12:00:33 16     A.  Yes, sir, I do.
12:00:33 17     Q.  Under "Results of Our Investigation" that
12:00:36 18  paragraph says, "In investigating the cause of
12:00:38 19  damage, we contacted independent adjuster
12:00:42 20  Michael White with U.S. Adjusting to assess the
12:00:45 21  damage to your property," and this letter is
12:00:47 22  written to Russ Godfrey; right?
12:00:49 23     A.  Correct.
12:00:49 24     Q.  "After conducting an inspection, a report
12:00:51 25  was prepared which includes detailed findings of

Page 137

12:00:55  1  the inspection and a determination the damage was
12:00:57  2  caused by wear and tear to your roof which allowed
12:01:00  3  water to enter your home."  Is that true?
12:01:04  4     A.  It is true.
12:01:05  5     Q.  How is it true?  Mr. White never wrote
12:01:07  6  that it was wear and tear, did he?
12:01:08  7     A.  We said we inves- -- we hired him to
12:01:10  8  investigate the cause.  We investigated.  "After
12:01:13  9  conducting an inspection, a report was prepared
12:01:14 10  that includes detailed findings of the
12:01:14 11  inspection" -- sorry, I'll slow down.
12:01:14 12     THE REPORTER:  That's okay.  Thank you.
12:01:14 13     THE WITNESS:  Apologize.
12:01:14 14     "And a determination the damage was
12:01:22 15  caused by wear and tear to your roof which allowed
12:01:24 16  water to enter." I actually, along with Sayde
12:01:27 17  Brooks, as part of that thorough investigation, did
12:01:30 18  that.  Mr. White did not have the authority to
12:01:33 19  apply coverage or not apply coverage to the
12:01:36 20  claim.
12:01:36 21  BY MR. GIVENS:
12:01:37 22     Q.  Okay.  Let's narrow our focus to what
12:01:42 23  this letter says.  It says that Michael White with
12:01:44 24  U.S. Adjusting was hired to assess the damage to
12:01:48 25  the Godfreys' property, and then it says

Page 138

12:01:50  1  specifically, "After conducting an inspection, a
12:01:52  2  report was prepared which includes detailed
12:01:55  3  findings of the inspection."  That refers to
12:01:58  4  Mr. White; correct?
12:01:59  5      A.  Actually, if I'm reading this -- from an
12:02:03  6  English standpoint those are separate, stand-alone
12:02:06  7  sentences.  The sentence ends at "We contacted
12:02:09  8  independent adjuster Michael White of
12:02:11  9  U.S. Adjusting to assess the damage to your
12:02:14 10  property, period.  After conducting an inspection,
12:02:16 11  a report was prepared which includes detailed
12:02:19 12  findings of the inspection and a determination that
12:02:21 13  the damage was caused by wear and tear."  That's --
12:02:25 14      Q.  CSAA --
12:02:26 15      A.  That's of the overall investigation.
12:02:27 16      Q.  CSAA never inspected the house; correct?
12:02:30 17          MR. ROBERTSON:  Objection to form.
12:02:32 18          THE WITNESS:  We reviewed the findings.
12:02:33 19  BY MR. GIVENS:
12:02:33 20      Q.  Okay.
12:02:33 21      A.  We inspected the photos, we reviewed the
12:02:36 22  photos in scope.
12:02:36 23      Q.  The sentence says, "After conducting an
12:02:39 24  inspection, a report was prepared."  Are you
12:02:41 25  seriously saying that's not supposed to be

Page 139

12:02:44  1  Mr. White who prepared the report?
12:02:45  2      A.  He prepared a report.  It was part of our
12:02:47  3  investigation.
12:02:48  4      Q.  Okay.  And his report, would you agree,
12:02:50  5  says nothing about damage being caused by wear and
12:02:53  6  tear?
12:02:54  7      A.  I would agree his report does not say
12:02:56  8  that --
12:02:57  9      Q.  Okay.
12:02:57 10      A.  -- but my report does.
12:03:01 11      Q.  Your report wasn't based on any
12:03:05 12  inspection you did; correct?
12:03:06 13      A.  My report was based on reviewing the
12:03:07 14  inspection and the photos thoroughly.
12:03:26 15      Q.  Okay.  Turn to 491, please.  This is
12:03:29 16  another letter from Sayde Brooks to Russ Godfrey
12:03:29 17  dated March 14th of 2018.  Second paragraph says,
12:03:33 18  "A copy of the estimate related to this claim is
12:03:37 19  enclosed.  Based on this estimate, the independent
12:03:39 20  adjuster found the damages to be less than the
12:03:43 21  $2,500 deductible.  Because of this, we are unable
12:03:45 22  to make an offer of payment on this claim to assist
12:03:48 23  you with repair costs"; correct?
12:03:50 24      A.  That's what it says.
12:03:54 25      Q.  How much did Michael White's estimate

Page 140

12:03:57  1  say?
12:03:57  2      A.  His was above the deductible, but it was
12:04:00  3  not the final estimate.
12:04:02  4      Q.  Okay.  "Based on this estimate, the
12:04:06  5  independent adjuster found the damages to be less
12:04:08  6  than (sic) $2,500 deductible."  How is that not an
12:04:11  7  untrue statement?
12:04:12  8      A.  I would say it was probably more of a
12:04:15  9  mistake than an untrue statement.
12:04:17 10      Q.  Okay.  And that's just your
12:04:18 11  characterization of it; right?
12:04:19 12      A.  Well --
12:04:21 13          MR. ROBERTSON:  Objection to form.
12:04:21 14          THE WITNESS:  The final estimate found
12:04:24 15  that it was below the deductible.
12:04:27 16  BY MR. GIVENS:
12:04:27 17      Q.  That's very different than saying
12:04:28 18  Mr. White's estimate found that; right?
12:04:30 19          MR. ROBERTSON:  Objection to form.
12:04:30 20          THE WITNESS:  I think if you wanted to
12:04:32 21  extrapolate, the damages that we approved from his
12:04:35 22  estimate were below the deductible.  The damages we
12:04:38 23  removed from his estimate would have had it above
12:04:41 24  the deductible.  We didn't rewrite the estimate
12:04:44 25  from scratch.  We did use his estimate.  We just

Page 141

12:04:46  1  removed items from his --
12:04:48  2  BY MR. GIVENS:
12:04:48  3      Q.  Right, but it's --
12:04:48  4      A.  -- and added other items as well.
12:04:50  5      Q.  But it's not a true statement to say that
12:04:52  6  Michael White found damages to be less than the
12:04:55  7  deductible; correct?
12:04:56  8          MR. ROBERTSON:  Objection.  Asked and
12:04:56  9  answered.
12:04:57 10          THE WITNESS:  I would say Michael White's
12:04:58 11  initial inspection was above the deductible.  Once
12:05:02 12  reviewed by people who can make the coverage
12:05:06 13  determination, not Michael White, that
12:05:07 14  determination changed; however, we did use his
12:05:09 15  estimate.
12:05:10 16  BY MR. GIVENS:
12:05:10 17      Q.  Michael White never found the damages to
12:05:13 18  be less than the deductible, did he?
12:05:15 19          MR. ROBERTSON:  Objection to form.
12:05:16 20          THE WITNESS:  Michael White adding things
12:05:18 21  that weren't covered by the claim made it go above
12:05:21 22  the deductible, yes.  Writing an estimate for
12:05:24 23  everything he saw, yes.
12:05:26 24  BY MR. GIVENS:
12:05:26 25      Q.  It was above the deductible?

Page 142

12:05:27 1    A. It was.

12:05:29 2    Q. And that's the only amount he ever

12:05:30 3 submitted; right?

12:05:31 4    A. Correct.

12:05:32 5    Q. And the estimate he did was not attached

12:05:34 6 to this letter. What was attached was your

12:05:37 7 estimate; right?

12:05:39 8        MR. ROBERTSON: Objection to form.

12:05:40 9        THE WITNESS: I believe so.

12:05:55 10 BY MR. GIVENS:

12:05:55 11    Q. Page 510, please. This is the Ultimate

12:06:06 12 Roofing and Construction report that was submitted

12:06:15 13 and based upon work done by their team on May 29th

12:06:21 14 of 2018. Do you see that?

12:06:22 15    A. I do see that.

12:06:23 16    Q. Is it correct that you never saw this

12:06:26 17 until this week?

12:06:27 18    A. That is correct.

12:06:27 19    Q. So after you did your estimate in March

12:06:29 20 of 2018, your work on this claim ended?

12:06:32 21    A. Correct.

12:06:33 22    Q. The only thing that's happened is this

12:06:35 23 lawsuit got filed, and we asked for your

12:06:37 24 deposition, and in the course of preparing for your

12:06:39 25 deposition you were shown these documents?

Page 143

12:06:41 1    A. Yes, sir.

12:06:42 2    Q. Okay. Is there anything about seeing

12:06:52 3 this document this week that changes any of your

12:06:55 4 views?

12:06:55 5    A. No, sir.

12:07:04 6    Q. Do you see on page 513 --

12:07:13 7        MR. ROBERTSON: Give me just a second,

12:07:14 8 Keith. All right.

12:07:26 9 BY MR. GIVENS:

12:07:26 10    Q. Page 513 shows a blue tarp. Do you see

12:07:29 11 that?

12:07:30 12    A. I do, sir.

12:07:31 13    Q. The upper part that that tarp's attached

12:07:33 14 to, is it your understanding that that was the flat

12:07:36 15 roof that was paid to be replaced in 2017?

12:07:41 16    A. If you're saying it is. I haven't had

12:07:43 17 enough time to review, like, overview and aerial

12:07:47 18 photos. If you're saying it is, I -- I don't have

12:07:49 19 any reason to disagree with that.

12:07:51 20    Q. Okay. And then the lower part of the

12:07:53 21 tarp goes down towards the lower flat roof, and are

12:07:56 22 you aware that that's the flat roof that's involved

12:07:57 23 in this claim that we're talking about in this

12:07:59 24 case?

12:08:00 25    A. Yes, sir.

Page 144

12:08:01 1    Q. Okay. This picture would have been taken

12:08:14 2 in 2017; right?

12:08:17 3        MR. ROBERTSON: Objection to form.

12:08:19 4        THE WITNESS: I'm not sure when May 24th

12:08:21 5 was. It just says taken on May 24th.

12:08:25 6 BY MR. GIVENS:

12:08:25 7    Q. Well, as background -- or not as

12:08:27 8 background. Strike that.

12:08:28 9        Do you see any of the issues on the roof

12:08:30 10 that's involved in this case as you saw it after

12:08:34 11 the ice and snow event?

12:08:38 12    A. I mean, from this angle of the photo I

12:08:40 13 don't see any edges pulled away at this time.

12:08:43 14    Q. So from that would you presume that this

12:08:45 15 was photos taken in 2017?

12:08:47 16    A. I would -- I would presume that, yeah.

12:08:49 17    Q. Okay. Would you agree that the condition

12:08:51 18 of that roof looks a lot different than it did

12:08:55 19 after the snow and ice event?

12:08:58 20        MR. ROBERTSON: Objection.

12:08:59 21        THE WITNESS: I would agree overall it

12:09:02 22 does. The deterioration isn't as present. It

12:09:05 23 looks like, it's not possible to tell from this

12:09:07 24 angle, that there is some waving, that there is

12:09:09 25 some unlevel surfaces already forming.

Page 145

12:09:12 1 BY MR. GIVENS:

12:09:12 2    Q. But it looks like a roof that would hold

12:09:15 3 water; right?

12:09:17 4        MR. ROBERTSON: Objection, form.

12:09:19 5        THE WITNESS: I mean, roofs are designed

12:09:21 6 to shed water more than hold.

12:09:22 7 BY MR. GIVENS:

12:09:22 8    Q. Strike that then. It looks like a roof

12:09:24 9 that would be watertight?

12:09:26 10        MR. ROBERTSON: Objection to form.

12:09:26 11        THE WITNESS: I can't tell from this

12:09:27 12 photo. I can't see the seams close enough.

12:09:31 13 BY MR. GIVENS:

12:09:31 14    Q. Is it true that if a windstorm with winds

12:09:33 15 over 80 miles an hour lifted up some of the upper

12:09:37 16 part that was totaled in 2017, that it wouldn't be

12:09:41 17 unusual for it also to affect the lower part?

12:09:44 18        MR. ROBERTSON: Objection to form.

12:09:46 19        THE WITNESS: It wouldn't be unusual, but

12:09:48 20 it also wouldn't be a guarantee.

12:09:50 21 BY MR. GIVENS:

12:09:50 22    Q. If we go forward in the report, we can

12:09:52 23 eventually see the replacement that was done of

12:09:55 24 that upper part. Do you see that on page 515?

12:10:00 25    A. I do. Is that a replacement or tarping?

Page 146

12:10:03  1   It looks --

12:10:04  2        Q.  I believe that's part of the replacement,

12:10:07  3   but if you look on the next page, page 516, it

12:10:12  4   actually has a diagram.  And you looked this -- at

12:10:14  5   this getting ready for your deposition; right?

12:10:16  6        A.  Yes, sir.

12:10:17  7            MR. ROBERTSON:  Objection to form.

12:10:19  8   BY MR. GIVENS:

12:10:19  9        Q.  And it actually shows what was replaced

12:10:20  10   in 2017, and then it shows the parts that were at

12:10:23  11   issue in the 2018 claim.  Do you see that?

12:10:31  12        A.  I see that that's what their notes say,

12:10:33  13   correct.

12:10:34  14        Q.  Do you have any reason to disagree with

12:10:36  15   the accuracy of what they're pointing to?

12:10:38  16            MR. ROBERTSON:  Are you talking about the

12:10:39  17   area?

12:10:41  18   BY MR. GIVENS:

12:10:41  19        Q.  Yes, just their area.

12:10:42  20        A.  I don't disagree with their -- their

12:10:45  21   location.  I don't agree with their findings.

12:10:48  22        Q.  And why not?

12:10:49  23        A.  They basically state they show wind

12:10:51  24   damage that was the same as the 2017 loss, which

12:10:53  25   were not present, that I could see, from the

Page 147

12:10:55  1   inspection of the 2017.  And they're combining --

12:10:59  2   again it's saying ice damming, also wind damage.

12:11:12  3        Q.  Then on page 517, that shows after the

12:11:12  4   February of '18 snow and ice event; right?

12:11:17  5        A.  517?  It would appear so.

12:11:20  6        Q.  That's the other part of that flat roof

12:11:22  7   that goes into the atrium?

12:11:24  8        A.  Yeah, it appears so.

12:11:27  9        Q.  Okay.  And that's again one of the areas

12:11:28  10   where water got in the house?

12:11:30  11        A.  Yep.

12:11:30  12            MR. ROBERTSON:  Objection to form.

12:11:42  13   BY MR. GIVENS:

12:11:42  14        Q.  Does AAA have a policy about if you

12:11:45  15   have -- everyone who's inspected a roof on site

12:11:49  16   believe that it's from a covered event, that that

12:11:52  17   should be accepted --

12:11:55  18            MR. ROBERTSON:  Objection.

12:11:55  19   BY MR. GIVENS:

12:11:55  20        Q.  -- over somebody looking at photographs?

12:11:57  21            MR. ROBERTSON:  Objection to form.

12:11:58  22            THE WITNESS:  AAA's policy is we want to

12:12:00  23   do a thorough investigation on every claim.

12:12:04  24   BY MR. GIVENS:

12:12:04  25        Q.  And so my question?

Page 148

12:12:06  1        A.  My question would be -- or my answer

12:12:08  2   would be we want to -- we're going to review the

12:12:10  3   work of anyone that is not a direct AAA employee

12:12:14  4   who would be subject to normal quality file audits

12:12:18  5   and things like that.  So we would review every

12:12:21  6   estimate that an independent adjuster does for

12:12:23  7   thoroughness and accuracy.

12:12:25  8        Q.  So shouldn't AAA send its own adjuster

12:12:29  9   out there if it has doubts and it's going to deny a

12:12:32  10   claim for people like the Godfreys --

12:12:33  11            MR. ROBERTSON:  Objection.

12:12:33  12   BY MR. GIVENS:

12:12:33  13        Q.  -- instead of just doing it over

12:12:33  14   photographs?

12:12:33  15            MR. ROBERTSON:  Objection to form.

12:12:34  16            THE WITNESS:  If there is enough support

12:12:34  17   provided that we would need a reinspection, we

12:12:38  18   would do a reinspection.

12:12:41  19   BY MR. GIVENS:

12:12:41  20        Q.  Why wasn't it done in this case?

12:12:44  21        A.  We had enough support for our decision

12:12:46  22   and nothing disputing it to require a reinspection

12:12:51  23   at that time.

12:12:52  24        Q.  Are you aware that the Godfreys' roof

12:12:54  25   kept leaking for several months after the denial --

Page 149

12:12:57  1   or a couple months?  Excuse me.  I don't want to

12:12:59  2   misstate that.  Strike that.

12:13:01  3            Are you aware that the Godfreys' roof

12:13:04  4   continued leaking for a period of weeks after the

12:13:07  5   denial?

12:13:08  6            MR. ROBERTSON:  Objection to form.

12:13:09  7            THE WITNESS:  I was made aware of that

12:13:10  8   this week --

12:13:12  9   BY MR. GIVENS:

12:13:12  10        Q.  Are you --

12:13:13  11        A.  -- in reviewing it.

12:13:13  12        Q.  Are you aware that they had to borrow

12:13:14  13   money to have those roofs replaced?

12:13:17  14            MR. ROBERTSON:  Objection to form.

12:13:17  15            THE WITNESS:  I was not aware.  As a

12:13:19  16   homeowner sometimes you -- you have to do things

12:13:20  17   for repairs.

12:13:33  18   BY MR. GIVENS:

12:13:33  19        Q.  So there's no policy that says when cause

12:13:37  20   of a loss is disputed, if you will, because you're

12:13:46  21   disputing what Michael White concluded, that you

12:13:48  22   should go out to the property and actually

12:13:50  23   physically inspect it?

12:13:51  24        A.  There was -- we had enough support in the

12:13:53  25   file from the photographs.

Page 150

12:13:57 1    Q. So from that I take it there is no such
12:14:00 2 policy?
12:14:00 3       MR. ROBERTSON: Objection, form.
12:14:01 4       THE WITNESS: I mean, each claim is
12:14:04 5 handled on its own merit. If there was -- if there
12:14:05 6 was a reason to reinspect it, there was support to
12:14:09 7 do it, not enough support in the file, then, yes,
12:14:09 8 we would have reinspected.
12:14:11 9 BY MR. GIVENS:
12:14:11 10    Q. Did you ever go out and ever reinspect a
12:14:14 11 roof in this type of situation?
12:14:14 12    A. For CSAA, no, I have not.
12:14:18 13    Q. Are you saying you did for Farmers?
12:14:21 14    A. Farmers I did do some reinspections, not
12:14:24 15 many, but a few. Kind of the same policy. If
12:14:26 16 there's -- if the initial inspection didn't have
12:14:28 17 enough support in it, you want to either confirm
12:14:30 18 what they're telling you or support your decision
12:14:32 19 so --
12:14:32 20    Q. And Farmers sent you out to the property
12:14:35 21 to do that?
12:14:36 22    A. Yes.
12:14:38 23    Q. How many roofs did you actually inspect
12:14:40 24 at Farmers? Can you estimate? I mean, over a
12:14:43 25 hundred?

Page 151

12:14:43 1    A. Over a hundred.
12:14:44 2    Q. Over a thousand?
12:14:45 3    A. I would say it's safe to say over a
12:14:47 4 thousand.
12:14:47 5    Q. So you were an actual
12:14:48 6 out-of-the-office --
12:14:51 7    A. Yes --
12:14:51 8    Q. -- field adjuster?
12:14:52 9    A. -- I was a field adjuster with a larger
12:14:53 10 territory in Oklahoma.
12:14:55 11       MR. ROBERTSON: Watch out. Let him
12:14:55 12 finish his question. You guys are talking a bit
12:14:55 13 over.
12:14:57 14       THE WITNESS: Sorry.
12:14:57 15 BY MR. GIVENS:
12:14:57 16    Q. And how many years did you do that as a
12:14:59 17 field adjuster?
12:15:01 18    A. Almost three years as a field adjuster.
12:15:03 19    Q. And what years would those have been?
12:15:06 20    A. I want to say it was 2012 'til 2015, so
12:15:09 21 right up to my end of my career at Farmers.
12:15:24 22    Q. Do you think it would have been fair to
12:15:26 23 the Godfreys to go out and meet with them and see
12:15:29 24 things firsthand before you denied their claim?
12:15:34 25       MR. ROBERTSON: Objection to form.

Page 152

12:15:34 1       THE WITNESS: I feel like we had enough
12:15:36 2 support and evidence in our file that it wasn't
12:15:39 3 necessary to do that.
12:15:40 4 BY MR. GIVENS:
12:15:40 5    Q. And I don't mean you personally. CSAA
12:15:43 6 could have had one of its roof adjusters go do
12:15:45 7 that; correct?
12:15:46 8       MR. ROBERTSON: Objection to form.
12:15:48 9       THE WITNESS: I don't believe any support
12:15:48 10 was provided that would necessitate sending another
12:15:55 11 person back out.
12:15:56 12 BY MR. GIVENS:
12:15:56 13    Q. So this Ultimate Construction -- strike
12:16:02 14 that.
12:16:02 15       This Ultimate Roofing and Construction
12:16:05 16 report, in your view, having seen it for the first
12:16:06 17 time this week, would not have compelled an on-site
12:16:11 18 inspection?
12:16:12 19    A. When was this received?
12:16:15 20    A. It was sent in --
12:16:16 21    A. May 29, 2018.
12:16:18 22    Q. Correct.
12:16:19 23    A. So several months after the
12:16:20 24 determination?
12:16:21 25    Q. Correct. And it has historical pictures

Page 153

12:16:25 1 as well as current pictures in it.
12:16:28 2    A. As I recall from reviewing these files
12:16:30 3 this week, both adjusters gave specific
12:16:33 4 instructions for what they would need to see, as
12:16:35 5 this is overlapping two claims. I don't believe,
12:16:37 6 to my knowledge, that any of that information
12:16:39 7 supporting it came in. We got this lump "it could
12:16:42 8 be wind, it could be ice," and asked for
12:16:44 9 clarification. And I did not see, at least in my
12:16:46 10 review this week, any additional clarification
12:16:50 11 outside of these photos that show a roof under
12:16:54 12 repair.
12:16:55 13    Q. And what do you mean "a roof under
12:16:56 14 repair"?
12:16:56 15    A. Well, these are photos from them working
12:16:59 16 on the roof and months later lifting up seams, you
12:17:02 17 know, close-ups. They're not really showing
12:17:04 18 anything we didn't see from our inspection.
12:17:10 19       There is one that shows a torn seal. Let
12:17:14 20 me find the right photo. It's one of the ones you
12:17:16 21 referenced earlier. So it's photo on -- on page
12:17:20 22 512. That photo does show that there's a torn
12:17:24 23 seal. Again, I don't know that -- what part of the
12:17:28 24 roof this is on. If that was part of the wind
12:17:31 25 claim, if we'd initially estimated it. It's -- to

Page 154

12:17:35 1   make a determination from this both -- both
12:17:38 2   adjusters on both files asked for additional
12:17:40 3   information I don't believe they ever received, at
12:17:43 4   least that I could see.
12:17:43 5        Q.  What are you referring to?
12:17:45 6        A.  So when this was sent in, there are notes
12:17:47 7   in the claim that I estimated from the owning
12:17:51 8   adjuster, Sayde Brooks, that you're talking about
12:17:56 9   wind, which would be this claim, which they gave
12:17:56 10  the 2017 claim number.  And then on the 2017 claim
12:17:58 11  I noticed a note where someone reviewed it, sent
12:18:01 12  some questions, "Why are you supplementing over a
12:18:05 13  year later?  We need some different photos and more
12:18:09 14  information."  I don't -- not that I could tell was
12:18:13 15  anything else provided.
12:18:14 16       Q.  Well, the information that you just said
12:18:15 17  they needed was already in the e-mails and the
12:18:17 18  phone calls that Mr. Lippolt (phonetic) had with
12:18:23 19  CSAA in this claim; right?
12:18:24 20       A.  In the phone calls that I so noted he
12:18:27 21  referred to two different claims and was never real
12:18:31 22  sure which claim he was talking about.
12:18:35 23       Q.  Well, on 523 where Sayde responds to his
12:18:40 24  e-mail he says what his belief is --
12:18:43 25       A.  Do you have that page?

Page 155

12:18:44 1        Q.  -- that this is -- 523.  I mean, he
12:18:54 2   explains his position in that e-mail, does he not?
12:19:00 3        A.  He says, "Pics showing the damage to the
12:19:02 4   flat roof sections that mimic the prior 2017
12:19:04 5   claim."
12:19:08 6        Q.  He says, "The two roof sections
12:19:10 7   highlighted by the report" --
12:19:12 8        A.  Shows damage.
12:19:13 9        Q.  -- "attached to this e-mail show damage
12:19:13 10  that was caused by wind and also as a result of ice
12:19:15 11  damming loss from 2018"; correct?
12:19:19 12       A.  Correct.  And Sayde makes the deter- --
12:19:23 13  lets him know that those are the photos we
12:19:25 14  reviewed.  We determined there was no ice damming.
12:19:28 15  If it is wind, it's on the other claim which was
12:19:26 16  for wind.  This specific claim where I adjusted the
12:19:32 17  estimate was for ice, not wind.  They were separate
12:19:38 18  occurrences.
12:19:38 19       Q.  Have you ever seen a claim where two
12:19:41 20  losses overlap?
12:19:45 21       A.  I mean, in general you -- are you saying
12:19:48 22  the cause of loss from two causes overlaps?
12:19:52 23       Q.  Two events.
12:19:53 24       A.  Well, we investigated in this claim, in
12:19:55 25  2017 and in 2018.  If there was a different event

Page 156

12:20:03 1   for more wind that was between those two claims,
12:20:06 2   that would be a third event.
12:20:07 3        Q.  Are you aware of any investigation that
12:20:09 4   was done on the position that Mr. Lippolt put in
12:20:14 5   this May 29th e-mail?  Sayde Brooks says, "I've
12:20:24 6   reviewed the information and photos submitted."
12:20:24 7   Are you aware of anything beyond her reviewing
12:20:25 8   those?
12:20:25 9        A.  I believe on the other claim someone
12:20:27 10  asked for more information, "Why is this a year
12:20:30 11  later?"
12:20:31 12       Q.  Did they ever contact the Godfreys with
12:20:34 13  that request?
12:20:35 14       A.  I can't say if they did or not.  I don't
12:20:37 15  recall from my review.
12:20:38 16       Q.  Is there any documentation that they did?
12:20:41 17       MR. ROBERTSON:  Objection to form.
12:20:42 18       THE WITNESS:  There was an e-mail I
12:20:43 19  believe sent on the 2017 claim asking for
12:20:45 20  clarification.  I don't know who exactly it went
12:20:47 21  to.
12:20:48 22  BY MR. GIVENS:
12:20:48 23       Q.  If it was just sent to the contractor,
12:20:50 24  should it have also been communicated to the
12:20:54 25  Godfreys?

Page 157

12:20:54 1        MR. ROBERTSON:  Objection to form.
12:20:55 2        THE WITNESS:  If an insured lets us know
12:20:57 3   they're working with a contractor, we're happy to
12:20:59 4   work directly with that contractor.  We don't
12:21:02 5   always involved them on everything unless we feel
12:21:06 6   like they need to be involved.  I can't say what
12:21:08 7   they did or didn't do in that claim.
12:21:09 8   BY MR. GIVENS:
12:21:09 9        Q.  Well, Insurance 101, if you want to call
12:21:11 10  it that, if an insurance company needs information
12:21:14 11  to decide a claim, if a contractor doesn't respond,
12:21:19 12  isn't it incumbent upon the adjuster to reach out
12:21:22 13  to the insured whose claim it that's at risk and
12:21:25 14  ask for that information?
12:21:27 15       MR. ROBERTSON:  Objection.
12:21:28 16       THE WITNESS:  That's not what happened in
12:21:29 17  this claim.  We completed an investigation on this
12:21:31 18  claim.  There was a supplement asked for and some
12:21:34 19  more information asked for from the person who
12:21:37 20  requested the supplement.
12:21:38 21  BY MR. GIVENS:
12:21:38 22       Q.  Right.
12:21:38 23       A.  Unfortunately, we can't babysit every
12:21:43 24  single one of those.  When we ask for information,
12:21:45 25  it is then incumbent upon the contractor to -- to

Page 158

12:21:49  1  reply. He's acting, as we can tell, on behalf of
12:21:51  2  the insured's repairs. He's his contractor on
12:21:54  3  multiple claims.
12:21:54  4      Q.  Who's the insurance company's duty to?
12:21:57  5      A.  Its duty's to the insured, and we do a
12:22:00  6  thorough investigation.
12:22:01  7      Q.  But if you're lacking information that
12:22:03  8  you need to decide whatever the issue is, shouldn't
12:22:08  9  the company at least try once to get it from the
12:22:11 10  insured if it's important to have?
12:22:13 11          MR. ROBERTSON:  Objection to form.
12:22:15 12          THE WITNESS:  We weren't lacking
12:22:16 13  information.
12:22:18 14  BY MR. GIVENS:
12:22:18 15      Q.  Then what are you --
12:22:19 16      A.  We completed our investigation and
12:22:20 17  determination.  Someone told us we were wrong.  We
12:22:23 18  asked for support on that from the person who told
12:22:26 19  us we were wrong.
12:22:27 20      Q.  And that's what I'm referring to.  You're
12:22:30 21  telling me that you reached out for information
12:22:33 22  needed to clarify things, and it didn't come back,
12:22:36 23  and my question is just you're saying the adjuster
12:22:40 24  has not any duty to at least call or write the
12:22:44 25  insured --

Page 159

12:22:45  1          MR. ROBERTSON:  Object.
12:22:46  2  BY MR. GIVENS:
12:22:46  3      Q.  -- and ask for it?
12:22:46  4          MR. ROBERTSON:  Objection to form.
12:22:48  5          THE WITNESS:  I'm saying we completed an
12:22:50  6  investigation on a claim.  A year later somebody
12:22:52  7  provides a supplement.  We asked for clarification
12:22:55  8  and didn't get it.
12:22:57  9  BY MR. GIVENS:
12:22:57 10      Q.  And you're saying it's okay not to
12:23:00 11  involve the insured in that if that's what
12:23:02 12  happened?
12:23:02 13          MR. ROBERTSON:  Objection to form.
12:23:04 14          THE WITNESS:  I'm saying in this instance
12:23:05 15  we asked the person who provided the information
12:23:07 16  for some further information.
12:23:56 17  BY MR. GIVENS:
12:23:56 18      Q.  So your role was limited in this claim to
12:23:58 19  just reviewing the estimate and making a decision
12:24:00 20  on whether you thought the estimate was accurate,
12:24:02 21  including cause of the loss?
12:24:05 22          MR. ROBERTSON:  Objection to form.
12:24:07 23          THE WITNESS:  I would say my role was
12:24:09 24  similar to that.  I didn't make -- I made
12:24:12 25  determinations on coverage and discussed them with

Page 160

12:24:14  1  the owning adjuster, who in the end owns the claim,
12:24:17  2  which was Sayde Brooks.
12:24:18  3  BY MR. GIVENS:
12:24:18  4      Q.  Did you write either of the letters we
12:24:20  5  went over a few minutes ago?
12:24:22  6      A.  No, sir.
12:24:22  7      Q.  Did you review them or approve them?
12:24:24  8      A.  No, sir.
12:24:26  9      Q.  Should those letters have been worded
12:24:28 10  differently?
12:24:30 11          MR. ROBERTSON:  Objection to form.
12:24:30 12          THE WITNESS:  I would say potentially
12:24:32 13  yes, I think.
12:24:42 14  BY MR. GIVENS:
12:24:42 15      Q.  CSAA's process with its vendors like
12:24:46 16  U.S. Adjusting is that they get paid a percentage
12:24:49 17  of their estimates; is that right?
12:24:52 18          MR. ROBERTSON:  Objection to form.
12:24:53 19  BY MR. GIVENS:
12:24:53 20      Q.  Or a fee based on the amount of their
12:24:55 21  estimates?
12:24:56 22      A.  There is a different pay scale I believe
12:24:59 23  at the time that was for an everyday claim that,
12:25:01 24  yes, you would be given some for mileage if
12:25:05 25  necessary, and then it's a percentage of the

Page 161

12:25:06  1  estimate you wrote.
12:25:07  2      Q.  But if CSAA cuts the amount of their
12:25:09  3  estimate, they cut the amount of the payment to the
12:25:12  4  firm; right?
12:25:13  5          MR. ROBERTSON:  Objection, form.
12:25:15  6          THE WITNESS:  Correct.  And if we
12:25:16  7  increase it, we would increase the amount we pay.
12:25:19  8  BY MR. GIVENS:
12:25:19  9      Q.  So CSAA is realizing a savings by cutting
12:25:22 10  the estimate and by cutting the adjuster's fee?
12:25:27 11          MR. ROBERTSON:  Objection to form.
12:25:28 12          THE WITNESS:  No, sir.
12:25:28 13  BY MR. GIVENS:
12:25:28 14      Q.  How is that not correct?
12:25:29 15      A.  That's not what's considered at all.  The
12:25:32 16  adjuster's fees are the expense of doing business.
12:25:35 17  We understand that.  We just pay what's fair.
12:25:41 18      Q.  My question wasn't about anything being
12:25:42 19  considered.  It was if you pay out less to the
12:25:43 20  insured and you pay out less to the adjuster, those
12:25:45 21  are funds CSAA isn't paying; right?
12:25:49 22          MR. ROBERTSON:  Objection to form.
12:25:50 23          THE WITNESS:  I mean, I think we pay for
12:25:54 24  the product of work that we get.
12:26:10 25  BY MR. GIVENS:

Page 162

12:26:10  1    Q.  So is it your testimony that if snow and
12:26:11  2  ice or even just ice gets on a roof, and it takes a
12:26:15  3  roof that is watertight, it opens it up and leaks
12:26:18  4  inside of it, that that's not a covered loss?
12:26:21  5        MR. ROBERTSON: Objection to form.
12:26:22  6        THE WITNESS: That's not what happened
12:26:23  7  based on the evidence in this claim.  If this was a
12:26:25  8  brand-new roof and there was support that snow and
12:26:28  9  ice did that, then, yes, that would be covered.  If
12:26:31 10  it was a roof in better repair and it did that,
12:26:33 11  yes, but the determination I made was based on
12:26:37 12  photographs that showed potential previous repairs,
12:26:40 13  overall deterioration of the roof.  Again, nobody
12:26:44 14  was disputing the water getting in.  We paid for
12:26:47 15  that, or we estimated for that.
12:26:48 16  BY MR. GIVENS:
12:26:48 17    Q.  I thought you said earlier that you agree
12:26:50 18  that the ice damming did contribute to the water
12:26:53 19  getting in?
12:26:54 20    A.  The ice damming was the cause for the
12:26:56 21  water.  That's what ice damming does.
12:26:56 22    Q.  Okay.
12:26:56 23    A.  The weight of ice and snow, based on all
12:26:59 24  of the information, were not the cause of the
12:27:01 25  damage to the roof itself.

Page 163

12:27:03  1    Q.  Do you have any evidence that you've seen
12:27:04  2  this week or back then that this roof was leaking
12:27:08  3  before February 22nd of 2018?
12:27:10  4        MR. ROBERTSON: Objection. Objection to
12:27:12  5  form.
12:27:12  6        THE WITNESS:  I don't, but I don't know
12:27:13  7  why I would.
12:27:16  8  BY MR. GIVENS:
12:27:16  9    Q.  Well, if a roof is not leaking and then
12:27:19 10  an event happens and it starts leaking, isn't that
12:27:22 11  a factor that weighs towards that being a covered
12:27:25 12  event?
12:27:26 13        MR. ROBERTSON: Objection, form.
12:27:26 14        THE WITNESS:  It would be if there was a
12:27:28 15  lot of precipitation or moisture previous to this.
12:27:32 16  I don't recall exactly at the time the amount of
12:27:35 17  rainfall and water previous to this event.
12:27:38 18  BY MR. GIVENS:
12:27:38 19    Q.  And you didn't do anything to investigate
12:27:40 20  the amount of water that had happened between April
12:27:42 21  of '17 and February of '18, did you?
12:27:45 22    A.  Based on the photos of the interior, it
12:27:47 23  showed that the water came from the ice damming.
12:27:50 24    Q.  Okay.  My question is as part of your
12:27:51 25  work did you do anything to research the weather

Page 164

12:27:55  1  beyond just how much snow and ice may have been
12:27:58  2  there in February when this happened?
12:28:00  3    A.  No, I did not expand my scope outside of
12:28:03  4  the claim itself.
12:28:30  5    Q.  Did you have any involvement in putting
12:28:32  6  together CSAA's answers to our written questions or
12:28:35  7  document requests?
12:28:36  8    A.  No, sir.
12:29:00  9    Q.  Do you believe that it is more likely to
12:29:03 10  get an accurate evaluation seeing a property in
12:29:08 11  person than you can do over a computer looking at
12:29:11 12  photos?
12:29:12 13        MR. ROBERTSON: Objection to form.
12:29:14 14        THE WITNESS:  I don't believe that the
12:29:16 15  only way to get an accurate review is in person.
12:29:19 16  An accurate review and thorough review can be done
12:29:23 17  via photos, video, discussion.
12:29:28 18  BY MR. GIVENS:
12:29:28 19    Q.  And my question was --
12:29:29 20        MR. GIVENS:  Would you read it back,
12:29:30 21  please.
12:29:42 22        (Record read.)
12:29:43 23        THE WITNESS:  Overall I do not believe
12:29:45 24  that, no.
12:29:46 25  BY MR. GIVENS:

Page 165

12:29:46  1    Q.  How did you factor in the timing of the
12:29:54  2  leaks into your evaluation, if you did?
12:29:55  3    A.  Can you clarify what you're asking?
12:29:55  4    Q.  Well, when somebody's determining cause
12:29:57  5  of something, I would think the timing of the
12:29:59  6  fallout from it would be an important factor.
12:30:02  7    A.  Um-hmm.
12:30:02  8    Q.  Is that true?
12:30:03  9    A.  That is true.
12:30:04 10    Q.  How did you evaluate that factor in this
12:30:07 11  case?
12:30:07 12        MR. ROBERTSON: Objection to form.
12:30:08 13        THE WITNESS:  We determined that the
12:30:09 14  presence of ice and snow melting led to the water
12:30:12 15  entering the home.  So that wh- -- that was --
12:30:14 16  that's what was covered by the claim.
12:30:18 17  BY MR. GIVENS:
12:30:18 18    Q.  The term "collaborated estimate" was used
12:30:21 19  in the file.  Is that your discussion with Sayde
12:30:23 20  and Glenn?
12:30:24 21    A.  No.  Collaborated means I took the
12:30:26 22  estimate that Michael White wrote, I put the
12:30:29 23  estimate in my name, and I made changes to it.
12:30:32 24  It's a collaboration of multiple adjusters working
12:30:36 25  on one estimate physically.

Page 166

```
12:30:37  1    Q.  And so, in simple terms, he submitted a
12:30:40  2  written estimate through Xactimate.  You took that
12:30:44  3  exact estimate, put CSAA's name on it, put yourself
12:30:48  4  as the estimator, added something that you thought
12:30:50  5  was missing, got rid of all the damage to the roof,
12:30:53  6  and that is what resulted in the lower amount?
12:30:56  7       MR. ROBERTSON:  Objection.
12:30:57  8       THE WITNESS:  Yes, sir.
12:30:58  9       MR. ROBERTSON:  Go ahead.
12:30:58 10  BY MR. GIVENS:
12:30:58 11    Q.  And when that estimate is sent to Mr. and
12:31:03 12  Mrs. Godfrey, it would appear that that's CSAA's
12:31:05 13  estimate?
12:31:06 14    A.  It was CSAA's estimate, yes.
12:31:11 15    Q.  Who's your chain of command above you?
12:31:13 16    A.  Currently or at the time?
12:31:14 17    Q.  Currently, please.
12:31:15 18    A.  Currently I report to Zach Gordon.
12:31:18 19    Q.  What's his title?
12:31:19 20    A.  Homeowner claims executive.
12:31:21 21    Q.  Is he here in Las Vegas?
12:31:22 22    A.  No.  He's in Oklahoma City.
12:31:26 23    Q.  And who's above him?
12:31:28 24    A.  Above him would be Cal Hankins.
12:31:30 25    Q.  Is he there also?
```

Page 167

```
12:31:33  1    A.  He is in Oklahoma City as well.
12:31:33  2    Q.  And his title?
12:31:34  3    A.  Claims executive.
12:31:36  4    Q.  How many people do you have here at your
12:31:39  5  Las Vegas facility?
12:31:40  6    A.  Direct reports, I have six inside
12:31:42  7  supervisors who report to me.  I have one field
12:31:45  8  supervisor who reports to me.  I have --
12:31:47  9    Q.  I mean total.
12:31:48 10    A.  So I have 37 inside adjusters, so 43, 44,
12:31:51 11  and I've got seven field -- so overall my team in
12:31:54 12  Las Vegas itself I have 43 people that report to
12:31:58 13  me.  For field operations I have one supervisor and
12:32:00 14  seven field adjusters.
12:32:02 15    Q.  Sorry my question wasn't clear.  I'm just
12:32:04 16  asking how many CSAA people work in this facility.
12:32:08 17    A.  Work in the current facility?
12:32:10 18    Q.  In Las Vegas.
12:32:11 19    A.  Probably 250 to 300.
12:32:14 20    Q.  How many's in the Oklahoma City facility?
12:32:19 21    A.  I would say similar to that.
12:32:20 22    Q.  Who's your actual employer?
12:32:20 23    A.  My actual employer?  I report to CSAA
12:32:22 24  Insurance Group.  That's my employer.
12:32:24 25    Q.  And that's who issues your check, if you
```

Page 168

```
12:32:26  1  would get a check?
12:32:27  2    A.  Yes, sir.
12:32:30  3    Q.  Any other CSAA entities sharing that
12:32:34  4  building in Oklahoma City?
12:32:38  5    A.  There's policy services, which is part of
12:32:42  6  CSAA, but I'd say 80 percent of the build- --
12:32:43  7  85 percent of the building is claims operations.
12:32:46  8    Q.  Is policy services at AAA Oklahoma?
12:32:51  9    A.  No.  Policy services is also part of CSAA
12:32:51 10  Insurance Group, but they handle policyholder
12:32:56 11  questions, renewals, things like that.  Just kind
12:32:58 12  of a member service, "I have general questions.
12:32:59 13  When does my policy expire," things like that.
12:33:02 14    Q.  Do the adjusters also work for CSAA
12:33:06 15  Insurance Group --
12:33:07 16    A.  Yes.
12:33:07 17    Q.  -- to your knowledge?
12:33:08 18    A.  Yes, the adjusters do.
12:33:11 19    Q.  Did people get bonuses, as far as you
12:33:14 20  know, companywide bonuses for 2018?
12:33:16 21    A.  For 2018 there --
12:33:17 22       MR. ROBERTSON:  Objection.  Go ahead.
12:33:19 23       THE WITNESS:  There were bonuses given,
12:33:20 24  yes.
12:33:20 25  BY MR. GIVENS:
```

Page 169

```
12:33:20  1    Q.  Is that a percentage or is everybody's
12:33:23  2  amount different?
12:33:24  3    A.  Everyone's amount is different.  There's
12:33:25  4  a percentage based on position, and then there's
12:33:28  5  percentages based on company targets and goals.  So
12:33:31  6  we can get partial bonuses depending on certain
12:33:36  7  factors.
12:33:37  8    Q.  So the better the company does
12:33:40  9  financially the better bonuses people get?
12:33:46 10       MR. ROBERTSON:  Objection, form.
12:33:46 11       THE WITNESS:  I would say, I mean, yes,
12:33:47 12  as a business runs, but there's a lot more that
12:33:51 13  goes into it.
12:33:51 14  BY MR. GIVENS:
12:33:51 15    Q.  Well, I think you said earlier that it
12:33:53 16  depends on the company's year.
12:33:55 17    A.  Yeah, the performance.
12:33:55 18    Q.  Isn't that what you meant?
12:33:56 19    A.  Yes, performance of the company.
12:33:58 20    Q.  That's all I'm trying to verify.
12:34:11 21       Do you know if Sayde Brooks had any
12:34:13 22  insurance experience before coming to work at CSAA?
12:34:15 23    A.  I don't know.
12:34:20 24    Q.  Is it your testimony that wear and tear
12:34:22 25  results in the long cracks or lifts on the edges of
```

Page 170

```
12:34:27   1   the flat roof?
12:34:28   2        MR. ROBERTSON:  Objection to form.
12:34:29   3        THE WITNESS:  It's my testimony that wear
12:34:30   4   and tear to the roof -- that was the end result
12:34:33   5   from all the waving, cupping, standing water over
12:34:37   6   time is what caused that.
12:34:38   7   BY MR. GIVENS:
12:34:38   8        Q.  The pictures that show a uniform long
12:34:41   9   lift or crack, that's to you wear and tear?
12:34:43  10        A.  I would say I don't recall seeing long.
12:34:45  11   I saw several wavy type ones that matched waves
12:34:50  12   throughout the roof.
12:34:52  13        Q.  If there's just a long lift or crack, is
12:34:56  14   that indicative of something?
12:34:58  15        MR. ROBERTSON:  Objection to form.
12:34:59  16        THE WITNESS:  In the photos you showed me
12:35:00  17   there is some long lifts that were caused by wind
12:35:03  18   from the previous claim.
12:35:05  19   BY MR. GIVENS:
12:35:05  20        Q.  No, I'm talking about this loss.
12:35:07  21        A.  In this claim from the photos I recall
12:35:09  22   seeing, the lifts lined up with waves in the roof
12:35:13  23   that occurred throughout time.
12:35:18  24        Q.  So if there are lifts without the waves
12:35:20  25   near them, is that indicative of something
```

Page 171

```
12:35:23   1   different?
12:35:24   2        MR. ROBERTSON:  Objection, form.
12:35:26   3        THE WITNESS:  Based on the overall review
12:35:27   4   of the condition of the roof, it's supported that
12:35:31   5   the pull-away and lifts were caused by wear and
12:35:34   6   tear to the roof over time.
12:35:37   7   BY MR. GIVENS:
12:35:37   8        Q.  I'm not thinking you're answering my
12:35:38   9   question.  I'm just trying to get an idea of in
12:35:41  10   diagnosing roof problems, if there's not waves near
12:35:43  11   a lift on a flat roof, what does that mean --
12:35:48  12        MR. ROBERTSON:  Objection to form.
12:35:49  13   BY MR. GIVENS:
12:35:49  14        Q.  -- if it's just a lift?
12:35:51  15        A.  There don't have to be waves.  There were
12:35:52  16   other factors.  There was different colors,
12:35:55  17   different waves throughout the roof that could pull
12:35:57  18   away, not necessarily rolling up to it.  There was
12:36:02  19   just several that the wave carried the entire
12:36:04  20   length through the lifting.  Any of those pushing
12:36:06  21   down would pull pressure away from the edge of the
12:36:09  22   roof over time.
12:36:12  23        Q.  Is it true that if somebody, a roofing
12:36:15  24   contractor, used a sealant or glue to put a flat
12:36:18  25   roof down, that that's not a repair if it's done as
```

Page 172

```
12:36:21   1   part of the original installation?
12:36:25   2        MR. ROBERTSON:  Objection, form.
12:36:26   3        THE WITNESS:  Can you rephrase your
12:36:27   4   question.
12:36:28   5   BY MR. GIVENS:
12:36:28   6        Q.  I'm just trying to verify that if the
12:36:30   7   roof is installed with glue or sealant, even if
12:36:33   8   it's messy, that's not a repair; that's an
12:36:36   9   installation.
12:36:37  10        A.  It could potentially be.
12:36:38  11        Q.  Well, when would it not be if it's done
12:36:41  12   during the original installation?
12:36:43  13        A.  I mean, it could be done as part of a
12:36:45  14   repair.  It could be done as part of the
12:36:47  15   installation.  It's --
12:36:47  16        Q.  I'm saying it is done as part of the
12:36:50  17   installation.
12:36:51  18        A.  Okay.
12:36:51  19        Q.  So that would never be a repair, correct,
12:36:53  20   even if it's messy looking?
12:36:56  21        MR. ROBERTSON:  Objection to form.
12:36:57  22        THE WITNESS:  I mean, potentially.  This
12:36:58  23   didn't appear that way.
12:37:02  24   BY MR. GIVENS:
12:37:02  25        Q.  Do you not agree with my question?
```

Page 173

```
12:37:04   1        A.  I agree with your -- in reference to this
12:37:06   2   specific claim, no.  In general, yeah, you could
12:37:08   3   install a roof messily.
12:37:11   4        Q.  Okay.  What was Alana Hare's role on this
12:37:19   5   claim?
12:37:19   6        A.  I believe she was Sayde Brooks'
12:37:20   7   supervisor.
12:37:21   8        Q.  Does she review and approve all denial
12:37:24   9   letters for people under her?
12:37:26  10        MR. ROBERTSON:  Objection to form.
12:37:27  11        THE WITNESS:  All full denials I would
12:37:29  12   say yes.  Partial denials I can't answer if she
12:37:32  13   does or doesn't.  I know some people have authority
12:37:35  14   to do those.
12:37:43  15   BY MR. GIVENS:
12:37:43  16        Q.  Do you remember any conversations with
12:37:44  17   her about this claim?
12:37:47  18        A.  Again, as I mentioned earlier, she could
12:37:49  19   have been involved in the conversations.  I don't
12:37:51  20   remember going directly to her with it.  I mean,
12:37:57  21   she could have been involved.  Like I said, if I
12:37:59  22   had a discussion with Sayde, there's potential she
12:38:03  23   was there.
12:38:04  24        Q.  If this flat roof was on there for
12:38:06  25   20 years, or approximately that long, and then a
```

Page 174

```
12:38:09  1  storm happened and caused some damage to it, why
12:38:17  2  would CSAA pay for that and then deny this one?
12:38:24  3       MR. ROBERTSON: Objection to form.
12:38:26  4       THE WITNESS: The --
12:38:27  5  BY MR. GIVENS:
12:38:27  6    Q. Half the age, I guess, is why I'm asking.
12:38:30  7       MR. ROBERTSON: Objection to form.
12:38:30  8       THE WITNESS: Because it -- for a policy
12:38:31  9  to cover it, it would have to be a covered peril,
12:38:35 10  not an excluded peril. So wind, hail, those are
12:38:39 11  covered perils regardless of the age of that
12:38:42 12  roof.
12:38:43 13  BY MR. GIVENS:
12:38:43 14    Q. Well, if the roof is 20 years old and it
12:38:45 15  lifts up because of wind and they replace the roof
12:38:49 16  instead of repairing it, do you see what I'm
12:38:52 17  saying?
12:38:53 18    A. Um-hmm.
12:38:53 19       MR. ROBERTSON: Object.
12:38:54 20  BY MR. GIVENS:
12:38:54 21    Q. Does CSAA have a policy about that type
12:38:57 22  of situation?
12:38:58 23       MR. ROBERTSON: Objection, form.
12:39:00 24       THE WITNESS: Do we have guidance for
12:39:01 25  repair versus replace?
```

Page 175

```
12:39:03  1  BY MR. GIVENS:
12:39:03  2    Q. Right. If it's an old roof --
12:39:05  3    A. Sure. I mean, depending on the roof, if
12:39:05  4  it's repairable, which oftentimes you would have
12:39:09  5  to -- there's things that could be done. There's a
12:39:12  6  formula called DURA that can tell you if something
12:39:13  7  can be repaired, there's brittle tests that can be
12:39:15  8  done to show if a shingle can be repaired, and
12:39:19  9  obviously there's common sense that can tell you if
12:39:21 10  something can be repaired versus replaced.
12:39:32 11    Q. Can you tell how recent a lift on a flat
12:39:36 12  roof is by looking at the area that had lifted?
12:39:39 13    A. There are ways to. You can look at the
12:39:41 14  amount of debris build-up underneath it. You could
12:39:44 15  look at how worn out the seals are, if they're
12:39:48 16  torn. There's -- there's potential ways to do it,
12:39:51 17  yes.
12:39:51 18    Q. Was there any debris under these lift
12:39:53 19  areas?
12:39:53 20    A. From the photos I saw I didn't see any;
12:39:56 21  however, they could have also been washed away from
12:39:59 22  the water from the ice damming, which we agree
12:40:02 23  happened, and damaged the interior of the home.
12:40:02 24    Q. The debris factor, you'd get debris over
12:40:07 25  time if it was like that for a while. Is that
```

Page 176

```
12:40:09  1  generally correct?
12:40:10  2    A. You could. You know, the edges could
12:40:11  3  look different just depending on if they were
12:40:13  4  sealed down or up, exposed to more elements.
12:40:24  5       MR. GIVENS: Are you going to have any
12:40:25  6  questions?
12:40:26  7       MR. ROBERTSON: I -- no, not right now.
12:40:29  8       MR. GIVENS: Okay.
12:40:31  9  BY MR. GIVENS:
12:40:31 10    Q. Did you have any meetings or telephone
12:40:34 11  conferences with anybody within CSAA to get ready
12:40:36 12  for your deposition?
12:40:42 13    A. No, not to prepare for the deposition.
12:40:44 14    Q. Have you ever talked to Sayde Brooks
12:40:46 15  about the claim in reference to your deposition?
12:40:48 16    A. I believe I made an offhanded comment and
12:40:52 17  said, "I'm getting deposed on the claim that we
12:40:52 18  worked on together" when we were discussing another
12:40:54 19  matter, but no discussion of the actual claim or
12:40:56 20  anything.
12:40:56 21    Q. Okay. How would you -- well, strike
12:40:58 22  that.
12:40:59 23       Do you rate adjusters' performance on
12:41:02 24  claims as part of your job as a manager?
12:41:05 25    A. I mean, factors of claims, quality of
```

Page 177

```
12:41:07  1  files. Again, they're not solely rated just on
12:41:10  2  claims.
12:41:12  3    Q. No, I mean is part of your job to talk to
12:41:16  4  adjusters and grade them for personnel file
12:41:18  5  purposes on how they do on claims?
12:41:20  6    A. Part of my job is to review the findings
12:41:22  7  of the supervisors who audit files.
12:41:26  8    Q. Okay. So you're above the people that
12:41:28  9  actually do the evaluations?
12:41:29 10    A. Yes, sir, and there's --
12:41:29 11    Q. Did you do those evaluations yourself at
12:41:34 12  some point?
12:41:35 13    A. Yes, I have.
12:41:36 14    Q. Okay. So how would you grade the
12:41:37 15  handling of this claim?
12:41:40 16       MR. ROBERTSON: Objection to form.
12:41:40 17       THE WITNESS: I feel like Sayde's
12:41:42 18  documentation was good. I feel like the decision
12:41:44 19  was supported. I feel like she as an adjuster
12:41:48 20  trusted the support around her to help make her
12:41:51 21  decision. I think I probably would have coached
12:41:54 22  how those letters read. Some of those things
12:41:58 23  pre-fill. Sometimes you have to make a change. I
12:42:01 24  would have coached that. Not saying that would
12:42:03 25  have made the file bad or a failing-type file but
```

Page 178

```
12:42:07  1  an opportunity to do maybe better in some of the
12:42:11  2  wording. I think overall she replied timely. The
12:42:15  3  investigation was timely. Things were considered.
12:42:18  4  I mean, I would pass the file, if I was auditing
12:42:21  5  it, with some coaching opportunities. I think when
12:42:24  6  she got the supplement she responded timely and
12:42:27  7  responded with what I would have responded with.
12:42:31  8  We've reviewed these photos. You're referencing
12:42:34  9  another claim.
12:42:35 10  BY MR. GIVENS:
12:42:35 11     Q.  When Mr. Godfrey objected to the denial,
12:42:40 12  should CSAA have sent somebody out at that point?
12:42:43 13  Would that be something in hindsight you would do?
12:42:45 14         MR. ROBERTSON: Objection to form. Go
12:42:46 15  ahead.
12:42:46 16         THE WITNESS: If there's an objection
12:42:46 17  with support, we would. Just saying he thinks
12:42:48 18  we're wrong based on our investigation isn't --
12:42:51 19  isn't suffice to that.
12:42:54 20  BY MR. GIVENS:
12:42:54 21     Q.  Well, part of his basis that he
12:42:55 22  communicated was what the independent adjuster told
12:42:58 23  him in his living room.
12:42:59 24     A.  The independent adjuster does not have
12:43:01 25  the authority to discuss coverage. He doesn't see
```

Page 179

```
12:43:03  1  the policy. That's not what he's asked to do.
12:43:08  2     Q.  Well, he's asked to determine cause.
12:43:10  3  That's part of what he's --
12:43:11  4     A.  He is asked --
12:43:11  5     Q.  -- there for; right?
12:43:13  6         MR. ROBERTSON: Objection to form. Go
12:43:14  7  ahead.
12:43:14  8         THE WITNESS: He is asked to give us a
12:43:15  9  causal statement in his opinion, yes.
12:43:17 10  BY MR. GIVENS:
12:43:17 11     Q.  And those guidelines we went through tell
12:43:19 12  him how to do that in part, how to accurately
12:43:23 13  handle these situations?
12:43:24 14     A.  I wouldn't say accurately, because he was
12:43:27 15  inaccurate in this.
12:43:28 16     Q.  And not -- the guidelines, I don't want
12:43:30 17  to misspeak, they don't say, "Here's how you tell
12:43:34 18  if it's wind damage versus ice and snow," but it
12:43:37 19  says you have to go out there, properly photograph,
12:43:41 20  document, look at things a certain way, you know,
12:43:44 21  so everything you do out there needs to be proper;
12:43:46 22  right?
12:43:47 23         MR. ROBERTSON: Objection to form.
12:43:48 24         THE WITNESS: I would say that's what the
12:43:49 25  guidelines say, yes.
```

Page 180

```
12:43:50  1  BY MR. GIVENS:
12:43:50  2     Q.  And the whole purpose for him being there
12:43:53  3  is to figure out how much damage has happened and
12:43:56  4  what caused that damage?
12:43:57  5         MR. ROBERTSON: Objection to form.
12:43:58  6         THE WITNESS: I would say to determine
12:44:00  7  cause of loss but not coverage. It's never within
12:44:02  8  his scope to determine the coverage.
12:44:06  9  BY MR. GIVENS:
12:44:06 10     Q.  But with that understanding and what he
12:44:09 11  told Mr. Godfrey, in hindsight don't you think they
12:44:14 12  should have gone out before the roofs were replaced
12:44:16 13  to get to the bottom of why Mr. White thought one
12:44:19 14  thing and you guys thought another?
12:44:21 15         MR. ROBERTSON: Objection to form.
12:44:22 16         THE WITNESS: I would say if support was
12:44:23 17  provided outside of Mr. Godfrey or his roofer
12:44:27 18  saying "You're wrong," then we would have done
12:44:29 19  that.
12:44:29 20  BY MR. GIVENS:
12:44:29 21     Q.  Okay. How does a policyholder like
12:44:31 22  Mr. Godfrey provide support? What are you talking
12:44:34 23  about?
12:44:35 24     A.  We explained what we found. So something
12:44:37 25  to dispute that from his chosen contractor or
```

Page 181

```
12:44:40  1  roofer would have -- photos that showed we were --
12:44:44  2  our photos weren't showing everything specific to
12:44:48  3  that claim, photos that said, "This is from ice.
12:44:52  4  Here's the support for that." Not "This could be
12:44:55  5  wind. This could be ice" a year later. Those --
12:45:03  6  something that supported their position outside of
12:45:05  7  them just stating "You are wrong."
12:45:07  8     Q.  So Mr. Godfrey's point that it hadn't
12:45:09  9  been leaking until that storm and the person you
12:45:13 10  sent out there finding it was wind and snow -- I'm
12:45:18 11  sorry. Strike that.
12:45:20 12         So Mr. Godfrey's evidence that no leaks
12:45:24 13  were happening until that storm and the opinions of
12:45:28 14  the person that you sent out there as an adjuster
12:45:30 15  to determine the cause saying that it was snow and
12:45:38 16  ice, your testimony is that's not enough for a
12:45:41 17  reinspection?
12:45:42 18         MR. ROBERTSON: Objection, form.
12:45:43 19         THE WITNESS: My testimony is we agreed
12:45:45 20  that the snow and ice caused the water to enter the
12:45:46 21  home. We disagreed that the weight of that snow
12:45:48 22  and ice was the cause for the pulling away of the
12:45:52 23  roof and the damage to the roof.
12:45:54 24  BY MR. GIVENS:
12:45:54 25     Q.  So the answer to my question is it's not
```

Page 182

| | | |
|---|---|---|
| 12:45:55 | 1 | enough for a reinspection? |
| 12:45:57 | 2 | A. Him saying we are incorrect, no. |
| 12:45:59 | 3 | Q. Him saying there were no leaks until this |
| 12:46:02 | 4 | event and the guy you sent out there has concluded |
| 12:46:05 | 5 | it is storm related, those two things together is |
| 12:46:08 | 6 | not enough. I'm just asking for a yes or no on |
| 12:46:11 | 7 | whether that's correct. |
| 12:46:13 | 8 | MR. ROBERTSON: Objection to form. |
| 12:46:15 | 9 | THE WITNESS: Based on the lack of |
| 12:46:16 | 10 | thoroughness of his inspection, no, that was not |
| 12:46:20 | 11 | enough in this claim. |
| 12:46:29 | 12 | MR. GIVENS: I don't have any other |
| 12:46:29 | 13 | questions. |
| 12:46:33 | 14 | MR. ROBERTSON: We'll read and sign. |
| 12:46:35 | 15 | MR. GIVENS: Thanks for your time. |
| 12:46:37 | 16 | THE VIDEOGRAPHER: We are off the record, |
| 12:46:38 | 17 | 12:46 p.m. |
| 12:46:40 | 18 | THE REPORTER: Mr. Robertson, you said |
| 12:46:40 | 19 | you do want to order a copy of the transcript? |
| 12:46:46 | 20 | MR. ROBERTSON: A copy, yes. |
| 12:46:53 | 21 | THE REPORTER: Hard copy, electronic, |
| 12:46:53 | 22 | both? |
| 12:46:53 | 23 | MR. ROBERTSON: Yeah, that would be |
| 12:46:53 | 24 | great, both. |
| 12:46:53 | 25 | THE REPORTER: Thank you. |

Page 183

1  (The proceedings were concluded
2  at 12:46 p.m.)
3        *   *   *   *   *
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 184

1        DEPOSITION ERRATA SHEET
2
3
4  Our Assignment No. J4714351
5  Case Caption: Godfrey vs. CSAA
6
7        DECLARATION UNDER PENALTY OF PERJURY
8    I declare under penalty of perjury that I have
9  read the entire transcript of my deposition taken
10  in the captioned matter or the same has been read
11  to me, and the same is true and accurate, save and
12  except for changes and/or corrections, if any, as
13  indicated by me on the Deposition Errata Sheet
14  hereof, with the understanding that I offer these
15  changes as if still under oath.
16    Signed on the_____ day of _____,
17  20___.
18
19
20    _____
21    MARK S. COSTELLO
22
23
24
25

Page 185

1        DEPOSITION ERRATA SHEET
2  Page No._____ Line No._____ Change to: _____
3  _____
4  Reason for change:_____
5  Page No._____ Line No._____ Change to: _____
6  _____
7  Reason for change:_____
8  Page No._____ Line No._____ Change to: _____
9  _____
10  Reason for change:_____
11  Page No._____ Line No._____ Change to: _____
12  _____
13  Reason for change:_____
14  Page No._____ Line No._____ Change to: _____
15  _____
16  Reason for change:_____
17  Page No._____ Line No._____ Change to: _____
18  _____
19  Reason for change:_____
20  Page No._____ Line No._____ Change to: _____
21  _____
22  Reason for change:_____
23
24  SIGNATURE:_____DATE:_____
25    MARK S. COSTELLO

Page 186

1          DEPOSITION ERRATA SHEET

2   Page No._____Line No._____Change to: _____

3   _____

4   Reason for change:_____

5   Page No._____Line No._____Change to: _____

6   _____

7   Reason for change:_____

8   Page No._____Line No._____Change to: _____

9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to: _____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to: _____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to: _____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to: _____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25      MARK S. COSTELLO

Page 187

1        CERTIFICATE OF REPORTER

2   STATE OF NEVADA   )
                   ) ss:

3   COUNTY OF CLARK )

4      I, Allyson W. Harris, a Certified Court Reporter licensed by the State of Nevada, do hereby

5   certify:  That I reported the deposition of MARK S. COSTELLO, commencing on Friday, December 13, 2019.

6

7      That prior to being deposed, the witness, if any, was by me duly sworn to testify to the

8   truth.  That I thereafter transcribed my stenographic notes into typewritten form, and that the typewritten transcript is a complete, true and

9   accurate transcription of said stenographic notes. That review of the transcript was requested.

10

11      I further certify that I am not a relative, employee or independent contractor of

12   counsel of or of any of the parties involved in the proceeding, nor a person financially interested in

13   the proceeding, nor do I have any other relationship that may reasonably cause my impartiality to be questioned.

14

15      IN WITNESS WHEREOF, I have set my hand in my office in the County of Clark, State of Nevada,

16   this 9th day of January, 2020.

17

18

19      Allyson W. Harris, CCR No. 740

20

21

22

23

24

25