# Exhibit 1

ALLEN LIPPOLDT
GODFREY vs CSAA

December 30, 2019
1–4

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT
 2         FOR THE WESTERN DISTRICT OF OKLAHOMA
 3  RUSS GODFREY, and NATALIE
    GODFREY,                        )
 4                                  )
           Plaintiffs,             )
 5                                  )
    -vs-                           )  No. 5:19-CV-329G
 6                                  )
    CSAA FIRE & CASUALTY           )
 7  INSURANCE,                     )
                                    )
 8       Defendant.                )
 9
10
11
                   VIDEOTAPED DEPOSITION OF
12
13                     ALLEN LIPPOLDT
14
        TAKEN ON BEHALF OF THE DEFENDANT
15
16          IN OKLAHOMA CITY, OKLAHOMA
17
               On DECEMBER 30, 2019
18
19                    9:00 a.m.
20
21      REPORTED BY:  KASEY D. EGELSTON, CSR
22
23
24
25
```

**Page 2**

```
 1           A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3       KEITH F. GIVENS
         Attorney at Law
 4       MANSELL, ENGEL & COLE
         204 North Robinson Avenue, 21st Floor
 5       Oklahoma City, Oklahoma 73102-7001
         kgivens@meclaw.net
 6
    FOR THE DEFENDANT:
 7
         BRUCE ROBERTSON
 8       Attorney at Law
         RYAN, WHALEY
 9       400 North Walnut
         Oklahoma City, Oklahoma 73104
10       brobertson@ryanwhaley.com
11  ALSO PRESENT:
12       Bruce Rodgers, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                 C O N T E N T S
 2                                           PAGE
 3  Stipulations. . . . . . . . . . . . . . . .   4
 4  Direct Examination by Mr. Robertson . . . . .  5
 5  Cross Examination by Mr. Givens . . . . . . .  75
 6  Redirect Examination by Mr. Robertson . . . .  88
 7  Jurat . . . . . . . . . . . . . . . . . . . .  90
 8  Correction Sheet. . . . . . . . . . . . . . .  91
 9  Reporter's Certificate. . . . . . . . . . . .  92
10
11          DEFENDANT'S INDEX OF EXHIBITS
12  Exhibit Number 1 Notice of Deposition. . . . . .  7
13  Exhibit Number 2 Letter to Mark Engel. . . . . . 32
14  Exhibit Number 3 Insurance Claim . . . . . . . . 50
15  Exhibit Number 4 Ultimate Roofing Damage Report. 52
16  Exhibit Number 5 Supplemental Report . . . . . . 52
17  Exhibit Number 6 Ultimate Roofing Damage Report. 52
18  Exhibit Number 7 Photos of the Damage. . . . . . 63
19
20
21
22
23
24
25
```

**Page 4**

```
 1              S T I P U L A T I O N S
 2
 3       It is hereby stipulated and agreed by and
 4  between the parties hereto, through their respective
 5  attorneys, that the videotaped deposition of ALLEN
 6  LIPPOLDT may be taken on behalf of the Defendant on
 7  December 30, 2019, in Oklahoma City, Oklahoma, by
 8  Kasey D. Egelston, Certified Shorthand Reporter
 9  within and for the State of Oklahoma, pursuant to
10  the Federal Rules of Civil Agreement.
11
12                  **********
13
14
15
16
17
18
19
20
21
22
23
24
25
```



ALLEN LIPPOLDT
GODFREY vs CSAA

December 30, 2019
13–16

Page 13

1  with these contractors?
2      A   I don't get satisfaction out of long,
3  drawn-out processes.
4      Q   Explain that for me, if you would.
5      A   Just personally, I like to set expectations
6  and follow through with the expectations with
7  customers.  And there's too many moving parts, too
8  many uncontrollable variables for me to really enjoy
9  working with so many different people on a single
10  job, so.
11      Q   So you like to handle it yourself and get
12  it done?
13      A   Yeah.  If I talk with a customer, I want
14  what I said to happen.
15      Q   Okay.
16      A   There's too many moving parts.  Too many
17  things that are out of my control.  I'm not -- I'm
18  not, like, a controlling person, I just like to
19  stand by my word and have satisfaction at the end of
20  every day.
21      Q   Is Hunan, is that H-u-n-a-n?
22      A   I can look it up.
23      Q   Oh, that's all right.
24      A   I believe it's H-u-a-n (sic) --
25      Q   Okay.  Who did you work with at Hunan?  Who

Page 14

1  is your main person of contact?
2      A   Juan.  It's been a couple of months.  I can
3  look him up if you would like?
4      Q   Sure.  Do you remember the name of the
5  person that you -- while you're doing that, that you
6  consulted with or who your main contact was with GD?
7      A   It was Jim Brady.
8      Q   Grady?
9      A   Brady.
10      Q   Brady?
11      A   Yes.
12      Q   Who were your main people of contact at
13  Ultimate Roofing?
14      A   Bobby Smith, Dusty Smith, Brandon Crow.
15  I'm trying to find an invoice.
16      Q   That's all right.  Don't worry about it.
17  So did anything in particular happen that caused you
18  to decide to get out of the business of consulting
19  with general contractors?
20      A   My handyman business was going really well.
21      Q   Okay.
22      A   And I started to feel like any other
23  consulting -- anything outside of that was not worth
24  it any more.  Just distracting and made it to where
25  I couldn't manage my schedule.

Page 15

1      Q   Okay.  Prior to June of 2019, when you
2  opened your handyman business at Doolippoldt
3  Construction, how were you employed?
4      A   I was consulting full time for Ultimate
5  Roofing Construction up until, I think, February of
6  2019.  Then with Yellow Footprints Construction --
7  and I did not mention them earlier.
8      Q   Who is that?  Yellow Foot?
9      A   Yellow Footprints Construction.
10      Q   Where does that name come from?  Is it like
11  a last name?
12      A   They're military guys.
13      Q   I'm sorry?
14      A   Yellow Footprints?
15      Q   Uh-huh.
16      A   They're all military guys.
17      Q   Okay.  So that was another company you
18  were --
19      A   Consulting with.
20      Q   Uh-huh.  Who was your contact?
21      A   Dusty Smith, who was also at Ultimate
22  Roofing Construction.  And Brandon Crow.  They both
23  left Ultimate Roofing Construction and started
24  Yellow Footprints.
25      Q   How long did you consult with Ultimate?

Page 16

1  You said you ceased in 2 of 2019?
2      A   I think --
3      Q   When did you begin with them?  How about
4  that.
5      A   That's what I'm trying to figure out.  I
6  want to say April 2017.
7      Q   So about April of 2017 until February of
8  2019 you worked consulting?
9      A   Consulting.
10      Q   Were you ever an employee of Ultimate?
11      A   No.
12      Q   Did you have a contract with them?
13      A   No.
14      Q   Just a verbal agreement?
15      A   Yeah.  I got base -- a base pay.
16      Q   Okay.
17      A   And then actual money for any work I
18  actually did.
19      Q   What was your base pay with Ultimate?
20      A   I think it was $1,300 every -- $2,600 a
21  month.
22      Q   Okay.  And then you would receive a
23  percentage of the work that you did?
24      A   Yeah.  Based off of estimating.
25      Q   Was it a percentage?

Page 29

1    Q   Okay.  So what precipitated or what
2   resulted in you and Brandon and Dusty deciding to
3   leave in February of 2019?
4    A   They said they were out of money and they
5   wouldn't even be able to pay us what they owed.
6    Q   Do they owe you money now?
7    A   Yeah.
8    Q   How much do they owe you now?
9    A   A couple of thousand.
10   Q   What's Bobby Smith doing now?
11   A   Huh?
12   Q   What's Bobby Smith doing now?
13   A   I have no idea.
14   Q   In February of 2019, the last time you
15  spoke to him?
16   A   No.  I talked to him once.
17   Q   Trying to get paid?
18   A   No.  When there's no money, there's no
19  money.
20   Q   Right.
21   A   I don't expect to ever receive that.  There
22  was a customer that I had referred to them that I
23  did not want to get -- leave them in their hands and
24  I requested that I could get that customer taken
25  care of in a different way.  And I didn't want --

Page 30

1   since they had the contract, I didn't want to not
2   talk to the owner of the company that had a contract
3   with the customer before seeing if I could get them
4   taken care of.
5    Q   Okay.  So --
6    A   And that was the last time.
7    Q   Were you getting reports that your customer
8   wasn't getting taken care of?
9    A   They had made deposits to the company and
10  no work had been performed.
11   Q   I did a little bit of research on Ultimate.
12  Have you seen quite a few complaints of that nature?
13   A   I know there's a lot of complaints.
14   Q   About taking money and not paying (sic)?
15   A   Yeah.
16   Q   And not doing the work; right?
17   A   They haven't.
18   Q   With Ultimate; right?
19   A   Yeah.
20   Q   Is that one of the reasons you decided to
21  go on and do your own business?
22   A   Yeah.  Because that's --
23   Q   Because you couldn't trust Ultimate, could
24  you?
25   A   Yeah, at the end.

Page 31

1    Q   At the end?  Is that what you said?
2    A   Yeah.  They had good intentions.  I think
3   they mismanaged money.  But like I said earlier, if
4   I talk to somebody, I follow through.  And this
5   customer was a referral that I -- my last
6   communications with Bobby Smith were to reach out to
7   this customer.
8    Q   Did you get the customer back?
9    A   Yeah.  I personally did the work for them.
10   Q   Does your wife refer you quite a bit of
11  work through her real estate business?
12   A   Some.  You know, since I've known her for
13  -- been married to her for nine years, lived with
14  her for 10-plus, I can't help that I know 100
15  realtors and they all call me.
16   Q   My wife is a realtor and I understand how
17  that -- you know, obviously repairs being made to
18  homes that are being sold or that kind of thing.
19   A   He's going through it too. (Indicating.)
20   Q   Do what?
21   A   He's going through inspections and his
22  repairs and TRRs. (Indicating.)
23   Q   Have you met Mr. Givens before today?
24   A   No.
25      MR. GIVENS:  He's just referring to

Page 32

1   small talk --
2      MR. ROBERTSON:  That's what I figured.
3      MR. GIVENS:  -- before the depo
4   started.
5    Q   (By Mr. Robertson)  Do you recall
6   personally doing any work at the Godfrey home?
7    A   I was at the house, but I never did any
8   work.
9    Q   Okay.
10   A   Any repairs.
11   Q   I'll hand you what I marked as Defendant's
12  Exhibit 2.  Take a look at that for me, if you
13  would.  When you're ready, let me know.
14      (Defendant's Exhibit Number 2 was
15      marked for identification purposes and
16      made a part of the record.)
17      THE WITNESS: This looks like --
18  familiar.
19   Q   (By Mr. Robertson)  It looks what?
20   A   It looks kind of familiar.
21   Q   I'm sorry, it looks what?
22   A   Familiar.
23   Q   Oh, yeah.  Well, if you'll look on the
24  second page, it says Allen Lippoldt.
25   A   It says Allen on the first page too, and

